## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**JUSTIN MATTHEW WHITE,**
    *Petitioner*,

**v.**

**Case No. 2:21-cv-1700-CLM**

**TERRY RAYBON,**
Warden of William C. Holman
Correctional Facility,[1]
    *Respondent.*

## MEMORANDUM OPINION

Justin Matthew White strangled 17-year-old Jasmine Parker with her own clothes as he raped then murdered her. White committed a similar murder four months later. White is now incarcerated at Holman Correctional Facility under a judgment of conviction and sentence of death imposed by the Circuit Court of Jefferson County, Alabama. White challenges his conviction and sentence under 28 U.S.C. § 2254. (Doc. 56). For the reasons below, the court **WILL DENY** White's § 2254 petition for a writ of habeas corpus (doc. 56).

## I.

## FACTS OF THE CRIME

White was convicted of two counts of capital murder for killing Parker during the commission of a burglary and rape in violation of Ala. Code § 13A-5-40(a)(3) and (4). The Alabama Court of Criminal Appeals ("ACCA") described the facts of the crime in its opinion on White's direct appeal:

> On the morning of July 11, 2006, Parker went to work with her mother, Vanessa Parker, at Sharp Cleaners in Vestavia. Parker was not employed at the cleaners; however, she helped Vanessa

---

[1] "[T]he proper respondent [in a habeas action] is the warden of the facility where the prisoner is being held." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004). So the court **DIRECTS** the Clerk of Court to substitute Terry Raybon, Warden of Holman Correctional Facility, for John Q. Hamm, Commissioner of the Alabama Department of Corrections, as the proper respondent to this action.

on occasion. Around 3:00 p.m., Sylvia Williams, Vanessa's coworker, drove Parker home. After Parker got home, she called Vanessa and asked if she could go to a Captain D's restaurant with Greg Jelks. Vanessa gave Parker permission to go.

Vanessa left work around 6:00 p.m. and went to a funeral home because a friend had passed away. After leaving the funeral home, Vanessa drove to her apartment. She arrived at the apartment between 7:00 p.m. and 7:30 p.m. As she entered the apartment, she called out to Parker but received no response. At that point, Vanessa noticed that the apartment was in disarray. The cushions on the couch were misplaced, the telephone had been knocked from its base, and a coffee table had been knocked over.

Vanessa then began to walk through the apartment and found Parker's body in a small hall area. Parker was nude from the waist down and her shirt was pulled up, exposing her breasts. Parker's blue jeans had been tied in a knot around her neck and used to strangle her to death. Upon finding Parker's body, Vanessa telephoned emergency 911.

In response to Vanessa's call to 911, law-enforcement officers were dispatched to the apartment. Steve Owens, an officer with the forensic unit of the Birmingham police department, was called to the scene to collect evidence and diagram the scene. While at the scene, Owens took a number of photographs and collected, among other things: 1) a plastic fingernail that had been found next to Parker's body; 2) a cigar tip that had been found on a table; and 3) a cigarette butt. Parker's cellular telephone was never found.

Dr. Gregory G. Davis, with the Jefferson County Coroner's Office, performed an autopsy on Parker. According to Dr. Davis, when he began the examination, Parker's blue jeans were tied around her neck so tightly he could not get his finger between the blue jeans and her neck. Dr. Davis explained that Parker

had abrasions on her neck from the blue jeans. She also had a nonlethal, five-inch cut on her neck. Dr. Davis testified that Parker had petechiae—ruptured blood vessels due to pressure—under her eyelids. According to Dr. Davis, "petechiae [are] something that you … expect to see in someone who has been strangled." (R. 313.) Dr. Davis concluded Parker had died as a result of asphyxia due to strangulation.

During the autopsy, Dr. Davis swabbed Parker's mouth, vagina, and anus to look for signs of sexual assault. He also swabbed a stain on her leg. Initially, Dr. Davis did not detect any semen on the swabs. However, after examining the swabs a second time, Dr. Davis detected semen on the swab from Parker's vagina and on the swab from her leg.

The investigation into Parker's murder languished until Detective Christopher Anderson, the lead detective, realized in August 2008 that none of the evidence collected from the crime scene or from Parker's body had been sent to the Alabama Department of Forensic Sciences (hereinafter "DFS") for testing. The evidence collected from the crime scene and from Parker's body was then sent to DFS. Nathan Rhea, a forensic scientist at DFS, tested numerous items related to Parker's murder. According to Rhea, he obtained a DNA profile for saliva located on the cigar tip collected from the apartment and from the semen collected from Parker's leg and vagina. Rhea then entered those profiles into a State database and determined that the profiles matched White's profile.

*White v. State*, 179 So. 3d 170, 181–82 (Ala. Crim. App. 2013).

White's DNA profile was in the State database because he had previously been convicted of the rape and murder of UAB student Sierra Black. So the State sought under *Alabama Rule of Evidence* 404(b) to introduce evidence of Black's rape/murder at the trial on the rape/murder of Parker:

White objected on several occasions to the introduction of evidence relating to his guilt in Black's rape/murder. White

argued that the two rape/murders were not so similar as to constitute signature crimes. He also argued that the introduction of evidence relating to the Black murder was unduly prejudicial. The circuit court overruled White's objection but agreed, on White's request, to give a limiting instruction.

After giving the jury a limiting instruction relating to the 404(b) evidence, the State presented evidence establishing that White's DNA was in the State database because he had been convicted of capital murder for raping and killing Black. The State also presented considerable evidence establishing that White had raped and murdered Black in a manner similar to the rape and murder of Parker. The State presented evidence establishing that White murdered Black, who like Parker was a young African–American woman, by strangling her to death with a piece of her clothing while raping her. The State established that Black and Parker had similar body types and that both women were strangled with soft ligatures (their clothes), a manner of strangulation that is extremely rare. The State presented evidence indicating that items belonging to both women were kept by the murderer. Further, the State established that White had murdered Black slightly under four months after Parker was murdered.

To establish that White raped and murdered Black, the State presented White's confession. The State also presented testimony from the following witnesses who were involved in the investigation into Black's rape/murder: 1) the evidence technician who collected evidence relating to Black's murder; 2) the pathologist who performed the autopsy on Black's body; 3) the scientist with DFS who linked forensic evidence collected from Black's body to White; and 4) the detective who interviewed White regarding the Black rape/murder. The State presented extensive evidence regarding the details of Black's injuries. It also admitted numerous photographs of Black's body and the crime scene.

> During its final jury instructions in the guilt phase, the circuit court again instructed the jury regarding its consideration of evidence of the Black rape/murder. Specifically, the circuit court instructed the jury that it could consider White's involvement in the Black rape/murder as evidence only of his identity as the perpetrator in the Parker rape/murder. After being instructed by the circuit court, the jury found White guilty of both counts of capital murder charged in the indictment.

*Id.* at 182–83 (footnote omitted).

## II.

## STATE COURT PROCEEDINGS

1. *Conviction + Direct Appeals*: In May 2009, a grand jury indicted White for two counts of capital murder for homicide during the commission of a burglary and rape in violation of Ala. Code § 13A-5-40(a)(3) and (4). White's trial for Parker's murder began on December 7, 2009. On December 10, the jury convicted White on both counts of capital murder. (Doc. 10-9, p. 20). The penalty phase of trial began that afternoon. A day later, the jury voted 9-3 that White be sentenced to life without parole. (*Id.*, p. 21).

At the time, Alabama's capital punishment sentencing scheme allowed for judicial override of a jury's recommendation of a life sentence. *See* Ala. Code § 13A-5-47.1. So two months after the jury recommended White be sentenced to life without parole, the circuit court sentenced White to death. White appealed his conviction and sentence to the ACCA. That court affirmed White's conviction but remanded for resentencing, finding that the trial court failed to adequately explain its reasons for the judicial override. *See White*, 179 So. 3d at 225. On remand, the trial court again sentenced White to death. (Doc. 10-18, pp. 13–26).

On return from remand, the ACCA affirmed White's death sentence and denied rehearing. The Alabama Supreme Court denied certiorari. *See Ex parte White*, No. 1131374 (Ala. Apr. 17, 2015). So did the United States Supreme Court. *See White v. Alabama*, 577 U.S. 942 (2015).

2. *Rule 32 proceedings*: White timely filed a pro se state postconviction petition under *Alabama Rule of Criminal Procedure* 32. The circuit court appointed J.D. Lloyd and Greg Gardner to represent White as postconviction counsel. Counsel moved "for expert funding to assist in the development and presentation of evidence" in support of White's Rule 32 petition. (Doc. 10-25, p. 178). The circuit court denied White's motion. (*Id.*, p. 24, 29). Counsel then filed an amended petition, and the State moved to summarily dismiss the amended petition. The circuit court granted the State's motion. A month later, on April 5, 2017, White moved for reconsideration of the dismissal of his petition. Around that same time, the Alabama legislature repealed judicial override for all capital murder defendants charged after April 11, 2017. *See* Ala. Code § 13A-5-47.1. So on April 6, White moved for the court to withdraw its order denying his Rule 32 petition and to allow him to amend the petition given Alabama's decision to repeal judicial override. The next day, the court denied both the motion to reconsider and the motion to withdraw its order to allow White to amend his petition.

White appealed the dismissal of his Rule 32 petition to the ACCA. While that appeal was pending, White filed a second Rule 32 petition that asserted that under the "evolving standards of decency" standard, Alabama's repeal of judicial override showed that the procedure was cruel and unusual punishment that violated the Eighth Amendment. White's opening brief on appeal asked the ACCA to remand his case to the circuit court to reconsider White's second petition. The ACCA affirmed the circuit court's dismissal of White's first Rule 32 petition and denied White's request to remand the case for consideration of his second Rule 32 petition. *See White v. State*, 343 So. 3d 1150 (Ala. Crim. App. 2019). On June 25, 2021, the Alabama Supreme Court denied review of White's first Rule 32 petition, and the circuit court regained jurisdiction over White's second Rule 32 petition.

On May 12, 2022, the circuit court denied White's second Rule 32 petition on the merits. (Doc. 23-1, p. 30). White appealed the dismissal of his second Rule 32 petition to the ACCA. The ACCA affirmed and denied White's application for rehearing. *See White v. State*, CR-2022-0831, (Ala. Crim. App. 2024). Around two months later, the Alabama Supreme Court denied certiorari. *See Ex parte White*, SC-2024-0717 (Ala. Dec. 20, 2024) (unpublished).

# III.

## FEDERAL COURT PROCEEDINGS

1. *District court proceedings*: White filed this federal habeas proceeding under 28 U.S.C. § 2254 in December 2021. (Doc. 1). In June 2022, White filed an amended petition and motion to stay in this court, telling the court that he had an unexhausted claim related to the repeal of judicial override in Alabama. (*See* Docs. 17 & 19). The court denied White's motion to stay without prejudice because the motion failed to address the fact that the United States Supreme Court had upheld the constitutionality of Alabama's judicial override provision. (Doc. 34).

Two months later, White renewed his request to stay this case under *Rhines v. Weber*, 544 U.S. 269 (2005). In August 2023, the court denied White's motion to stay finding that his unexhausted judicial override claim was "plainly meritless." (Doc. 40). The court then gave White until September 11, 2023, to either delete his unexhausted claim or face dismissal of his amended § 2254 petition. (*Id.*, p. 6). White did not delete the unexhausted judicial override claim by this deadline. Instead, he moved for the court to certify an interlocutory appeal related to the denial of his *Rhines* stay. (Doc. 41). The court denied White's motion but gave White until December 4, 2023, to delete his unexhausted claim from the amended petition. (Doc. 44).

2. *CA11 proceedings*: White again chose not to delete his unexhausted claim. Instead, he appealed this court's orders to the Eleventh Circuit. (Doc. 45). The Circuit Court questioned whether it had appellate jurisdiction over White's appeal but carried the jurisdictional question with the case. Oral argument was held on December 18, 2024. Two days later, the Alabama Supreme Court denied certiorari on the dismissal of White's second Rule 32 petition, rendering his judicial override claim exhausted. So the Circuit dismissed White's interlocutory appeal as moot. (Doc. 50).

—

After the Eleventh Circuit's mandate issued, White moved for leave to file a third amended petition. (Doc. 52). The court granted White's motion and set a briefing schedule on the amended petition. (Doc. 55). White's third amended petition is now fully briefed and ripe for review.

## IV.

### STANDARDS OF FEDERAL HABEAS REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs federal habeas petitions filed by state prisoners. In reviewing a habeas petition under 28 U.S.C. § 2254, the court must keep several legal standards in mind. The court outlines those standards below. The court will discuss AEDPA's rules in more detail when applying them to the claims raised in White's petition.

1. *Section 2254(a)*: This court may "entertain an application for writ of habeas corpus" on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2254(a). So this court's review is limited to answering federal constitutional questions. "[A]nd a state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1326 (11th Cir. 2010) (cleaned up).

2. *Exhaustion + procedural default*: Under § 2254(b) and (c), a federal court must limit its grant of habeas applications to cases in which an applicant has exhausted all state court remedies. *See Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). Exhaustion requires state prisoners to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process, including review by the state's last court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358–59 (11th Cir. 2003) (quotations omitted). "[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. It is not

8

enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat-similar state-law claim was made." *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

Related to the exhaustion requirement is the doctrine of procedural default. Under this doctrine, "[a] state habeas petitioner who fails to raise his federal claims properly in state court" generally "is procedurally barred from pursuing the same claim in federal court." *Bailey v. Nagle*, 172 F.3d 1299, 1302 (11th Cir. 1999). A claim can be procedurally defaulted in two ways. "First, where the state court correctly applies a procedural default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred," the federal court must "respect the state court's decision." *See id.* "Second, if the petitioner simply never raised a claim in state court, and it is obvious that this unexhausted claim would now be procedurally barred due to a state-law procedural default, the federal court may foreclose the petitioner's filing in state-court; the exhaustion requirement and procedural default principles combine to mandate dismissal." *Id.*

A petitioner can obtain federal court review of a procedurally defaulted claim only by showing either (1) "cause for the default and actual prejudice growing out of the alleged violation of federal law," or (2) "a resulting fundamental miscarriage of justice if the federal court does not consider the claims." *McCoy v. Newsome*, 953 F.2d 1252, 1258 (11th Cir. 1992).

3. *Adjudicated claims*: When a petitioner raises a constitutional claim that hasn't been procedurally defaulted and has been adjudicated on the merits, this court is restricted in its ability to grant relief by § 2254(d)(1) and (d)(2). To grant habeas relief on an adjudicated claim, this court must not only find that the claim is meritorious, but must also determine that the state court's resolution of that claim:

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*See* 28 U.S.C. § 2254 (d)(1)-(d)(2).

Under (d)(1), a state court's decision is "contrary to" clearly established Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a [Supreme Court decision] but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005). "A state-court decision involves an unreasonable application of [the] Court's clearly established precedents if the state court applies [the] Court's precedents to the facts in an objectively unreasonable manner." *Id.*

Under (d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). So "even if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Id.* (cleaned up). But "when a state court's adjudication of a habeas claim results in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in State court proceedings, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1249 (11th Cir. 2013).

Plus, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). And it is the applicant's burden to rebut "the presumption of correctness by clear and convincing evidence." *Id.*

4. *Unadjudicated claims*: For each of White's claims, the court will review "the last state-court adjudication on the merits." *Greene v. Fisher*, 565 U.S. 34, 40 (2011). And the court will presume that "the state court adjudicated [a] claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). But if the state courts did not reach the merits of a claim, "federal habeas review is not subject to the deferential standard that applies under AEDPA." *Cone v. Bell*, 556 U.S. 449, 472 (2009). The court will instead review the merits of any unadjudicated claims presented to the state courts de novo. *See id.*

# V.

## DISCUSSION OF WHITE'S CLAIMS

With these standards in mind, the court turns to the claims that White raises in his third amended petition.

### 1.    Ineffective Assistance of Counsel

White first claims that his counsel provided constitutionally ineffective assistance during the guilty, penalty, and sentencing phases of trial. White divides this claim into 10 subclaims and describes each subclaim as follows: (a) trial counsel failed to adequately investigate and present a defense during the guilt phase of Mr. White's trial; (b) counsel should have introduced non-hearsay evidence supporting witness observations from the day of the offense; (c) counsel failed to adequately challenge the introduction of unreliable DNA evidence; (d) trial counsel failed to adequately challenge and limit the State's introduction of highly improper 404(b) evidence; (e) counsel failed to prevent the introduction of inflammatory and improper victim impact evidence in the guilt phase; (f) counsel failed to challenge the State's introduction of non-record evidence during the guilt phase; (g) counsel failed to object to the prosecution's improper assertion, at the guilt phase, of Mr. White's purported lack of remorse; (h) trial counsel failed to challenge the prosecution's discriminatory peremptory strikes during jury selection; (i) counsel's failure to investigate and present evidence of other suspects, coupled with the failure to challenge the introduction of irrelevant unreliable, and illegal evidence prejudiced Mr. White, and (j) Mr. White was deprived of his Sixth Amendment right to effective assistance of counsel during the penalty phase before a jury and the subsequent judge-sentencing.

Each of these claims is governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, to show ineffective assistance of counsel, White must prove (1) that his counsel's performance "fell below an objective standard of reasonableness," and (2) "that the deficient performance prejudiced the defense." *See id.* at 687–88.

In examining whether counsel's performance fell below an objective standard of reasonableness, the court should be "highly deferential." *Id.* at 689.

And the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* To overcome this presumption, White must show "that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000).

As for the prejudice prong, White "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "[W]hen a petitioner challenges a death sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.*" Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007).

Plus, because "the standards created by *Strickland* and § 2254(d) are both 'highly deferential,' . . . when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105. "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* "Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012).

## A.   Claim that counsel failed to adequately investigate and present a defense during guilt phase

White argues that his trial counsel did not conduct an adequate investigation or present an adequate defense during the guilt phase of trial. According to White, there were several shortcomings in the State's evidence, but defense counsel failed to conduct a meaningful investigation into the plausible lines of defense.

Counsel argued at trial that the State had limited evidence that White murdered Parker and was thus relying on the evidence from the Black murder to convict White. White says that counsel should have investigated other lines

of defense, including Parker's contacts on the day of her murder and the possible suspects that officers initially identified. White also says that counsel inadequately investigated the physical evidence collected at the scene, including 32 fingerprints, tire impressions, and an unidentified male source of DNA on a cigarette butt. Relatedly, White faults his counsel for not putting on an affirmative defense during the guilt phase or investigating White's alibi that he was working at AutoZone at the time of the murder. Finally, White says that counsel's failure to adequately investigate left counsel unprepared to respond to evidentiary issues around exclusion of a police report that someone named Wheezy had expressed an intent to kill Parker.

1. *ACCA ruling*: White exhausted these allegations during his Rule 32 proceedings. (*See* Doc. 10-26, pp. 10–20; Doc. 10-32, pp. 60–69; Doc. 10-35, pp. 40–50). The ACCA, which issued the last reasoned state court opinion, affirmed the circuit court's rejection of these claims, explaining:

> White argues that his trial counsel failed to show that the police investigation into Parker's murder was incomplete.
>
> The circuit court made the following findings:
>
> "White alleges that the police did not test the majority of the physical evidence, did not follow-up on relevant leads, and did not interview a number of witnesses. However, White does not set forth specific facts to support this claim. White does not identify what physical evidence was not tested, what relevant leads were not followed up on, and does not identify the witnesses who were not interviewed. Because White failed to specifically plead how counsel's performance was deficient, this claim is summarily dismissed pursuant to Ala. R. Crim. P. 32.7(d).
>
> "....
>
> "White contends ... that his attorneys were ineffective because they failed to investigate who the victim was in contact with on the day of the murder. This claim is summarily dismissed because it does not satisfy the specificity and full factual

13

pleading requirements of Rule 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. While it appears that White asserts that his attorneys should have talked to Greg Jelks and Naman Jones, White fails to plead what his attorneys would have learned from talking to these people and fails to plead how this information would have changed the outcome of his trial....

"White's allegation ... that his attorneys were ineffective because they failed to investigate potential witnesses to the murder that the police did not interview is insufficiently pleaded and is therefore summarily dismissed. While White names some of those potential witnesses, he does not identify what counsel would have learned from these witnesses or how this information would have changed the outcome of his trial....

"White contends ... that his attorneys were ineffective because they failed to investigate several possible suspects identified by the police. This claim is summarily dismissed because it does not satisfy the specificity and full factual pleading requirements of Rule 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. While White identifies the suspects the police failed to investigate, he does not set forth what information these people would have provided to counsel concerning the offense or how this information would have changed the outcome of his trial. White merely makes conclusory allegations which are not supported by facts....

"White's claim that his attorneys were ineffective because they failed to investigate physical evidence from the crime scene ... is summarily dismissed because it does not satisfy the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. White does identify some of the physical evidence counsel failed to have analyzed; however, he does not set forth what counsel would have learned from further testing of this physical evidence or how this information would have changed the outcome of his trial....

14

"White contends ... that his attorneys were ineffective because they failed to put on an affirmative case during the guilt phase of his trial. This claim is summarily dismissed because it does not satisfy the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. While White alleges that counsel should have presented an alibi defense, he does not identify who would have established his alibi or that the outcome of his trial would have been different had he presented such evidence."

(C.37-40).

The circuit court correctly found that White failed to plead what a "proper" investigation would have uncovered or what evidence was not presented. Indeed, White pleaded that his trial counsel failed to investigate the fact that not all the physical evidence collected at the murder scene had been tested, but White failed to plead in his petition what evidence was not tested. White pleaded that counsel failed to investigate who the victim was in contact with on the day of her murder but failed to plead what information those witnesses would have provided. White pleaded that his trial counsel failed to investigate the suspects who were originally identified but failed to plead what an investigation would have uncovered. Clearly, White failed to plead full facts in support of this claim -— he failed to plead what such an investigation would have uncovered or what counsel failed to specifically present once he conducted what White considered to be an "appropriate investigation." "Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b)." <u>Hyde</u>, 950 So.2d at 356.

Moreover, the trial record shows that Det. Christopher Anderson, a homicide investigator with the City of Birmingham, testified that he was assigned to investigate the case. He explained on direct examination that the delay in the case occurred because not all of the evidence collected from the crime scene had been sent to the Department of Forensic

Sciences for testing. Det. Anderson stated that there were several suspects. White's counsel on cross-examination thoroughly cross-examined Det. Anderson concerning the adequacy of the police investigation. Also, on cross-examination Det. Anderson stated that he had spoken to Naman Jones, who was Parker's ex-boyfriend, and that he had obtained a search warrant to search Jones's blue Cadillac. He had also spoken with Greg Jelks because he had been informed that Parker was dating Jelks at the time of her murder. Det. Anderson testified that he eliminated Jelks as a suspect because Jelks had been in the hospital that day. Also, Det. Anderson said that police had no evidence to support charging Jones with any crime. It is clear from reading the record on direct appeal that trial counsel did challenge the police investigation into Parker's murder and did present evidence that two others had been investigated before the investigation ultimately focused on White.

Thus, not only was this claim insufficiently pleaded, it also failed to state an issue of fact or law that would entitle White to relief and was thus due to be summarily dismissed. *See* Rules 32.3 and 32.7(d), Ala. R. Crim. P. White is due no relief on this claim.

*White*, 343 So. 3d at 1179–1181.

2. *Analysis*: "Summary dismissals under Rules 32.6(b) and 32.7(d) are adjudications on the merits." *Daniel v. Comm'r, Alabama Dep't of Corr.*, 822 F.3d 1248, 1260 (11th Cir. 2016). Thus, AEDPA deference under 28 U.S.C. § 2254(d)(1) and (d)(2) applies to White's claim that counsel was ineffective for inadequately investigating or presenting a guilt phase defense. *See id.*

Under Alabama Criminal Rule 32.6(b), a Rule 32 petition "must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." Ala. R. Crim. P. 32.6(b). In reviewing the ACCA's Rule 32.6(b) analysis, this court's task is "to evaluate

whether the [ACCA's] determination that [White's] relevant ineffective assistance of counsel claims were due to be dismissed for failure to state a claim with sufficient specificity under Rule 32.6(b) was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See Borden v. Allen*, 646 F.3d 785, 817–18 (11th Cir. 2011).

The ACCA's finding that White inadequately pleaded his claim that counsel did not adequately investigate or present a guilt phase defense was not contrary to, or an unreasonable application of, clearly established federal law. As the ACCA noted, while White asserted that counsel should have talked to Parker's contacts on the day of her murder and the investigators' initial suspects, White did not plead what information Parker's neighbors or friends and the other suspects would have provided or what an investigation into the initial suspects would have uncovered. Instead, White pleaded only that "Ms. Parker's neighbors or friends would have provided defense counsel with critical information from the day of the offense" and that investigation of the other suspects "would have provided information concerning the offense." (Doc. 10-26, pp. 13–15). Thus, even if counsel's failure to contact Parker's friends and neighbors or the other suspects amounted to deficient performance, White did not specifically allege how this deficient performance prejudiced him under *Strickland*. And because White's conclusory allegations would not "warrant a finding of prejudice," the court cannot say that the ACCA's dismissal of White's claims related to the failure to interview potential witnesses or investigate suspects "was an unreasonable application of clearly established federal law." *See Borden*, 646 F.3d at 821–23.

The ACCA also reasonably determined that White inadequately pleaded his allegation that counsel was ineffective for failing to investigate physical evidence from the scene, such as the 32 fingerprints, tire impressions, and the male source of DNA on the cigarette butt.

Again, White failed to plead what an investigation into this physical evidence "would have uncovered or what counsel failed to specifically present once he conducted what White considered to be an 'appropriate investigation.'" *White*, 343 So. 3d at 1181. He instead alleged that "[t]esting of this evidence was critical to determine the identity of other individuals at the scene" and

that the results "may have implicated someone else." (Doc. 10-26, pp. 16–17). But to establish prejudice under *Strickland*, White must show something more than mere speculation that more thorough testing of the physical evidence could have produced exculpatory evidence. He must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As a result, the ACCA's determination that White failed to adequately plead prejudice was not contrary to or an unreasonable application of *Strickland*.

White next claims that counsel was ineffective for failing to investigate and present an alibi defense. In his amended Rule 32 petition, White alleged:

> Defense counsel were aware that Mr. White was employed at AutoZone at the time of the offense. Defense counsel should have developed and effectively marshaled evidence to establish that Mr. White was working at the time of the incident. Such evidence would have included testimony from Mr. White's supervisor and Mr. White's co-workers as well as Mr. White's employment record, all of which would have established he was working at the time of the incident. Defense counsels' obligation to investigate and develop a defense for Mr. White included developing and presenting evidence regarding Mr. White's alibi.

(Doc. 10-26, pp. 17–18).

White's federal habeas petition includes much more detail about the alibi defense he contends defense counsel should have presented. For example, White notes that Vanessa Parker told police that she last spoke with Jasmine by phone around 5:00 pm on July 11. (Doc. 56, p. 33). But White says his timecard from AutoZone shows that he worked from 4:53 pm to 8:23 pm on July 11. (*Id.*, pp. 33–34). Thus, White asserts that the AutoZone records establish that he couldn't have raped and murdered Jasmine between 5:00 pm and when her body was discovered between 7:00 and 7:30 pm.

This court must "examine the reasonableness of the [ACCA's] adjudication of [White's] claims based upon the allegations contained" in his Rule 32 petition. *See Borden*, 646 F.3d at 816–17. Thus, the court does not consider White's allegations about his timecard when evaluating White's claim

under § 2254(d). As for the alibi-related allegations presented to the state courts, it wasn't an unreasonable application of *Strickland* and its progeny to dismiss these allegations under Rule 32.6(b) for inadequate pleading. As the circuit court noted, White did not identify the names of the supervisor or co-workers who would have testified that White was working at the time of Parker's murder. Nor did White explain how their testimony would create a reasonable probability that the outcome of his trial would have been different. "[I]n light of Alabama's fact pleading post-conviction regime," the ACCA's dismissal of the allegation that counsel was ineffective for not putting on an affirmative guilt phase defense was not "contrary to" or "an unreasonable application of, clearly established Federal law." *Borden*, 646 F.3d at 820.

Nor did the ACCA unreasonably apply federal law when it rejected White's allegations that counsel failed to adequately point out inadequacies in the police investigation, present evidence of other suspects, or otherwise advance a constitutionally adequate guilt phase defense. As the ACCA noted, counsel thoroughly cross-examined homicide investigator Christopher Anderson about the adequacy of the police investigation into Parker's murder. For example, counsel pointed out that investigators hadn't tested the tire marks found at the scene, interviewed neighbors who Parker saw the day of her murder, or tried to match the fingerprints taken from the scene with the suspects that they first interviewed. (Doc. 10-14, pp. 35–36, 38–41).

Counsel also showed through cross-examination of Detective Anderson that Naman Jones and Greg Jelks were investigated before the investigation focused on White. For example, Detective Anderson testified that he spoke with Jones, who was Parker's ex-boyfriend, and obtained a search warrant for Jones's blue Cadillac based on information he received during the investigation. (*Id.*, pp. 31–32). Detective Anderson then stated that "Greg Jelks was the only other person that we were able to find through our investigation." (*Id.*, pp. 36–37). Detective Anderson said he spoke with and investigated Jelks because (a) he was Parker's boyfriend, and (b) during their last conversation, Jasmine told Vanessa Parker that she was going to Captain D's with Greg. (*Id.*, pp. 37–38). The ACCA reasonably concluded that through Detective Anderson's cross-examination, counsel adequately challenged the police investigation into Parker's murder and presented evidence of other suspects. So White has not overcome the double deference that applies to ineffective

assistance of counsel allegations that were adjudicated in state court. *See Harrington*, 562 U.S. at 105.

White's final argument related to this subclaim is that counsel's failure to adequately investigate left them unprepared to argue and respond to issues surrounding the admission of what White alleges was "critical evidence." In support of this argument, White points to counsel's failure to defend against the State's motion to exclude evidence from a police report that a man named Willy Tate told a detective that "Gankman said that Wheezy was going to kill Jasmine" over stolen marijuana. (*See* Doc. 10-12, pp. 74–76). Even if counsel performed deficiently, White hasn't shown a reasonable probability that the trial court would have allowed this triple hearsay statement into evidence. And as explained, White failed to adequately plead what an investigation into Wheezy would have uncovered. Plus, while counsel did not question Detective Anderson about Wheezy, counsel did present evidence that Jelks and Jones were initial suspects in Parker's murder. Thus, even if the court were reviewing this ineffective assistance of counsel allegation de novo, the court would find that the allegations related to Wheezy failed to satisfy *Strickland*.

—

To sum up, White has not established that the ACCA's resolution of his claim that counsel was ineffective for failing to investigate and present a defense during the guilt phase of trial "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *See* 28 U.S.C. § 2254(d)(1)-(d)(2). Thus, habeas relief isn't warranted on this claim.

## B.    Claim that counsel could have introduced non-hearsay evidence supporting witness observations

White next argues that counsel was ineffective for failing to introduce non-hearsay evidence when cross-examining police investigators. According to White, counsel unreasonably failed to ask investigators about Wheezy, Gankman, or Tate's allegation that Parker had stolen marijuana. White also says that counsel should have asked (a) whether police had obtained DNA

samples from Jones and Jelks, and (b) whether police had matched known suspects to the unidentified male DNA collected at the scene.

White exhausted his allegations related to this subclaim in state court. (*See* Doc. 10-26, pp. 20–21; Doc. 10-32, pp. 70–71; Doc. 10-35, pp. 50–51). The ACCA affirmed the circuit court's denial of this subclaim by noting:

> The circuit court made the following findings:
>
> "This claim is summarily dismissed because it does not satisfy the specificity and full factual pleading requirements of Rules 32.2 and 32.6(b) of the Alabama Rules of Criminal Procedure. White fails to allege in this claim how evidence concerning another suspect would have affected the outcome of the trial."
>
> (C. 41.) We agree with the circuit court. By itself, this claim is confusing. Review of the entire petition is necessary to fully understand the claim. As we previously stated: "[T]he claim of ineffective assistance of counsel is a general allegation that often consists of numerous specific subcategories. Each subcategory is an independent claim that must be sufficiently pleaded." Coral v. State, 900 So.2d 1274, 1284 (Ala. Crim. App. 2004), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala. 2005).
>
> Moreover, the trial record shows that Det. Anderson testified that he interviewed two individuals -- Naman Jones and Greg Jelks -- as possible suspects and eliminated both as suspects. Det. Anderson was also questioned as to whether any DNA evidence tied Jones to the murder and he replied "No." (Trial R. 386.)
>
> For these reasons, summary dismissal of the claim was proper. White is due no relief on this claim.

*White*, 343 So. 3d at 1182.

Under § 2254(d)(1), the ACCA's rejection of this claim was not "contrary to" or an "unreasonable application of, clearly established Federal law."

White's sole allegation related to prejudice was that "[h]ad counsel adequately investigated and presented a defense for Mr. White at trial, there is a reasonable probability that he would not have been found guilty of capital murder." (Doc. 10-26, pp. 20–21). Thus, the ACCA's finding that White failed to sufficiently plead prejudice was reasonable. *See Borden*, 646 F.3d at 821 (finding summary dismissal under Rule 32.6(b) reasonable when "there are simply no facts presented in the Amended Petition that would warrant a finding of prejudice and therefore habeas relief—only bare allegations—and mere conclusions of law" (cleaned up)).

It also wasn't contrary to or an unreasonable application of *Strickland* for the ACCA to find that the record contradicted White's contention that counsel was ineffective for not eliciting whether police had obtained DNA from Jones or Jelks or asking whether police had matched the known suspects with the unidentified male DNA collected at the scene. As the ACCA noted, Detective Anderson testified that both Jones and Jelks were initial suspects in Parker's murder but that Detective Anderson later eliminated them. (Doc. 10-14, pp. 31–32, 37–38, 41–43). Detective Anderson also testified that no DNA evidence tied Jones to Parker's assault. (*Id.*, p. 43). White hasn't shown that it was unreasonable for counsel not to ask more questions about this topic or that further questioning would have revealed any information that could have changed the outcome at trial.

Under § 2254(d)(2), the ACCA's resolution of this subclaim was not "an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." White says that the ACCA's characterization of this subclaim as "confusing" and requiring "[r]eview of the entire petition . . . to fully understand the claim" was an erroneous factual finding that warrants relief under § 2254(d)(2). But White acknowledges that his allegations about Tate's statement and why he believes defense counsel didn't adequately investigate the statement weren't in this subclaim. (Doc. 61, p. 29). Instead, those allegations are found in the subclaim related to defense counsel's alleged failure to adequately investigate or present a guilt phase defense. (*Id.*). Thus, it was not an unreasonable determination of the facts for the ACCA to find that "***[b]y itself***, this claim is confusing." *White*, 343 So. 3d at 1182 (emphasis added). Nor was it unreasonable for the ACCA to find that you need to read other portions of White's petition to understand who Tate, Wheezy, Gankman,

22

Jones, or Jelk are. And as discussed, the ACCA's affirmance of the circuit court's finding that this subclaim was inadequately pleaded was reasonable.

Finally, the court agrees with the Respondent that this subclaim should be dismissed for failure to satisfy the heightened pleading requirements for § 2254 petitions. Under Rule 2(c) of the Rules Governing § 2254 Proceedings, a petition must "(1) specify all the grounds for relief available to the petitioner; (2) state the facts supporting each ground; [and] (3) state the relief requested." *See* Rule 2(c) of the Rules Governing § 2254 Cases in the U.S. District Courts. Yet White does not explain how the alleged attorney errors identified in this subclaim prejudiced him. Instead, he simply states "[h]ad counsel adequately investigated and presented a defense for Mr. White there is a reasonable probability he would not have been found guilty of capital murder." (Doc. 56, p. 36). This conclusory assertion of prejudice fails to satisfy Rule 2(c)'s fact pleading requirements. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("The . . . presentation of conclusory allegations unsupported by specifics is subject to summary dismissal."); *Mayle v. Felix*, 545 U.S. 644, 655 (2005) ("Rule 2(c) is more demanding" than notice pleading and requires the petitioner "to state facts that point to a real possibility of constitutional error."). Thus, habeas relief isn't warranted for this subclaim.

## C. Claim that counsel failed to adequately challenge the introduction of DNA evidence

White's next subclaim is that counsel was ineffective for not adequately challenging the introduction of evidence that his DNA was found on the cigar tip and the semen collected from Parker's body. According to White, the DNA testing was inherently unreliable because the DNA evidence included a mixture of two people's DNA. White also says that the DNA evidence was inadmissible because the State did not present evidence establishing (1) the nature of the testing of the Parker evidence; (2) a description of the testing of the DNA evidence from White's prior conviction; or (3) the methodology used to determine that the DNA matched White. Finally, White asserts that counsel should have objected to flaws in the chain of custody for the DNA evidence.

As explained below, White presented most of these allegations to the state courts. (*See* Doc. 10-26, pp. 21–25; Doc. 10-32, pp. 71–75; Doc. 10-35, pp. 51–55). And the ACCA rejected this claim as follows:

> White next argues that counsel was ineffective for failing to adequately challenge the DNA evidence admitted at the guilt phase of his trial. A cigar was collected from the scene, and the saliva on the cigar matched White's DNA profile. Also, semen collected from Parker's body matched White's DNA profile.
>
> The circuit court made the following findings:
>
> "This claim is summarily dismissed because the allegations supporting the claim are not sufficiently pleaded. For example, White alleges that there was no evidence presented describing the DNA testing and no evidence presented describing the methodology relied on to determine the DNA match but White does not specifically allege how the State's testing of the DNA was unreliable or what testimony should have been presented by the State to prove these matters. ...
>
> "This claim concerning the chain of custody of the DNA evidence is also summarily dismissed from the first amended Rule 32 petition as a matter of law because it fails to state a valid claim for relief or present a material issue of fact or law under Rule 32.7(d) of the Alabama Rules of Criminal Procedure. White raised the substantive claim on direct appeal and the Court of Criminal Appeals found that the claim was without merit."
>
> (C. 48.)
>
> We agree with the circuit court's findings. White pleaded that his trial counsel should have challenged the methodology used in conducting the DNA tests but failed to plead what defects occurred in the testing or what should have been done. Also, on direct appeal, this Court specifically found that the State presented a proper chain of custody for the evidence that

> contained White's DNA. "[B]ecause the underlying claims have no merit, the fact that [the petitioner's] lawyer did not raise those claims cannot have resulted in any prejudice to [the petitioner]." <u>Magwood v. State</u>, 689 So.2d 959, 974 (Ala. Crim. App. 1996). White is due no relief on this claim.

*White*, 343 So. 3d at 1182–83 (footnote omitted).

1. *Mixture*: In his § 2254 petition, White asserts that counsel should have objected to the admission of the DNA evidence collected at the scene of Parker's murder because "mixture evidence poses inherent interpretation problems." (Doc. 56, pp. 38–39). As White notes, Rhea, the DFS forensic scientist who tested the DNA samples from the Parker case, testified that both the DNA collected from the cigarette butt and the semen sample contained a mixture of DNA from two people. (*See* Doc. 10-13, pp. 192, 194–95). Relying on an article from the National Institute of Standards and Technology ("NIST"), White asserts that this type of mixture evidence is inherently more unreliable than single source DNA and thus counsel was ineffective for not challenging the reliability of the State's use of mixture evidence.

White did not mention the unreliability of mixture evidence in his state court filings. (*See* Doc. 10-26, pp. 21–25; Doc. 10-32, pp. 71–75; Doc. 10-35, pp. 51–55). And as explained, this court must "examine the reasonableness of the [ACCA's] adjudication of [White's] claims based upon the allegations contained" in his Rule 32 petition. *See Borden*, 646 F.3d at 816–17. Plus, the court isn't persuaded by White's argument that he presented the substance of his mixture DNA evidence argument in his Rule 32 proceedings. While White generally argued that counsel should have challenged the reliability and methodology used to test the DNA evidence, he did not fairly present any DNA mixture related argument. *See Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) ("[A]n issue is exhausted if the reasonable reader would understand the claim's particular legal basis and specific factual foundation to be the same as it was presented in state court." (cleaned up)).

The court also rejects White's argument that it can consider the NIST article when ruling on his DNA-related claims. Because White's DNA mixture allegations do not rely on "a new rule of constitutional law," the court may

consider the article only if it includes "a factual predicate that could not have been previously discovered through the exercise of due diligence." *See* 28 U.S.C. § 2254(e)(2). White says that the circuit court's denial of his Rule 32 counsel's motion for expert funds was an external impediment that prevented him from arguing that his trial counsel was ineffective for not challenging the reliability of DFS's interpretation of the DNA mixtures. But White has not shown that he needed an expert to discover that interpreting DNA mixtures is considered more challenging than interpreting single-source samples. Indeed, White's § 2254 petition doesn't rely on an expert to make this argument. He instead points to a publicly available article on DNA mixture interpretation. Finally, White contends that post-conviction counsel negligently failed to present this aspect of his DNA-related ineffective assistance of counsel claim. But White hasn't shown that post-conviction counsel performed deficiently by failing to bring a DNA mixture-related claim. And even if he had, "a federal habeas court may not . . . consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." *Shinn v. Ramirez*, 596 U.S. 366, 382 (2022). Thus, the court finds that it cannot consider White's evidence that DNA mixtures are inherently less reliable than single source samples.

In short, White did not make a DNA mixture-related argument to the state courts in his Rule 32 proceedings, so this court cannot consider White's allegations about the unreliability of DNA mixtures when reviewing the state court's denial of his DNA-related ineffective assistance claims under § 2254(d).

2. *Methodology + testing*: White did argue in his Rule 32 proceedings that his trial counsel was ineffective for not challenging the State's alleged failure to establish the reliability of the testing and methodology used to match the DNA from the Parker evidence to the DNA profile of White in the DFS computer database. As discussed, the ACCA rejected these allegations as insufficiently pleaded.

The ACCA's determination was not contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts. As the ACCA noted, White's Rule 32 petition failed to allege what defects occurred in testing or what should have been done to establish the reliability of the DNA evidence. And it's not like the State

presented ***no evidence*** of reliability. To the contrary, Rhea testified at length about his experience as a forensic scientist for DFS and the process he used to test the DNA from the Parker case. (Doc. 10-13, pp. 183–200). For example, Rhea testified that he confirmed that the vaginal swab and swab from Parker's lower right leg included the presence of semen. (*Id.*, pp. 188–89). Rhea then took the swabs from the cigarette butt, cigar tip, and semen to DNA to perform DNA testing and obtain a DNA profile. (*Id.*, p. 190). When Rhea ran the vaginal swab through DFS's computer database, it came back as a match for White. (*Id.*, p. 191). And though the cigar tip was not searched through the DFS database, it too was found to exhibit genetic traits consistent with White's DNA profile. (*Id.*, pp. 191–192). Rhea then explained that he would match DNA components by comparing the DNA profile from a known individual with the item of evidence to determine whether the known individual "could have contributed this DNA into evidence." (*Id.*, pp. 192–93). According to Rhea, the genetic traits shared by White's DNA profile and the semen and cigar tip gave him a high degree of confidence that either White or his identical twin was the source of the DNA. (*Id.*, pp. 193–94).

Rhea, whose forensic science experience qualified him as an expert, also affirmed the reliability of the tests he performed by stating that "numerous studies have been performed within [the DFS] laboratory. As well as other laboratories throughout the United States and the world. And they have affirmed that this science is indeed valid and reliable." (*Id.*, p. 196). He then described the negative and positive controls he uses to make sure that his interpretation of the DNA test results was error free. (*Id.*, pp. 197–99).

DFS forensic scientist Carl Mauterer similarly testified about the reliability and process for testing the DNA evidence from the Black case. (Doc. 10-14, pp. 126–39). For example, Mauterer testified that DFS tests DNA by identifying a particular sample, cutting that particular stain, cleaning it, and placing it in a tube so that the only thing in the tube is the DNA. (*Id.*, p. 130). He then stated that they will make multiple copies of the 16 locations they want to look at and examine and then determine what the DNA profile is. (*Id.*, pp. 130–31). Mauterer, who was also qualified as an expert, testified that this type of testing is used in labs around the United States and is generally accepted in the scientific community as reliable. (*Id.*, p. 131). And Mauterer testified that he used multiple controls to make sure that his DNA analysis

27

was correct and that those controls were standard practice by DNA labs. (*Id.*, pp. 131–32). Mauterer then testified, in detail, about the process he used to match White's saliva with semen found on vaginal swabs of Black. (*Id.*, pp. 135–39).

The court thus cannot say that the ACCA's determination that to state an ineffective assistance of counsel claim, White needed to allege specific defects in DFS's DNA testing or explain what more should have been done to establish reliability of the DNA evidence was contrary to or an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

3. *Chain of custody*: White's final DNA-related ineffective assistance of counsel allegation is that his trial counsel should have objected to flaws in the chain of custody of the DNA evidence. The ACCA affirmed the dismissal of these allegations because it had rejected the same argument on direct appeal and thus White hadn't shown prejudice. On direct appeal, the ACCA ruled on White's chain of custody argument as follows:

> [T]he State presented sufficient evidence to establish that the cigar tip and the biological samples submitted to DFS were collected during the investigation of Parker's murder. Owens and Rhea identified the same package containing the cigar tip, and Owens testified that he collected that cigar tip from Parker's apartment. Further, Dr. Davis and Rhea identified the same package containing the glass slides, and Dr. Davis identified those slides as ones containing the biological material he collected from Parker's vagina and leg. Accordingly, pursuant to § 12-21-13, Ala. Code 1975, the circuit court ***did not commit any error***, much less plain error, by allowing the DNA evidence to be admitted.

*White*, 179 So. 3d at 215–16 (emphasis added).

White contends that the ACCA's finding that he had failed to establish *Strickland* prejudice for his chain of custody allegations was contrary to or an unreasonable application of clearly established federal law under § 2254(d)(1). As White points out, the ACCA decided his chain of custody argument under plain-error review and a finding of no plain error under Alabama law doesn't

automatically mean that there was no prejudice under *Strickland*. *See Ex parte Taylor*, 10 So. 3d 1075, 1078 (Ala. 2005). But White ignores that even though his chain of custody direct appeal was decided under plain-error review, the ACCA held that "the circuit court ***did not commit any error***, much less plain error, by allowing the DNA evidence to be admitted." *White*, 179 So. 3d at 215–16 (emphasis added). As no error related to the DNA evidence's chain of custody was found on direct appeal, the court cannot say that the ACCA's determination that White's chain of custody ineffective assistance of counsel allegation failed to establish *Strickland* prejudice was contrary to or an unreasonable application of Supreme Court precedent.

—

In sum, White isn't entitled to habeas relief on his DNA-related ineffective assistance of counsel claims.

### D.    Claim that counsel failed to adequately challenge and limit the State's introduction of the 404(b) evidence

White argues that for two reasons counsel was ineffective for not challenging or limiting the State's introduction of evidence of White's conviction for the murder and rape of Sierra Black. First, White asserts that counsel erred by not properly objecting to the Rule 404(b) evidence, moving to strike the evidence after it was presented, or objecting in a manner that would have meaningfully limited the scope and breadth of the evidence. Second, White contends that counsel erred by not objecting to the trial court's jury instruction on how the jurors could consider the evidence from the Sierra Black case. White exhausted his allegations related to his 404(b)-based ineffective assistance of counsel subclaim. (Doc. 10-26, pp. 26–50; Doc. 10-32, pp. 49–54; Doc. 10-35, pp. 29–34). So the court addresses White's two arguments in turn.

*1. Admission of Rule 404(b) evidence*: White's counsel objected to admission of evidence of Sierra Black's murder asserting that (a) there wasn't enough evidence under Rule 404(b) to find that the two murders were signature crimes, and (b) allowing the jurors to view photographs of Black and listen to a tape of White's 90-minute interrogation and confession would cause "extreme prejudice." (Doc. 10-11, pp. 123–28). But White asserts that counsel

was ineffective for not adequately objecting or meaningfully presenting the challenge necessary to limit the introduction of this evidence.

The ACCA rejected White's ineffective assistance of counsel claim under *Strickland*'s prejudice prong because it had rejected White's Rule 404(b) argument on direct appeal:

> The record of White's trial shows that the State gave pretrial notice of its intent to present Rule 404(b), Ala. R. Evid., evidence that White had been convicted of raping and murdering Sierra Black. (Trial C. 45.) White objected. The trial court allowed detailed evidence of White's conviction to be presented at his trial for murdering Parker. Black was murdered in October 2006; Parker was murdered in July 2006.
>
> On direct appeal, this Court thoroughly addressed this issue:
>
> . . .
>
> "At trial, White's theory was that he was not the individual who murdered [Jasmine] Parker. Accordingly, White's identity as the individual who murdered Parker was at issue. 'Considering there was no eyewitness to [Parker's] murder, it was necessary for the State to present other evidence proving the identity of the killer.' Petric v. State, 157 So.3d 176, 192 (Ala. Crim. App. 2013). Further, the circumstances of the Black rape/murder and Parker rape/murder were sufficiently similar to admit evidence of the Black rape/murder under the identity exception contained in Rule 404(b). White murdered both Parker and Black by strangling them to death with a soft ligature, a method of strangulation that is extremely rare. In fact, he strangled both women with their clothing. In both rapes, White did not wear a condom and left his semen on his victims. The State established that both victims were young, black women with similar body types. The State presented evidence indicating that items belonging to both women were kept by the murderer. Further, the State established that White murdered Black slightly under four months after Parker was murdered. Because

> the evidence established that White's two crimes were peculiarly distinctive, the circuit 'court did not exceed its discretion in finding that the evidence of [White's] bad acts against [Black] was admissible under Rule 404(b) as proof of [his] identity [as Parker's] killer.' <u>Petric</u>, 157 So.3d at 193.
>
> "Further, this Court has thoroughly reviewed the record and holds that the probative value of the evidence establishing that White raped and murdered Black was not substantially outweighed by unfair prejudice. <u>See Averette v. State</u>, 469 So.2d 1371, 1373–74 (Ala. Crim. App. 1985) (holding that 'not only must it be determined that the other offenses are material and relevant to an issue other than the character of the accused and fall within an exception to the exclusionary rule, but the probative value must not be substantially outweighed by undue prejudice'); Rule 403, Ala. R. Evid. (providing that, '[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence')."
>
> <u>White</u>, 179 So.3d at 186-87.

*White*, 343 So. 3d at 1177–78.

The ACCA's prejudice analysis was not contrary to or an unreasonable application of clearly established federal law. The court recognizes that the Rule 404(b) argument that White raised on direct appeal is slightly different from the ineffective assistance claim that he raises in his collateral proceedings because the ineffective assistance of counsel claim relates to whether counsel should have more effectively challenged the introduction of evidence about Sierra Black. And the outcome of a direct appeal is not always determinative when establishing prejudice under *Strickland*.

That said, the ACCA reasonably determined that it's analysis from White's direct appeal shows that White has failed to establish that counsel's alleged failure to effectively challenge or limit the evidence of White's prior

conviction prejudiced White under *Strickland*. As the ACCA noted, the identity of Parker's killer was at issue because there were no eyewitnesses to the murder. And though White has pointed to some differences between the two, "the circumstances of the Black rape/murder and Parker rape/murder were sufficiently similar to admit evidence of the Black rape/murder under the identity exception contained in Rule 404(b)." *White*, 179 So. 3d at 186. For example, the evidence showed that the two women were murdered within four months of each other by an extremely rare method of strangulation and that both victims were young, black women with similar body types. Plus, on direct appeal, the ACCA "thoroughly reviewed the record" and held that the probative value of the evidence introduced about the Black murder "was not substantially outweighed by unfair prejudice." *See id.* Indeed, the probative value of White's conviction for Black's murder was extremely high because the only other evidence connecting White to Parker was DNA evidence. And the ACCA found that while "the evidence that White raped and murdered Black was prejudicial in that it established his identity in the Parker rape/murder, it was not unduly or unfairly prejudicial." *Id.* at 187.

White thus fails to show that it was unreasonable for the ACCA to find that he failed to establish a reasonable probability that if counsel had more adequately challenged the Rule 404(b) evidence it would have been either excluded or limited. *See Harrington*, 562 U.S. at 101.

2. *Jury instruction on Rule 404(b) evidence*: White's second Rule 404(b) ineffective assistance argument is that counsel's failure to object to the trial court's Rule 404(b) jury instructions was prejudicial because an objection would have either (a) limited how the jury considered the evidence related to the Sierra Black murder, or (b) created grounds for reversible error on appeal. The ACCA again rejected this argument under *Strickland*'s prejudice prong based on its analysis in White's direct appeal:

> On direct appeal, this Court stated the following concerning the jury instructions:
>
> "In its final instructions, the circuit court informed the jury that evidence of collateral bad acts is not admissible to prove bad character; however, it may be admissible to prove motive,

> opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. After informing the jury of the possible purposes for which evidence of collateral crimes may be admitted, it then restricted the jury's consideration of White's collateral crimes to determining his identity only. Accordingly, unlike in [Ex parte] Billups [86 So.3d 1079 (Ala. 2010),] the circuit court did 'limit the jury's consideration of ... evidence [of White's collateral crime] to only th[e] purpose[ ] for which [it] was ... offered by the State,' i.e., to establish White's identity. Ex parte Billups, 86 So.3d at 1086. Consequently, no error, much less plain error, resulted from the circuit court's jury instruction."
>
> White, 179 So.3d at 189.
>
> This Court held that the judge's limiting instructions were not overly broad. Thus, the underlying claim supporting the claim of ineffective assistance of counsel was without merit and White could establish no prejudice under *Strickland*. White was due no relief on this claim.

*White*, 343 So. 3d at 1178.

The ACCA's ruling was not contrary to or an unreasonable application of clearly established federal law. In asserting that the ACCA's ineffective assistance of counsel analysis related to the 404(b) jury instructions isn't entitled to AEDPA deference, White once again emphasizes that on direct appeal this issue was decided under plain-error review. But White again ignores that the ACCA found that "***no error***, much less plain error, resulted from the circuit court's jury instruction." *See White*, 179 So. 3d at 189 (emphasis added). As the ACCA found on direct appeal that the Rule 404(b) jury instructions weren't erroneous, the ACCA's determination that White failed to establish prejudice wasn't an unreasonable application of *Strickland*.

—

In sum, the ACCA reasonably applied *Strickland* to both of White's Rule 404(b) ineffective assistance of counsel claims. And though White argues that

he's entitled relief under § 2254(d) because the ACCA did not consider counsel's Rule 404(b) deficiencies cumulatively, the court disagrees. "[W]ithout harmful errors, there can be no cumulative effect compelling reversal." *United States v. Barshov*, 733 F.2d 842, 852 (11th Cir. 1984). And whether this court considers the cumulative impact of counsel's Rule 404(b) conduct de novo or through the lens of AEDPA deference, the court finds that White hasn't identified any harmful errors that either standing alone or combined would establish ineffective assistance of counsel under *Strickland*. So White is not entitled to habeas relief on this claim.

### E. Claim that counsel failed to prevent the introduction of victim impact evidence during guilt phase

White's next guilt-phase ineffective assistance of counsel claim is that counsel was ineffective for not objecting to the State introducing into evidence Vanessa Parker's 911 call, which White characterizes as impermissible victim impact evidence. White exhausted this claim during his Rule 32 proceedings. (*See* Doc. 10-26, pp. 50–54; Doc. 10-32, pp. 54–55; Doc. 10-35, pp. 34–35). The ACCA rejected this claim because it had found White's victim impact evidence argument without merit on direct appeal:

> The circuit court found that this issue was procedurally barred because it had been raised and addressed by this Court on White's direct appeal. Rule 32.2(a)(4), Ala. R. Crim. P.
>
> "Here, the recording of the call Vanessa Parker made to emergency 911 after finding her daughter's lifeless body was relevant to the discovery of Parker's body, the timing of the murder, and how the police became involved in investigating the murder. Accordingly, the recording did not constitute victim-impact evidence."
>
> White, 179 So.3d at 206. On appeal, this Court held that the 911 emergency call did not constitute victim-impact evidence. "Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue." Lee v. State, 44 So.3d 1145, 1173 (Ala. Crim. App. 2009). "This Court will not

> consider an ineffective assistance of counsel claim when the underlying issue was considered on direct appeal and found to be without merit." <u>Moffett v. State</u>, 156 So.3d 835, 866 (Miss. 2014).
>
> This claim was correctly summarily dismissed because it failed to state a material issue of fact or law that would entitle White to relief. <u>See</u> Rule 32.7(d), Ala. R. Crim. P. White is due no relief on this claim.

*White*, 343 So. 3d at 1178–79.

White asserts that the court should review this claim de novo because the ACCA's ruling failed to contend with the standard for *Strickland* prejudice and conflated a finding of no plain error with a finding of no prejudice under *Strickland*. The court disagrees. The court has no "grave doubt" about whether the ACCA applied the prejudice standard from *Strickland* when resolving White's ineffective assistance of counsel claim based on the failure to object to the 911 call. *See Romine v. Head*, 253 F.3d 1349, 1365 (11th Cir. 2001).

And the ACCA's determination that White had failed to show prejudice was not contrary to or an unreasonable application of clearly established federal law. Victim impact evidence is "evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." *Payne v. Tennessee*, 501 U.S. 808, 817 (1991). In Alabama, "[s]uch statements are admissible during the guilt phase of a criminal trial only if the statements are relevant to a *material* issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible." *Ex parte Crymes*, 630 So. 2d 125, 126 (Ala. 1993).

Relying on this precedent when considering White's direct appeal, the ACCA found that Vanessa Parker's 911 call wasn't impermissible victim impact evidence because the 911 call was relevant to the discovery of Jasmine Parker's body, the timing of the murder, and how police became involved in investigating the murder. *White*, 179 So. 3d at 206. The ACCA also determined that the State's comments about the 911 call during closing weren't improper because in acknowledging the emotional nature of the 911 call, the prosecutor told the jury that it should focus on the evidence and not consider passion or

emotions. *See id.* "Because the 911 recording did not constitute victim-impact evidence and because the prosecutor did not argue that the jury should consider the emotional nature of the recording," the ACCA found White's victim impact argument "without merit." *Id.* Only after finding that the 911 call and prosecutor's statement weren't impermissible victim impact evidence or argument did the ACCA determine that "***even if*** the 911 recording and the prosecutor's statement did constitute impermissible victim-impact evidence and argument," there wasn't any plain error. *See id.* at 206–07 (emphasis added). Thus, on collateral review, it was reasonable for the ACCA to determine that even if White's counsel had preserved an objection to the 911 call or the prosecutor's statement, there is not a reasonable probability that the Alabama courts would have found error in the admission or discussion of evidence about the 911 call.

Nor was the ACCA's ruling an unreasonable application of *Payne v. Tennessee*, 501 U.S. 808 (1991), which White relies on to argue that the 911 call was impermissible victim impact evidence. *Payne* overruled Supreme Court precedent holding "that the Eighth Amendment bars the admission of victim impact evidence during the penalty phase of a capital trial." *Id.* at 811. In doing so, the Court left open the possibility that evidence could be "introduced that is so unduly prejudicial that it renders the trial fundamentally unfair" in violation of the Fourteenth Amendment's Due Process Clause. *See id.* at 825. But the Court also recognized that "[i]n many cases the evidence relating to the victim is . . . relevan[t] to the guilt phase of the trial." *Id.* at 823. Because the 911 call was relevant to several guilt phase issues and the prosecutor didn't improperly capitalize on the emotional nature of the 911 recording, it wasn't unreasonable under *Payne* to determine that the failure to object to the 911 recording or prosecutor's statements didn't amount to *Strickland* prejudice.

In short, White is not entitled to habeas relief under § 2254(d) for his victim impact evidence related ineffective assistance of counsel claim.

36

**F.**   **Claim that counsel failed to challenge the State's introduction of non-record evidence**

White next asserts that counsel was ineffective for not objecting to the prosecutor's statement in closing that if White and Parker had sex before the night of July 11 "[t]hat semen on her leg would have washed off. She would have taken a shower in the morning." (Doc. 10-15, p. 12). As White points out, there was no evidence in the record showing when Parker showered last, so White contends this statement improperly argued facts not in evidence.

White exhausted this ineffective assistance of counsel claim before the Alabama state courts. (*See* Doc. 10-26, pp. 54–57; Doc. 10-32, pp. 75–77; Doc. 10-35; pp. 55–57). The ACCA rejected this claim under *Strickland*'s prejudice prong after noting that it had considered the substantive argument related to the prosecutor's statements on direct appeal and found no plain error:

> The Alabama Supreme Court in <u>Ex parte Taylor</u> . . . held that situations where no plain error rises to the level of error under <u>Strickland</u> will be "rare." White challenged his trial counsel's failure to object to an argument made by the prosecutor. However, the jury was instructed that arguments of counsel were not evidence, and on direct appeal this Court noted that the argument could have reasonably been inferred from the evidence presented at trial. This is not one of those rare cases where the unchallenged argument of the prosecutor rises to the level of prejudice necessary to satisfy <u>Strickland</u>. We agree with the circuit court's detailed findings on this claim. White is due no relief.

*White*, 343 So. 3d at 1183–85.

White says that the ACCA's analysis was contrary to or an unreasonable application of *Strickland* for two reasons. First, White asserts that the ACCA misapplied *Strickland*'s prejudice prong because it's only assessment of prejudice was to say that the finding of no plain error on direct appeal showed that White hadn't established prejudice. But the court once again has "no grave doubt" that the ACCA applied *Strickland* to this claim as the ACCA specifically stated that it found that White hadn't shown that the prosecutor's

unchallenged argument rose to the level of prejudice necessary to satisfy *Strickland*. *See Romine*, 253 F.3d at 1365. And the ACCA recognized that it's earlier finding of no plain error wasn't determinative.

The ACCA also reasonably determined that White hasn't shown that there is a reasonable probability that the outcome of White's trial or appeal would have been different had counsel objected to the prosecutor's statement about Parker showering. As the ACCA noted on direct appeal, "the circuit court emphasized during its jury instruction that the jury could consider only evidence presented at trial and could not consider facts not in evidence." *White*, 179 So. 3d at 211. The circuit court also instructed the jury "that what the lawyers say is not evidence." *Id.* And much of the evidence that the State presented allowed the jury to infer that White was with Parker and left his semen on her the day she was murdered. For example, there was evidence that within the same period in which "Parker struggled with an attacker in her apartment, was stripped of her jeans and panties, and was strangled to death with those jeans," White was in Parker's apartment smoking a cigar. *Id.* at 212. And the evidence showed that White "raped and murdered another [woman] in a very similar manner less than four months later." *Id.* Thus, White hasn't established that "no fairminded jurist could agree" with the ACCA's determination that White suffered no prejudice from his counsel's failure to object to the prosecutor's statements about Parker showering. *See King v. Warden, Ga. Diagnostic Prison*, 69 F.4th 856, 867 (11th Cir. 2023).

Second, White asserts that the ACCA's determination was contrary to or an unreasonable application of clearly established federal law because the ACCA segregated this aspect of White's ineffective assistance of counsel claim and didn't consider counsel's alleged errors cumulatively. The court finds that this issue is best addressed in Part V.1.I of this opinion when considering White's claim that the cumulative effect of counsel's guilt phase errors warrants relief. Thus, the court does not address this argument here.

White isn't entitled to habeas relief for his ineffective assistance of counsel claim related to counsel's failure to object to the prosecutor's statement about Parker showering.

### G.     Claim that counsel failed to object to prosecutor's comments on White's alleged lack of remorse

White's next guilt phase ineffective assistance of counsel claim is that counsel was ineffective for not objecting to the State relying on White's alleged lack of remorse for the killing of Black to establish that he murdered Parker:

```
When you listen to his statement in

Sierra Black's case.  It tells you

everything you need to know about Justin

White.  Everything.

     Did he show any remorse whatsoever?

Other than for himself?
```

(Doc. 56, p. 64).

White exhausted this claim during his Rule 32 proceedings. (See Doc. 10-26, pp. 57–58; Doc. 10-32, pp. 77–78; Doc. 10-35, pp. 57–58). The ACCA noted that it had rejected this argument under plain-error review and ruled as follows:

> Again, this is not one of those rare cases when a finding of no plain error rises to the level of prejudice under _Strickland_. Accordingly, because the substantive claim underlying the claim of ineffective assistance is without merit, White could establish no prejudice under _Strickland_. White is due no relief on this claim.

_White_, 343 So. 3d 1186.

White once again argues that the ACCA's ruling was contrary to or an unreasonable application of _Strickland_ because it found the plain-error outcome on direct appeal determinative in evaluating whether counsel's errors prejudiced White. But the ACCA acknowledged that in some cases there could

be a finding of *Strickland* prejudice even though no plain error was found on direct appeal. And White again ignores the substance of the ACCA's direct appeal ruling:

> As stated above, evidence establishing that White raped and murdered Black was admissible under Rule 404(b), Ala. R.Crim. P., to establish his identity as the individual who raped and murdered Parker. Because White's actions in raping and murdering Black were admissible to establish his identity, the evidence relating to facts underlying Black's rape and murder and the circumstances of that crime were admissible. *Jones v. State,* 915 So.2d 78, 83 (Ala.Crim.App.2005). The prosecutor's comment about White's lack of remorse was not, as White argues, an improper comment on his bad character. Instead, the prosecutor's comment related to evidence—White's lack of remorse for killing Black—tending to establish that White intentionally murdered Black. *See Darby v. State,* 145 S.W.3d 714, 721 (Tex.App.2004) (holding that the jury may infer intent to kill from the defendant's lack of remorse). Because the prosecutor's comment related to evidence establishing White's intent to murder Black, ***no error***, much less plain error, occurred.

*White*, 179 So. 3d at 204 (emphasis added). Plus, as the ACCA noted, the prosecutor's statement was isolated and made in the heat of debate, and the circuit court repeatedly instructed the jury that it could not consider White's involvement in Black's murder to infer that he had bad character. *See id.*

As the ACCA found on direct appeal that it wasn't error to allow the prosecutor's comment and the jury was instructed that it could not consider evidence of the Black murder for an improper purpose, the court cannot say that "no fairminded jurist could agree" with the ACCA's determination that White suffered no prejudice from his counsel's failure to object to the prosecutor's statement. *See King*, 69 F.4th at 867. Thus, White isn't entitled to habeas relief for this ineffective assistance of counsel claim.

**H.     Claim that counsel failed to challenge the prosecution's peremptory strikes during jury selection**

White next asserts that counsel was ineffective for failing to object to the prosecution's use of peremptory strikes to remove women from the venire, which White contends was in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986) and *J.E.B. v. Alabama*, 511 U.S. 127 (1994). White exhausted this claim during his Rule 32 proceedings. (Doc. 10-26, pp. 65–69; Doc. 10-32, pp. 78–81; Doc. 10-35, pp. 59–61). And the ACCA found that this claim failed to establish *Strickland* prejudice:

> On direct appeal, we stated the following concerning White's <u>Batson</u> claim:
>
> "Here, the State used 12 of its 14 peremptory strikes to remove female veniremembers. Thereafter, White's jury consisted of 5 women and 7 men. Also, a female and a male served as alternate jurors. At the conclusion of voir dire, defense counsel did not indicate and the circuit court did not believe that a <u>J.E.B. [v. Alabama</u>, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994),] violation had occurred. The circuit court asked both sides whether they had anything to say, and defense counsel responded: 'The defense is satisfied, Your Honor.' (R. 208.)
>
> "Now, on appeal, White argues for the first time that the State's use of 12 of its 14 peremptory strikes, including the last 9 in a row, to remove women establishes a prima facie case that the State used its strikes to discriminate against women. This Court disagrees. The use of 12 of 14 peremptory strikes against women does not raise an inference that the State purposefully discriminated against women. <u>See</u> <u>Ex parte Land</u>, 678 So.2d 224, 246 (Ala. 1996) (holding that the State's use of 11 of its 14 peremptory strikes against whites did not raise a inference that the State purposefully discriminated against whites); <u>Ex parte Trawick</u>, 698 So.2d [162,] 167 [ (Ala. 1997) ] (holding that the State's 'use[ ] [of] 11 of its 14 peremptory strikes to remove women from Trawick's jury, resulting in a petit jury that was

composed of 7 men and 5 women' did not raise an inference that the State discriminated against women). Nor does the State's use of its last 9 peremptory strikes against women establish that there was a pattern to the State's use of its strikes. McCray v. State, 88 So.3d 1, 19 (Ala. Crim. App. 2010) (holding that the State's use of its last 7 strikes against women did not establish a pattern). Further, the number of strikes the State used against women is tempered by the fact that 5 jurors and 1 alternate were women. See McCray v. State, 88 So.3d 1, 24 (Ala. Crim. App. 2010) (' " 'Of course, the fact that [women] are ultimately seated on the jury does not necessarily bar a finding of discrimination under Batson [v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ] [or J.E.B.,] see [United States v.] Battle, 836 F.2d [1084,] 1086 [ (8th Cir. 1987) ], but the fact may be taken into account in a review of all the circumstances as one that suggests that the government did not seek to rid the jury of persons who shared the [same gender].' United States v. Young–Bey, 893 F.2d 178, 180 (8th Cir. 1990)" ' (quoting Mitchell v. State, 579 So.2d 45 (Ala. Crim. App. 1991), quoted with approval in Ex parte Thomas, 659 So.2d 3, 7 (Ala. 1994) ) (emphasis omitted) ). Accordingly, the State did not use 'peremptory challenges to dismiss all or most [female] jurors.' Ex parte Branch, 526 So.2d [609] at 623 [ (1987) ].

"Further, there is nothing in the record to indicate that the prosecutor had a history of discriminating against women. The type and manner of questions asked during voir dire were general and not directed toward women. In fact, the State asked questions of the entire venire, then asked follow-up questions of both men and women when appropriate. Additionally, the State did not single out women for individualized voir dire; rather, all potential jurors (men and women) who had given answers that raised concerns [were] questioned individually."

White, 179 So.3d at 200.

> Based on this Court's holding in <u>White</u>, this claim would not have constituted error even had counsel made an objection in the circuit court. Again, this is not one of those rare cases where a finding of no plain error rises to the level of prejudice under <u>Strickland</u>. White was due no relief on this claim.

*White*, 343 So. 3d at 1186–87.

White contends that the ACCA's ruling isn't entitled to deference under § 2254(d) for two reasons. First, White again says that the ACCA improperly conflated a finding of no plain error with a lack of *Strickland* prejudice. Second, White asserts that the ACCA's *J.E.B.* / *Batson* analysis was contrary to or an unreasonable application of Supreme Court precedent. White's first argument lacks merit as the ACCA correctly applied the *Strickland* prejudice standard by considering whether White's *J.E.B.* claim would have been successful had counsel objected to the State's use of peremptory strikes. White's contention that the ACCA's underlying *J.E.B.* / *Batson* analysis was unreasonable is discussed below.

Under the Equal Protection Clause, "litigants may not strike potential jurors solely on the basis of gender." *See J.E.B.*, 511 U.S. at 143. The Supreme Court has outlined a three-step burden-shifting framework that courts must use to determine whether peremptory strikes have been used in a discriminatory manner. First, the party challenging the peremptory strike makes out a prima facie case of discrimination by "showing that the totality of the relevant facts give rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005). Second, if the court agrees that a prima facie case exists, the striking party must offer a gender-neutral explanation for its strike. *See id.* Finally, if the striking party gives a gender-neutral reason for the strike, the court must then decide "whether the opponent of the strike has proved purposeful [gender] discrimination." *Id.* (cleaned up).

The Alabama state courts resolved White's *Batson* / *J.E.B.* challenge at step one, so it is the only step the court considers when deciding whether the ACCA's ruling is entitled to AEDPA deference. "When considering whether an objector has made a prima facie case as a first step, a court must consider all relevant circumstances which include, but are not limited to: (1) a prosecutor's

pattern of strikes against [female] jurors included in the venire, (2) the prosecutor's questions and statements during voir dire examination, (3) the failure of the prosecutor to ask meaningful questions to the struck jurors, (4) the subject matter of the case[,] and (5) evidence of past discrimination in jury selection." *Madison v. Comm'r, Ala. Dep't of Corr.*, 677 F.3d 1333, 1337 (11th Cir. 2012) (internal citations omitted).

1. *Standard applied*: White argues that the ACCA's *Batson / J.E.B.* analysis isn't entitled to AEDPA deference under § 2254(d)(1) because the ACCA "increased [his] prima facie burden beyond what *Batson* requires." *See Madison*, 677 F.3d at 1338. But unlike in *Madison*, the ACCA did not require White to "**establish**[ ] purposeful racial discrimination" to meet his burden at step one. *See id.* (emphasis added). Instead, consistent with *Batson* and *J.E.B.*, the ACCA repeatedly noted that what White needed to do was raise an inference of purposeful discrimination. *Compare White*, 179 So. 3d at 198–202; *White*, 343 So. 3d at 1186–87, *with Batson*, 476 U.S. at 96–97. Thus, the ACCA correctly applied the three-step burden-shifting framework to White's challenge under *J.E.B.* In doing so, the ACCA properly recognized that it was to consider "the totality of relevant facts" and "all relevant circumstances which could lead to an inference of discrimination." *White*, 179 So. 3d at 199. And the ACCA considered many factors relevant to *Batson / J.E.B.* challenges, including the use of strikes against female jurors, whether the prosecutor had a history of discriminating against women, the type and nature of the voir dire questions, and whether the State asked meaningful questions to struck jurors. *See id.* at 200–202.

The court thus finds that the ACCA's underlying *Batson / J.E.B.* step-one analysis is entitled to deference under 28 U.S.C. § 2254(d)(1) and (d)(2).

2. *Statistics*: As White notes, the State used 12 of its 14 peremptory strikes, including its last 9, against prospective female jurors when women made up 26 of the 44 prospective jurors. This resulted in a jury with 7 men and 5 women with one female and one male serving as alternates. White says that the ACCA's ruling was unreasonable under § 2254(d) because (a) the State's acceptance of some female jurors doesn't negate an inference of discrimination, and (b) the Supreme Court held in *Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003), that in a case in which prosecutors used their peremptory strikes to

exclude 91% of eligible black jurors "the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors."

But standing alone the "statistical disparities of the magnitude present in [White's] jury do not support a prima facie case." *See Ledford v. Warden, Ga. Diagnostic Prison*, 975 F.3d 1145, 1156 (11th Cir. 2020). For example, in *Ledford*, the Eleventh Circuit found reasonable the Georgia state courts' determination that the prosecution's use of 9 of its 12 peremptory strikes against female jurors in a jury pool comprised of 15 women didn't establish a prima facie case under *J.E.B. See id.* at 1156–57. And in *United States v. Campa*, 529 F.3d 980, 989, 998 (11th Cir. 2008), the circuit court found that the defendant had failed to establish a prima facie case of racial discrimination even though 7 of the government's 9 used strikes were used to strike black jurors.

Here, the percentage of strikes (86%) used on female jurors is only slightly higher than the percentage used in *Leford* (75%) or *Campa* (78% used and 64% allotted). Thus, the court cannot say that the ACCA's determination that the State's use of 12 out of 14 strikes to strike female jurors failed to state a prima facie case of discrimination was an unreasonable application of *J.E.B.* or *Batson*. Plus, it was not unreasonable for the ACCA to conclude that the fact that five women served on the jury and one served as an alternate undercuts White's argument that the number of strikes the State used on women suggests discrimination. True, there were 26 women in the jury pool, so the State couldn't use its 14 peremptory strikes to exclude all women from the jury. But the ACCA recognized that the fact that women served on the jury wasn't fatal to White's prima facie case of discrimination and instead appropriately considered the number of women serving on the jury as part of "the totality of the relevant facts" to consider. *See Johnson*, 545 U.S. at 168. And "[t]hat the state accepted female jurors, even in small numbers, where a different allocation of strikes could have reduced female participation even further, tends to undermine the inference that those women who were peremptorily excluded were targeted on account of their gender." *Ledford*, 975 F.3d at 1156. So it was relevant to the ACCA's prima facie case analysis that the State "did not attempt to exclude as many [women] as it could from the jury." *See Campa*, 529 F.3d at 998.

In short, it was reasonable for the ACCA to conclude that the statistical disparities that White points to do not establish a prima facie case "absent additional facts which may give rise to an inference of discriminatory purpose." *Ledford*, 975 F.3d at 1157 (cleaned up).

3. *Other relevant circumstances*: White says that he has more facts that support an inference of discrimination and that the ACCA was wrong to find that these facts combined with his statistical showing failed to establish an inference of discrimination. According to White other facts that support an inference of discrimination are that (1) the prosecution engaged in disparate treatment of prospective female jurors, (2) the prosecution failed to meaningfully voir dire challenged female jurors, and (3) the prosecutor made statements that exhibited gender consciousness during voir dire. White also says that he was prejudiced by counsel's failure to object to the State's alleged discriminatory strikes because of his case's sexual overtones.

a. <u>Disparate treatment</u>: White asserts that the State treated women disparately because it struck women with criminal charges or whose family members were charged with criminal offenses but allowed two men prosecuted for criminal offenses (and one with a close friend with a drug addiction) to serve on the jury. White also contends that the State's strikes were discriminatory because the State struck five women with children under 19 but allowed three men with children under 19 to serve on the jury. Finally, White says that disparate treatment is the only explanation for the State striking potential juror Sherylnn Cade as she answered only one question during voir dire and two similarly situated male jurors who also answered only one question were seated on the jury. The ACCA addressed this argument in White's direct appeal:

> White's argument is not supported by the record. The record establishes that the State struck both men and women who had family members who had been charged with crimes. Although the State allowed some men who had a family member who had been charged with a crime to serve on the jury, it also allowed B.S., a female who had a family member charged with a crime, to serve on the jury. White's argument that the State targeted female potential jurors with children under the age of 19 while

> allowing similarly situated males to serve on the jury is also belied by the record. Although the State did not strike 3 male potential jurors with children under the age of 19, it also allowed E.K., a similarly situated female juror, to serve. Further, E.S., the female alternate juror, had a child under the age of 19. Finally, although the State struck S.C., a female potential juror who answered only one question during voir dire, it also struck C.H., a male potential juror who answered only one question. Thus, contrary to White's assertion, the State struck and allowed men and women to serve who had family members who had been convicted of a crime, who had children under the age of 19, and who answered only one question during voir dire. Accordingly, disparate treatment is not "obvious on the face of the record." *Ex parte Walker,* 972 So.2d 737, 753 (Ala.2007).

*White*, 179 So. 3d at 201–02.

White has not argued, much less shown by clear and convincing evidence, that the ACCA's findings that (1) the State struck both men and women who had family members charged with crimes, (2) the State allowed a female juror with a family member charged with a crime to serve on the jury, (3) one juror and one alternate were females with children under the age of 19, and (4) the State struck a male potential juror who answered only one question were erroneous. So the court presumes that the ACCA's determination of these factual issues is correct. *See* 28 U.S.C. § 2254(e)(1). And considering those facts, the court cannot say that the ACCA's decision that "nothing in the record . . . indicates that the State treated women disparately" was based on an unreasonable determination of the facts under § 2254(d)(2). The court recognizes that it's relevant that the State struck Cade after only asking her one question. *See Madison*, 677 F.3d at 1337. But the argument that the State struck Cade because of her gender is undercut by the fact that the State also struck a male juror after not meaningfully questioning him. And the ACCA's finding that the State treated male and female jurors similarly is at the very least not unreasonable.

b. <u>Voir dire of female jurors</u>: White adds that it was relevant that the State did not ask meaningful questions of several of the female jurors that it struck. The court agrees that this was a relevant factor to consider when evaluating whether White had established a prima facie case of discrimination. *See Miller-El v. Dretke*, 545 U.S. 231, 244–45 (2005). But White has not shown that it was an unreasonable determination of the facts for the ACCA to find that "the State asked questions of the entire venire, then asked follow-up questions of both men and women when appropriate." *White*, 179 So. 3d at 201. And that the State struck a potential male juror who answered only one question undermines White's argument that female jurors who White believes should have been asked more follow-up questions were struck because of their gender. Thus, White hasn't shown that the ACCA's evaluation of this factor was unreasonable.

c. <u>Gender conscious statements</u>: White next says an inference of intentional gender discrimination is strengthened because the State called White a "handsome guy" several times during voir dire and the penalty phase of trial. (*See* Doc. 10-12, pp. 137–38; Doc. 10-15, pp. 169–70). In White's direct appeal, the ACCA rejected this argument:

> During voir dire, the State asked the following:
>
> "Now, do any of you think looking at the Defendant in this case, Justin White, that he just looks too nice of a guy to have done something like we're talking about in these indictments?"
>
> (R. 80–81.) After receiving no response, the State asked:
>
> "I mean, does anybody right now just say, I just don't believe it, right off the bat, this is not what you would think about a guy that looks like that, handsome guy, well dressed?
>
> "I just, right now, I want to tell you I just don't believe that he did it; does anybody feel that way?"
>
> Contrary to White's assertion, these two questions did not "indicate that the prosecution believed female jurors could not be impartial in a case involving charges of capital murder and rape against an attractive male defendant." (White's brief, at

> 63–64.) Rather, these questions were designed to elicit responses from any potential juror (male or female) who might have felt that a nice-looking, well dressed individual like White would not have committed the horrendous acts with which he was charged.

*White*, 179 So. 3d at 202.

Having reviewed the record, the court agrees with the ACCA. And at the very least, the ACCA's interpretation of the State's questions and comments about White being "handsome" was not an unreasonable determination of the facts under § 2254(d)(2).

d. <u>Subject matter of case</u>: Another relevant factor under *Batson* and *J.E.B.* is the subject matter of the case. *See Madison*, 677 F.3d at 1337. And White suggests that a gender balanced jury would be less likely to convict him of murder during a course of rape, a crime with sexual overtones. But the jury was largely balanced at 7-5. And White has not explained or cited any case that would suggest that female jurors are less likely to convict a male defendant accused of raping and then murdering a woman. In fact, Justice O'Connor's *J.E.B.* concurrence notes that studies suggest that female jurors are ***more*** likely to convict a defendant of rape. *See J.E.B.*, 511 U.S. at 148–49 (O'Connor, J., concurring). The court is thus unconvinced by this argument. And even if the subject matter of White's case supports an inference of discrimination, it doesn't render the ACCA's evaluation of the "totality of the relevant facts" unreasonable. *Johnson*, 545 U.S. at 168.

—

In sum, the ACCA did not act contrary to or unreasonably apply clearly established federal law when the ACCA decided that White had failed to meet *Strickland*'s prejudice prong based on its determination that its direct appeal holding showed that White's *J.E.B.* claim would not have been successful had counsel objected to the State's peremptory strikes. And the ACCA's underlying *Batson* / *J.E.B.* analysis was not unreasonable under either § 2254(d)(1) or § 2254(d)(2). So White isn't entitled to habeas relief on his claim that counsel was ineffective for failing to object to the State's peremptory strikes under *J.E.B.*

49

## I.  Claim that cumulative effect of guilt phase errors entitles White to relief

White's final guilt phase ineffective assistance of counsel claim is that the cumulative effect of counsel's alleged errors prejudiced him. White exhausted this claim in state court. (*See* Doc. 10-26, pp. 69–71; Doc. 10-32, pp. 81–83; Doc. 10-35, pp. 61–64). Contrary to White's assertion, the ACCA rejected this argument on the merits:

> White argues that the cumulative effect of the errors at the guilt phase entitled him to relief.
>
> "Even if a cumulative-effect analysis were required by Alabama law, that factor would not eliminate Taylor's obligation to plead each claim of ineffective assistance of counsel in compliance with the directives of Rule 32." <u>Taylor</u>, 157 So.3d at 140. White is due no relief on this claim.

*White*, 343 So. 3d at 1188.

"Even if the state court's prejudice determination as to each ground of allegedly deficient performance was reasonable, [this court] still must decide whether its conclusion as to the cumulative prejudice constituted an unreasonable application of *Strickland*." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1055 (11th Cir. 2022) (en banc). "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotation omitted), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813 (2006). But "[w]ithout harmful errors, there can be no cumulative effect compelling reversal." *Barshov*, 733 F.2d at 852.

It was reasonable for the ACCA to determine that because White's individual claims related to counsel's alleged guilt phase errors were meritless, the supposed errors, even considered in the aggregate, did not undermine confidence in the state court proceedings. *See Masse v. Sec'y, Fla. Dep't of Corr.*, 700 F. App'x 890, 895 (11th Cir. 2017) ("Because Masse's individual claims

have no merit, Masse can show no cumulative error."). Thus, White has not established that he is entitled to relief under § 2254(d) for his guilt phase cumulative errors claim.

### J.   Claim that counsel deprived White of right to effective assistance of counsel during penalty and sentencing phases

White's next ineffective assistance of counsel subclaim is that his trial counsel was ineffective during the penalty and sentencing phases of trial. Within this subclaim, are several sub-subclaims. Respondent asserts that most of these subclaims were not presented to the state courts and are thus procedurally defaulted. As a result, the court will follow this framework when analyzing each subclaim:

> o  Step One: The court will determine whether the subclaim was "fairly presented" to the state courts. *See Pope*, 680 F.3d at 1284.

> o  Step Two: If the subclaim wasn't fairly presented, the court will determine whether the failure to exhaust that subclaim is somehow excused.

> o  Step Three: For any subclaims that were fairly presented to the state courts or that can otherwise be decided on their merits, the court will address the merits of the subclaim.

Only after addressing "all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default," may the court address White's argument that any procedural default should be excused because he is actually innocent of the death penalty. *See Dretke v. Haley*, 541 U.S. 386, 393–94 (2004). Thus, the court doesn't address White's actual innocence argument until the very end of this opinion, *see* Part V.7, *infra*.

### i.   Duty to adequately investigate and present a basis for a sentence of life

White's first four penalty phase ineffective assistance of counsel subclaims assert that White's trial counsel failed to adequately investigate mitigation evidence to present during the penalty and sentencing phases. As White notes, trial "[c]ounsel's performance is unreasonable where counsel fails

altogether to make an investigation, or where counsel makes only a desultory or cursory effort to find mitigating evidence." *Fortenberry v. Haley*, 297 F.3d 1213, 1229 (11th Cir. 2002).

>    a.    *Counsel did not prioritize a mitigation investigation by retaining necessary experts.*

White first asserts that trial counsel erred by not retaining necessary experts to aid counsel in White's mitigation case and instead improperly outsourced the search for mitigating evidence to a single expert: psychologist Allen Shealy.

1. <u>Exhaustion</u>: Respondent asserts that this subclaim is procedurally barred because it was never presented to the state courts. As the court has noted, exhaustion requires state prisoners to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process, including review by the state's last court of last resort, even if review in that court is discretionary." *Pruitt*, 348 F.3d at 1358–59. If "the substance of a federal habeas corpus claim was first presented to the state courts, *despite variations in the factual allegations urged in its support*, the claim is exhausted." *Freeman v. Comm'r, Ala. Dep't of Corr.*, 46 F.4th 1193, 1217 (11th Cir. 2022) (cleaned up). Thus, the claims in a federal habeas petition needn't be "carbon copies of the claims . . . presented to the state courts." *Id.* But a claim isn't exhausted if a reasonable reader of the state court filings wouldn't understand that the claims brought in federal and state court share a "particular legal basis and *specific factual foundation*." *See id.*

Applying this standard, the court finds that White presented his failure to retain necessary experts subclaim to the circuit court but did not fairly present this subclaim to the ACCA or Alabama Supreme Court. In his amended Rule 32 petition, White asserted that "[t]rial counsel's failure to obtain and present independent expert witnesses at the sentencing phase constituted deficient performance that prejudiced Mr. White." (Doc. 10-26, p. 93). And the Rule 32 petition alleged that trial counsel should have retained as expert witnesses a social worker (or mitigation specialist), an investigator, a mental health expert, and an expert on drug and alcohol abuse to explain "the likely

causes of Mr. White's mental and emotional problems and how those problems were relevant both to Mr. White's defense and to his moral culpability." (*Id.*, pp. 91–93). The circuit court rejected this claim for failure to the meet the pleading requirements of Rules 32.3 and 32.6(b). (Doc. 10-25, p. 46). While the factual allegations in White's federal habeas petition are much more detailed than those in his Rule 32 petition, "[a]t its core," the failure to retain experts' claim in the Rule 32 petition raises the same legal issues as those presented in White's federal habeas petition. *See Freeman*, 46 F.4th at 1219. And "[u]ltimately, the new factual allegations do not change the substance of" White's claim—that Dr. Shealy shouldn't have been the only expert that counsel relied on. *See id.*

The court thus finds that White's amended Rule 32 petition fairly presented a failure to retain necessary experts ineffective assistance of counsel claim. But a reasonable reader wouldn't understand either White's brief to the ACCA or cert petition to the Alabama Supreme Court as raising a penalty phase ineffective assistance of counsel claim based on the failure to retain experts. (*See* Doc. 10-32, pp. 33–49; Doc. 10-35, pp. 13–29). So White did not exhaust this subclaim. *See Pruitt*, 348 F.3d at 1358–59.

2. <u>No corrective process exception</u>: Because White did not exhaust this subclaim, he would now be barred from attempting to bring this subclaim in state court under Alabama Rules of Criminal Procedure 32.2(c) (statute of limitations bar) and 32.2(b) (successive petition bar). So this subclaim is procedurally defaulted unless White can establish that he meets an exception to the exhaustion requirement. *See Bailey*, 172 F.3d at 1303.

White asserts that he can meet an exception to the exhaustion requirement under § 2254(b)(1)(B), which doesn't require exhaustion if "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." *See* 28 U.S.C. § 2254(b)(1)(B)(i)-(ii). According to White, Alabama provided him with no corrective process to protect his rights because (1) the Alabama postconviction process is complex, (2) Alabama did not guarantee White counsel, and (3) Alabama's courts denied White resources, discovery, and an evidentiary hearing, which White said he needed to prove counsel's ineffective assistance at sentencing.

This court has rejected similar arguments in the past. *See Ingram v. Stewart*, 2021 WL 1208867, at *5 (N.D. Ala. Mar. 31, 2021) (rejecting argument that there was no corrective process because Rule 32 petitioners often aren't granted State funding for experts); *Shanklin v. Dunn*, 2024 WL 1321152, at *27 (N.D. Ala. Mar. 27, 2024) (rejecting argument that there was no corrective process because petitioner was "limited to unqualified, underpaid out-of-state counsel" and "never stood a chance in Rule 32 proceedings against his well-funded opponent"). And during his Rule 32 proceedings, White was represented by two attorneys who aided him in raising many claims to the ACCA and Alabama Supreme Court. The court thus finds that White has failed to show that the no corrective process exception to exhaustion applies here.

3. <u>Procedural default</u>: White also asserts that he can meet the "cause and prejudice" exception to procedural default. Under this exception, "[i]f a petitioner can show cause for the default and establish prejudice resulting from the alleged violation of federal law, then the default will be excused, and federal courts can hear the claim." *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1368 (11th Cir. 2021). "To establish cause, a petitioner must ordinarily demonstrate some objective factor external to the defense that impeded his effort to raise the claim properly in state court." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1260 (11th Cir. 2014) (quotations omitted). But *Martinez v. Ryan*, 566 U.S. 1 (2012), created an equitable exception for ineffective assistance of trial counsel claims. For unexhausted ineffective assistance of trial counsel claims, ineffective assistance of post-conviction counsel in an initial review collateral proceeding can establish cause when "the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal." *See Davila v. Davis*, 582 U.S. 521, 524–25 (2017).

White says that he can establish cause in two ways. White first asserts that the state court's denial of his motions for expert funding was an external impediment that establishes cause. The court rejects this argument for two reasons. First, a state's denial of funding for postconviction experts or investigative services doesn't constitute cause for excusing procedural default. *See Kennedy v. Herring*, 54 F.3d 678, 694 (11th Cir. 1999); *Soler-Norona v. Floyd*, 2023 WL 7182356, at *5 (6th Cir. May 11, 2023) (single judge order); *see also Simpson v. Warden, Lebanon Corr. Inst.*, 2018 WL 1241482, at *9 & n.4

(S.D. Ohio Mar. 9, 2018) (distinguishing lack of effective assistance of postconviction counsel from lack of expert assistance). Second, despite the alleged inadequate funding, White managed to present the failure to retain necessary experts ineffective assistance of counsel claim in his amended Rule 32 petition. So White hasn't shown that a lack of funding is what caused him to not raise this claim in his filings with the ACCA or Alabama Supreme Court.

White also says that his failure to exhaust is excused because the circuit court's denial of his requests for funding "[a]rguably . . . rendered Rule 32 counsel ineffective within the meaning of *Martinez*, despite Mr. White's diligent efforts to develop and litigate his substantial IAC claim." (Doc. 61, p. 58). Because White presented his failure to retain necessary experts subclaim in his amended Rule 32 petition, *Martinez*'s exception doesn't apply to this subclaim. *See Martinez*, 566 U.S. at 16 (noting that exception doesn't apply to attorney errors during "appeals from initial-review collateral proceedings").

Even if *Martinez* did apply, White has failed to show that his Rule 32 counsel's performance was deficient. To satisfy *Martinez*, White must establish **both** "that his habeas counsel's conduct fell below an objective standard of reasonableness, **and** that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *See Hittson*, 759 F.3d at 1262 (quotations omitted) (emphasis added). The underlying merits of White's ineffective assistance of trial counsel claims is relevant to both inquiries. *See id.* But "a petitioner does not establish constitutionally defective performance simply by showing that (a) potentially meritorious claims existed and (b) his collateral counsel failed to raise those claims." *Id.* at 1263. Instead, White must show that "*no competent counsel*, in the exercise of reasonable professional judgment, would have omitted those claims." *Id.*

White does not address how his Rule 32 counsel's performance was deficient other than to say that his attorneys were "arguably ineffective" because the state court denied their funding requests. The court thus finds that White has failed to establish that Rule 32 counsel was incompetent for failing to raise the ineffective assistance of trial counsel claims that he seeks to raise for the first time in his federal habeas petition.

As White has failed to establish cause for not exhausting his failure to retain necessary experts ineffective assistance of counsel claim, this claim is procedurally defaulted unless White can show that he is actually innocent of the death penalty, an issue the court addresses later.

> b.    *Counsel did not properly, and regularly, interview Mr. White to learn about troubled history in his background.*

White next asserts that his trial counsel was ineffective for failing to thoroughly interview him so that they could learn mitigating information from White and develop a coherent sentencing theory. White did not raise a standalone failure to interview claim in his state court filings. Instead, White's only reference to counsel's failure to interview him was in the context of White's claim that counsel failed to interview several available witnesses, including White, about his family history and adoption. (*See, e.g.*, Doc. 10-35, p. 19). Thus, the court finds that White failed to "fairly present" this claim to the state courts. *See Pope*, 680 F.3d at 1284.

Because White did not exhaust this subclaim, he would now be barred from attempting to bring this subclaim in state court under Alabama Rules of Criminal Procedure 32.2(c) (statute of limitations bar) and 32.2(b) (successive petition bar). So this subclaim is procedurally defaulted unless White can establish that he meets an exception to the exhaustion requirement. *See Bailey*, 172 F.3d at 1303. As explained, White has failed to show that the no corrective process exception applies, that the circuit court's denial of funds is an external impediment that excuses White's failure to exhaust, or that his Rule 32 counsel was ineffective. *See* Part V.1.J.i.a., *supra*. Plus, White has not explained why he would need an expert or mitigation specialist to present a claim that counsel was ineffective for failing to interview him when counsel's billing records and Mr. White's own recollections would supply the information necessary to bring this claim. The court thus finds that this subclaim is procedurally barred unless White can show that he is actually innocent of the death penalty.

> c.    *Counsel did not conduct appropriate, timely interviews with Mr.*
>       *White's family and other readily available informants about his*
>       *background.*

White next asserts that his trial counsel was ineffective for failing to interview White's biological mother Beth Crook, his foster parents, his adopted parents, his extended adopted family, his biological siblings, his adopted siblings, and others to learn more information about White's background, including the circumstances and impact of his adoption. Respondent says that this claim is also procedurally defaulted. But the court disagrees. Review of White's state court filings reveals that White presented this claim to the circuit court, ACCA, and Alabama Supreme Court. (*See* Doc. 10-26, pp. 85–88; Doc. 10-32, pp. 39–40; Doc. 10-35, pp. 19–20). And the ACCA rejected this subclaim for failure to meet the pleading requirements of Rule 32.3:

> White next argues that the circuit court erred in summarily dismissing his claim that his trial counsel was ineffective for failing to investigate and present evidence concerning his family history.
>
> In his amended petition, White pleaded:
>
> "Trial counsel failed to adequately interview Mr. White, his biological mother Beth Crook, his foster parents, his adopted parents, his extended adopted family, his biological siblings, his adopted siblings, and relevant experts in order to obtain information critical to understanding the circumstances and impact of his adoption. Trial counsel failed to obtain available records regarding Mr. White's birth records and records regarding his time in foster care and his adoption. There were records available that counsel could have obtained to provide important details regarding Mr. White's birth, time in foster care, and adoption.
>
> "....
>
> "Mr. White spent the beginning of his life in foster care. He was taken in by his foster parents Ben Gordon and Patty Gordon at

four months old. He lived with his foster parents until he was
adopted at eight months old by Andrew and Stella White.
Defense counsel failed to adequately investigate and present
evidence from Ben Gordon and Patty Gordon regarding Mr.
White's time in foster care. Defense counsel failed to adequately
interview and present evidence from Caleb Gordon regarding
Mr. White's relationship with the Gordon family...."

(C. 285-86.)

When dismissing this claim, the circuit court made the
following findings:

"This claim is insufficiently pleaded because White does not
specifically allege what further records counsel should have
obtained concerning his adoption, what details these records
would show, what impact White's adoption had on his
development, and what evidence counsel should have presented
concerning White's positive relationships with his adoptive
family."

(C. 44.)

This claim was insufficiently pleaded. Clearly, White failed to
plead full facts in support of this claim -– he failed to plead what
such an investigation would have uncovered or what counsel
failed specifically to present once counsel conducted what White
considered to be an "appropriate investigation." "Conclusions
unsupported by specific facts will not satisfy the requirements
of Rule 32.3 and Rule 32.6(b)." Hyde, 950 So.2d at 356.

Moreover, the trial record shows that White was adopted when
he was about eight months old and was in foster care only until
that time. We fail to see how White could establish any
prejudice for trial counsel's failure to present evidence of his
foster care, which occurred before White was eight months old.
Also, White's adoptive mother, Stella White, testified at the
sentencing hearing that White had "issues" with being adopted:

> "[W]hen he was about 7 or 8, you know, he got the telephone, and you know he was learning -— he found out his birth name. So he went down the telephone book and he'll dial numbers with that last name.
>
> "That he would ask people, if a lady answered, he would say, are you my mother? And once people would say no, he would hang up and go to the next number.
>
> "I remember one person, a lady actually talked to him, a very long time. She was very sweet. And she just talked to him. Just like he was her own.
>
> "He just -— he just wanted to know where she was. When we got him, we didn't know anything about his birth father. There were no records on him. And the birth mother said in a letter to him, you know, she alluded to the fact that she was not a willing participant in his conception.
>
> "And so he -— but he always wondered, why didn't she keep me. Because he knew he was biracial. But he would always see biracial children with their parents. So he didn't understand why his mother wouldn't keep him. And he just -— he was always worried about it."
>
> (Trial R. 683-84.)
>
> This claim was correctly summarily dismissed because White failed to comply with the full-fact pleading requirements of Rule 32.3, Ala. R. Crim. P. White is due no relief on this claim.

*White*, 343 So. 3d at 1170–1172.

White has failed to show that the ACCA's decision was unreasonable under either § 2254(d)(1) or § 2254(d)(2). It was reasonable for the ACCA to find that to establish prejudice White needed to explain what information each person trial counsel failed to interview would have provided. And reasonable jurists could agree that the failure to interview witnesses about White's time in foster care didn't prejudice White because White was around eight months old when he was adopted. Finally, as the ACCA noted, through the testimony of White's adoptive mother, Stella White, White's counsel did present evidence

that (a) White had issues with his adoption, and (b) White's birth mother did not willingly participate in his conception. Thus, the court finds that White isn't entitled to habeas relief on this subclaim.

> ### d.    Counsel failed to obtain critical records to support a mitigation case.

White next asserts that counsel was ineffective for failing to obtain records to support White's mitigation case, including school, medical, institutional, court, or employment records about White and his family. Respondent once again argues that this claim is procedurally defaulted. The court disagrees. Review of the state court record establishes that White exhausted this subclaim. (*See* Doc. 10-26, pp. 72–73; Doc. 10-32, pp. 37–39; Doc. 10-35, pp. 17–18). While unlike his Rule 32 petition, White's federal habeas petition cites specific records that his trial counsel failed to obtain, "the new factual allegations do not change the substance" of White's claim that counsel was ineffective for failing to compile records relevant to his mitigation case. *See Freeman*, 46 F.4th at 1219. As a reasonable reader would understand that the claims raised in state and federal court share the same "legal basis and specific factual foundation," the court finds that White exhausted his failure to obtain relevant records ineffective assistance of counsel subclaim in state court. *See id.* at 1217 (emphasis omitted).

The ACCA rejected White's failure to investigate records subclaim under Rules 32.3 and 32.7(d):

> White next argues that the circuit court erred in summarily dismissing his claim that his trial counsel failed to adequately investigate and present a basis for a sentence of life imprisonment without the possibility of parole because, he says, counsel did not investigate any of White's records. In White's amended petition, White pleaded:
>
> "Counsel's duty to investigate includes looking into [White's] medical history, educational history, employment and training history, family and social history, prior correctional experience, and religious and cultural influences. See ABA Guidelines 10.7 Commentary. An adequate investigation requires defense

counsel to interview all available witnesses, and gather school records, social service and welfare records, juvenile dependency or family court records, medical records, military records, employment records, criminal and correctional records, family, birth, marriage and death records, alcohol and drug abuse assessment or treatment records, and INS [Immigration and Naturalization Service] records. Only by acquiring information from these sources can counsel perform the sort of multi-generational investigation extending as far as possible vertically and horizontally necessary to adequately defend a capital case. In this case, counsel failed to conduct the type of investigation necessary to effectively defend Mr. White during the penalty phase of his capital trial."

(C. 271-72.)

. . .

" 'A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.' United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989)." Nelson v. Hargett, 989 F.2d 847, 850 (5th Cir. 1993). As the circuit court stated, White failed to plead what any further investigation would have revealed. "Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis must be included in the petition itself." Hyde v. State, 950 So.2d at 356.

Moreover, the record of White's trial shows that trial counsel requested and was granted funds for an investigator to investigate the circumstances surrounding the case, and a mitigation expert to assist in gathering mitigation for the penalty phase. (Trial C. 53, 56.) The record further shows that trial counsel requested funds so he could secure White's "medical records, school records, criminal background records, and military records." (Trial C. 133.) That motion was also

> granted. (Trial C. 136.) Dr. Shealy, a psychologist, testified at the penalty phase that he had reviewed White's medical, mental-health, and school records.
>
> Accordingly, this claim was correctly summarily dismissed pursuant to Rule 32.3, Ala. R. Crim. P., and Rule 32.7(d), Ala. R. Crim. P. White is due no relief on this claim.

*White*, 343 So. 3d at 1169–1170.

White has failed to show that the ACCA's decision was unreasonable under either § 2254(d)(1) or § 2254(d)(2). Again, this court reviews the reasonableness of the ACCA's decision based on the allegations in White's Rule 32 petition. *See Borden*, 646 F.3d at 816–17. And White's Rule 32 petition didn't specify what records White's counsel failed to compile or what mitigating evidence was contained within those records. So it was reasonable for the ACCA to find that White had failed to adequately plead *Strickland* prejudice. It was also reasonable for the ACCA to find that the allegations in White's Rule 32 petition failed to establish deficient performance. White does not dispute the ACCA's finding that White's counsel secured funds to obtain White's medical, school, and criminal background records. Nor does White dispute that Dr. Shealy testified that he reviewed White's medical, mental health, and school records before testifying.

White has thus not shown that the ACCA's finding that trial counsel adequately investigated his records was unreasonable. White is not entitled to habeas relief on this subclaim.

### ii. A reasonable investigation would have revealed new mitigation evidence, which should have been presented during the penalty and sentencing phases of trial.

White's next seven ineffective assistance of counsel subclaims assert that his trial counsel was ineffective for failing to present mitigation evidence that should have been presented during the penalty and sentencing phases.

>        a.    *White's gestation and infancy were defined by chaos, neglect, and abandonment.*

White first asserts that trial counsel "unreasonably failed to investigate and present available evidence of his abandonment by his mother, its impact on him, and the dysfunctional lifestyle he endured while he was with her." (Doc. 56, p. 97). White also asserts that trial counsel should have presented evidence about his foster parents and his attachment to them. (*Id.*, p. 95).

1. <u>Exhaustion</u>: The court finds that White exhausted his allegations related to his conception, relationship with his foster parents, and the effect of his adoption. In state court, White combined these allegations with his allegation that counsel failed to interview his family and others to raise a claim that trial counsel were ineffective for failing to investigate and present evidence of White's family background. (*See* Doc. 10-26, pp. 85–88; 10-32, pp. 39–40; Doc. 10-35, pp. 19–20). But White did not allege in state court an ineffective assistance of counsel claim based on trial counsel's failure to present evidence of White's life with his biological mother for the first 3 or 4 months of his life. The court will address White's exhausted claims first.

2. <u>Exhausted claims</u>: As explained in Part V.1.J.i.c., *supra*, the ACCA rejected White's claim that counsel was ineffective for failing to present information about his family history. Relevant to this subclaim, the ACCA found that White couldn't establish prejudice for counsel's failure to present evidence of his time in foster care because he was around 8 months old when he left the Gordons. *See White*, 343 So. 3d at 1171. The ACCA also noted that White's adoptive mother had testified about White's issues with his adoption and that White's birth mother had alluded to the fact that she did not willingly participate in White's conception. *See id.*

White has not shown that the ACCA's ruling was an unreasonable application of *Strickland* or unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (d)(2). So the court finds that habeas relief isn't warranted on White's claim that counsel was ineffective for failing to present evidence related to his conception, relationship with his foster family, and issues with his adoption.

3. <u>Unexhausted claim</u>: Under Alabama Rules of Criminal Procedure 32.2(c) (statute of limitations bar) and 32.2(b) (successive petition bar), White would now be barred from attempting to bring his claim that counsel was ineffective for failing to present evidence of the first 3 to 4 months of his life. So this claim is procedurally defaulted unless White can establish that he meets an exception to the exhaustion requirement. *See Bailey*, 172 F.3d at 1303. As explained, White hasn't shown that the no corrective process exception applies, that the State court's denial of funds excuses his failure to exhaust, or that his postconviction counsel were ineffective. *See* Part V.1.J.i.a., *supra*. So White's claim that counsel was ineffective for failing to present evidence about the first few months of his life is procedurally defaulted unless White can show that he is actually innocent of the death penalty.

> b.    *White displayed obvious and severe symptoms of mental disorders from an early age.*

White next asserts that counsel was ineffective for failing to present evidence of his mental disorders, including his biological family's mental health struggles, his disabling ADHD, his bipolar disorder, and his Alcohol-Related Neurodevelopmental Disorder, a Fetal Alcohol Spectrum Disorder. The court finds that White exhausted his allegations related to his biological family's mental health, severe ADHD, and bipolar disorder. (*See* Doc. 10-26, pp. 74–85; Doc. 10-32, pp. 34–37; Doc. 10-35, pp. 15–17). But White did not present to the state courts any allegations related to Alcohol Related Neurodevelopmental Disorder or Fetal Alcohol Spectrum Disorder. The court will address the allegations not presented to the state courts before addressing the allegations that the state court considered.

1. <u>Allegations not presented</u>: White's federal habeas petition includes nearly 20 pages of allegations related to White's assertion that counsel was ineffective for failing to present evidence that he suffered from fetal alcohol syndrome related disorders. (Doc. 56, pp. 104–21). But White did not make any allegations related to fetal alcohol syndrome to the state courts. And Alabama Rules of Criminal Procedure 32.2(c) (statute of limitations bar) and 32.2(b) (successive petition bar) would prevent White from bringing a subclaim related to fetal alcohol syndrome in state court now. So to the extent that White's fetal-alcohol syndrome related allegations should be considered a separate claim

from his claims related to his other mental disorders, this claim is procedurally defaulted unless White can establish that he meets an exception to the exhaustion requirement. *See Bailey*, 172 F.3d at 1303. As explained, White hasn't shown that the no corrective process exception applies, that the state court's denial of funds excuses his failure to exhaust, or that his postconviction counsel were ineffective. *See* Part V.1.J.i.a., *supra*. Thus, White's default won't be excused unless he can show that he is actually innocent of the death penalty.

To the extent that White's fetal alcohol syndrome related allegations are considered part of the same claim as his other mental disorder allegations, the court finds that it still cannot consider these allegations because "a federal court must determine whether a habeas petitioner has satisfied § 2254(d) based only on the record that was before the state court that adjudicated the claim on the merits." *Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254, 1262 (11th Cir. 2014) (quotations omitted). Thus, the court's § 2254(d) analysis cannot consider evidence of White's fetal alcohol spectrum disorder, which wasn't presented to the state courts. *See id.*

2. <u>Allegations presented</u>: The ACCA rejected White's claim that counsel were ineffective for failing to adequately present evidence of his mental illness as follows:

> Although White listed many individuals he said could have provided mitigation testimony, he failed to plead what each of those individuals could have presented. White also failed to specifically identify all of witnesses by name and instead identified them by their title, i.e., former coaches, teachers, or peers. "Specificity in pleading requires that the petitioner state both the name and the evidence that was in the witness's possession that counsel should have discovered, but for counsel's ineffectiveness." <u>Daniel v. State</u>, 86 So.3d 405, 422 (Ala. Crim. App. 2011). "Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis must be included in the petition itself." <u>Hyde v. State</u>, 950 So.2d at 356.

Moreover, as set out above, one affidavit was attached to the postconviction petition; that affidavit was executed by Dr. Samuel Saxon, a clinical psychologist. Dr. Saxon stated that he had treated White when he was young and that White had been diagnosed with ADHD and impulse-control issues. (C. 404.) However, the evidence in this affidavit was presented at White's sentencing hearing.

White's trial counsel presented evidence of his mental illness at his sentencing hearing through the testimony of Dr. Shealy and White's adopted mother. In fact, the mitigation evidence was so persuasive that the jury recommended a sentence of life imprisonment without the possibility of parole. Stella White testified, in depth, concerning their struggles in raising White because of his mental problems and said that White had been diagnosed with ADHD when he was four years old. Dr. Shealy testified that White had ADHD and impulse-control problems.

Dr. Saxon's testimony was cumulative of testimony that White's trial counsel did present at the sentencing hearing.

"Any testimony the additional witnesses would have provided would have been cumulative to that provided by the witnesses at resentencing. As discussed above, trial counsel are not ineffective for failing to present cumulative evidence. See Marquard v. State, 850 So.2d 417, 429–30 (Fla. 2002) ('[C]ounsel is not required to present cumulative evidence.'). Moreover, the cumulative mitigation testimony would not have outweighed the State's evidence in aggravation. See, e.g., Bell v. State, 965 So.2d 48 (Fla. 2007) (finding that the defendant did not demonstrate the prejudice prong because the unpresented penalty phase testimony could not have countered the quantity and quality of the aggravating evidence); see also Gaskin v. State, 737 So.2d 509, 516 n. 14 (Fla. 1999) ('Prejudice, in the context of penalty phase errors, is shown where, absent the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been

> different or the deficiencies substantially impair confidence in
> the outcome of the proceedings.'). The additional testimony
> would only have added to the mitigation already found."
>
> Rhodes v. State, 986 So.2d 501, 512–13 (Fla. 2008).
>
> This claim was correctly summarily dismissed because it failed
> to comply with the full-fact pleading requirements of Rule 32.3,
> Ala. R. Crim. P. Also, this claim was subject to summary
> dismissal under Rule 32.7(d), Ala. R. Crim. P., because it failed
> to state an issue of fact or law that would entitle White to relief.
> White is due no relief on this claim.

*White*, 343 So. 3d at 1168–69.

To be entitled to habeas relief on his claim that counsel was ineffective for failing to adequately present evidence of his mental illness, White must show more than that this claim is meritorious. He instead must establish that "no fairminded jurist could have reached the same judgment as the state court." *Shinn*, 596 U.S. at 378 (cleaned up). But neither White's habeas petition nor his reply brief explains why the state court's adjudication of this ineffective assistance of counsel subclaim was unreasonable under either § 2254(d)(1) or (d)(2). Thus, the court finds that White has failed to meet his burden to establish that the ACCA's decision was unreasonable.

And the court cannot say that no reasonable jurist would have agreed with the ACCA's ruling. As the ACCA noted, Dr. Shealy and White's adoptive parents testified extensively about White's mental health issues during the penalty phase of trial. Dr. Shealy testified that White had been treated for mental disorders since he was either 4 or 5 and that he was admitted to a psychiatric hospital on one occasion. (Doc. 10-15, p. 101). Dr. Shealy diagnosed White with "impulse control disorder, in that not otherwise specified, for intermittent explosive disorder." (*Id.*, p. 102). And Dr. Shealy testified that White had been diagnosed with various forms of impulse control disorders over the years, including ADHD, conduct disorder, and oppositional defiance disorder. (*Id.*, pp. 101–02). According to Dr. Shealy, White was likely born with this disorder because it began manifesting at an early age and would chronically show up in different settings. (*Id.*, p. 102). Dr. Shealy also

explained that individuals with intermittent explosive disorder have trouble controlling their impulses and are often aggressive with other people. (*Id.*). Dr. Shealy then noted that he believed White's condition was genetic and not environmental. (*Id.*, p. 105).

Dr. Shealy also told the jury that he found White's mental disorder to be a mitigating factor because "he had less ability to conduct his behavior according to the requirements of law, than a person without this disorder." (*Id.*, p. 107). And Dr. Shealy said that he understood that White lost several of his jobs because of his difficulties with impulse control. (*Id.*, p. 113). Dr. Shealy also pushed back against the State's assertion that White's mental disorders weren't serious because White was initially diagnosed with ADHD. Dr. Shealy explained that White's "rage episodes are certainly not present in most of the people with ADHD." (*Id.*, p. 116). And Dr. Shealy stated that White suffered from a severe impulse control disorder that's not characteristic of most people with ADHD. (*Id.*). Dr. Shealy finally stated that while White tested in the school system as lower average intelligence, Dr. Shealy found White to be of average intelligence. (*Id.*, p. 117).

White's adoptive parents also testified about White's mental health struggles. Andrew White testified that it was a real challenge for him and his wife to keep up with White and that they had "tried all different type of things to change his behavior." (*Id.*, p. 123). For example, the Whites began taking their son to doctors when he was a small boy and by the time he turned 17, he was seeing a psychiatrist. (*Id.*, p. 128). Stella White testified that even as a baby, White was very active, so she began talking to pediatricians about how active he was when he was 4. (*Id.*, p. 133). The pediatrician referred the Whites to a psychologist who diagnosed White with ADHD. (*Id.*, pp. 133–34). Mrs. White also testified that White was kicked out of one daycare and that she had to beg a second daycare to keep him. (*Id.*, pp. 134–36).

Mrs. White then testified that because of these issues White saw a psychiatrist once or twice a month from the time he was 4 until he was arrested for Sierra Black's murder at age 19. (*Id.*, pp. 136–37). Mrs. White testified that one time when White was in middle school, he was having difficulty, so Mrs. White took him to the emergency room. (*Id.*, pp. 137–38). After the resident psychiatrist talked to White, he said he could not release him because White

said that he was having thoughts of suicide. (*Id.*, p. 138). White was then admitted to a mental hospital in Decatur for 10 days. (*Id.*, pp. 138–39). Things didn't get better after White's hospitalization. (*Id.*, p. 140). And White's doctors told his parents that he had lots of issues with his adoption, which they knew because White would often ask them why his mother wouldn't keep him. (*Id.*, pp. 140–41).

"In the capital sentencing context, the prejudice inquiry asks whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Pye*, 50 F.4th at 1041 (cleaned up). "To assess whether an allegedly deficient aspect of a lawyer's performance was prejudicial, courts must consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced at the habeas proceeding—and reweigh it against the evidence in aggravation." *Id.* at 1042.

It wasn't an unreasonable determination of the facts or contrary to or an unreasonable application of clearly established federal law for the ACCA to find that much of the mental health evidence that White pointed to in his Rule 32 petition was cumulative of the evidence presented at trial. "Mitigating evidence in postconviction proceedings is cumulative when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." *Dallas v. Warden*, 964 F.3d 1285, 1308 (11th Cir. 2020) (quotations omitted). Cumulative evidence includes evidence that "substantiates, supports, or explains more general testimony provided at trial." *See id.* (cleaned up).

The jury and sentencing judge heard that White was diagnosed with mental health issues from a young age, had received various diagnoses, including ADHD and impulse control disorder, and spent 10 days in a psychiatric hospital. They also heard evidence that White's ADHD came with atypical rage episodes and that his condition was likely genetic. So more testimony about the severity of White's ADHD, his accompanying impulse control issues, and the effects of these disorders would have merely "substantiat[ed], support[ed], or explain[ed]" Dr. Shealy and Ms. White's testimony about White's mental health struggles. *See id.* And as the ACCA noted, White's Rule 32 petition failed to explain what the testimony of many of

the witnesses who he says counsel should have called would have added. Instead, White simply said that these witnesses "would have provided extensive and persuasive testimony about Mr. White's mental health issues." (*See, e.g.*, Doc. 10-26, p. 77).

To be sure, counsel didn't present evidence that White suffered from bipolar disorder or that his biological family, including his mother and siblings, had a history of mental illness. But evidence presented during the penalty phase showed the effects of White's bipolar disorder, including the fact that he was hospitalized for reporting suicidal thoughts, struggled greatly with his adoption, and experienced rage episodes. Plus, Dr. Shealy explained that White's condition appeared to be genetic as his symptoms showed up at a young age and were present in various settings. While White's bipolar disorder and family's mental health struggles "would have offered another possible explanation for some of his difficulties, the jury heard a great deal about the potential causes of those difficulties that were beyond [White's] control." *See Dallas*, 964 F.3d at 1310.

There is also "no per se rule of prejudice based on unpresented mental-health evidence." *Pye*, 50 F.4th at 1052. So while White cites several Supreme Court and Eleventh Circuit cases in which the failure to present mitigating mental health evidence was found to prejudice the petitioner, the court is unconvinced that these cases establish that the state court's adjudication of this issue was unreasonable. Instead, "[i]n each of the key Supreme Court cases finding prejudice as a result of counsel's failure to offer mitigating evidence, the disparity between what was presented at trial and what was offered collaterally was vast." *Dallas*, 964 F.3d at 1312. For example, in *Wiggins v. Smith*, counsel introduced no evidence of Wiggins' life history or family background when postconviction evidence established that Wiggins suffered "severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother," followed by "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." 539 U.S. 510, 516, 535 (2003). And in *Porter v. McCollum*, "[t]he sum total of the mitigating evidence was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son." 558 U.S. 30, 32 (2009). But the postconviction record included evidence that "described [Porter's] abusive childhood, his heroic military service and the

trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity." *Id.* at 33. Finally, in *Rompilla v. Beard*, the "evidence in mitigation consisted of relatively brief testimony: five of [Rompilla's] family members argued in effect for residual doubt, and beseeched the jury for mercy, saying that they believed Rompilla was innocent and a good man. Rompilla's 14-year-old son testified that he loved his father and would visit him in prison." 545 U.S. 374, 378 (2005). But files from Rompilla's previous conviction "pictured Rompilla's childhood and mental health very differently from anything defense counsel had seen or heard," including evidence that Rompilla suffered from schizophrenia and other disorders, "and test scores showing a third grade level of cognition after nine years of schooling." *Id.* at 390–91.

The Eleventh Circuit cases that White cites are also distinguishable because in those cases "counsel either failed to present *any* important mitigating evidence at trial or presented only a sliver of significant evidence." *See Mashburn v. Comm'r, Ala. Dep't of Corr.*, 80 F.4th 1292, 1301–02 (11th Cir. 2023) (discussing lack of mitigating evidence presented in *DeBruce*, *Cooper*, *Ferrell*, and *Brownlee*); *see also Baxter v. Thomas*, 45 F.3d 1501, 1512, 1514 (11th Cir. 1995) (noting that while Baxter "spent approximately three years of his teenage life in a psychiatric hospital," counsel presented **no evidence** of his psychiatric problems at sentencing). Here, in contrast, the sentencing judge and jury did hear evidence of White's impulse control issues, struggle with depression, and rage and how those issues affected his daily life. Thus, the court finds that "the ACCA did not unreasonably err" in deciding that White failed to show that it was "reasonably probable . . . that the information he believes should have been introduced would have tipped the aggravation-mitigation scale in his favor." *Mashburn*, 80 F.4th at 1302.

This "conclusion is bolstered by the strength of the aggravating circumstances identified by the trial court." *Id.* at 1303. The State proved three aggravating circumstances at sentencing (1) the capital offense was committed while the defendant was engaged in a rape; (2) the capital offense was committed while the defendant was engaged in a burglary; and (3) the defendant was previously convicted of another capital offense, which was the murder and rape of Sierra Black. (Doc. 10-18, pp. 18–19.) As the sentencing judge noted, Jasmine Parker was only 17-years-old when she was raped by a

71

man who took around 5 minutes to strangle the life out of her with her own clothes. (*Id.*, p. 22). When Parker's mother returned home, "she found her daughter dead, lying on the floor, mostly naked, with her tongue sticking out, and with all of the life strangled out of her." (*Id.*, p. 22). White also "entered into Jasmine Parker's home and remained unlawfully, while he raped her and strangled her to death." (*Id.*, p. 23). Finally, White had previously been convicted of the capital murder and rape of Sierra Black. In both murders, the victims were young African-American women who were strangled to death by an article of their clothing. (*Id.*). And both victims experienced trauma to their bodies, were raped, and had items taken from them. (*Id.*). "It wasn't unreasonable for the state court to weigh these aggravating factors heavily in its evaluation of whether the presentation of additional mitigating evidence" would have changed the trial court judge's imposition of the death sentence. *Pye*, 50 F.4th at 1049.

In sum, the court cannot say that it was "so obviously wrong as to be beyond any possibility for fairminded disagreement," for the ACCA to find no substantial likelihood that White's additional mental health evidence would have made a difference. *See id.* (cleaned up). Thus, White isn't entitled to habeas relief on this ineffective assistance of counsel claim.

> c.    *White sustained multiple head injuries during his childhood, which further damaged his developing brain.*

White's next claim is that his trial counsel was ineffective for failing to obtain and present evidence that he suffered from several head injuries during childhood. White never presented this claim to the state courts. And Alabama Rules of Criminal Procedure 32.2(c) (statute of limitations bar) and 32.2(b) (successive petition bar) would prevent White from bringing this claim in state court now. So this subclaim is procedurally defaulted unless White can establish that he meets an exception to the exhaustion requirement. *See Bailey*, 172 F.3d at 1303. As explained, White hasn't shown that the no corrective process exception applies, that the State court's denial of funds excuses his failure to exhaust, or that his postconviction counsel were ineffective. *See* Part V.1.J.i.a., *supra*. Thus, White's claim that counsel was ineffective for failing to present evidence about his head injuries during

childhood is procedurally defaulted unless White can show that he is actually innocent of the death penalty.

> d.    *White was the victim of sexual abuse and predation during childhood.*

White next asserts that counsel was ineffective for failing to present evidence that when he was in first grade, he was sexually molested by a babysitter and introduced to pornography by a YMCA counselor. White never presented this claim to the state courts. And Alabama Rules of Criminal Procedure 32.2(c) (statute of limitations bar) and 32.2(b) (successive petition bar) would prevent White from bringing this claim in state court now. So this subclaim is procedurally defaulted unless White can establish that he meets an exception to the exhaustion requirement. *See Bailey*, 172 F.3d at 1303. As explained, White hasn't shown that the no corrective process exception applies, that the State court's denial of funds excuses his failure to exhaust, or that his postconviction counsel were ineffective. *See* Part V.1.J.i.a., *supra*. Thus, White's claim that counsel was ineffective for failing to present evidence about his sexual abuse is procedurally defaulted unless White can show that he is actually innocent of the death penalty.

> e.    *White's childhood experiences traumatized and psychologically damaged him.*

White also asserts that counsel was ineffective for failing to present evidence that he suffers from Post-Traumatic Disorder Complex or Complex Trauma, which caused him to develop maladaptive coping strategies, including substance abuse. Though White's Rule 32 petition asserted that counsel was ineffective for failing to investigate evidence relevant to his substance dependence, White did not connect this substance dependence to undiagnosed trauma or otherwise assert that White suffered from Complex Trauma. (*See* Doc.10-26, pp. 76, 83–84). The court thus finds that this subclaim wasn't fairly presented to the state courts. And because White hasn't established that the no corrective process exception applies, that the State's denial of funds excuses his failure to exhaust, or that his state postconviction counsel were ineffective, the court finds that this subclaim is procedurally defaulted unless White can show that he is actually innocent of the death penalty.

    *f.    If counsel had investigated, they could have presented evidence of White's good behavior and adaptability to prison.*

White next asserts that counsel was ineffective for failing to present evidence of White's adaptability to prison during the penalty phase. The court rejects Respondent's argument that White failed to exhaust this claim. In each of his state court filings, White asserted as part of his failure to obtain records ineffective assistance of counsel claim that counsel's inadequate investigation resulted in the failure to present evidence of White's "well-adjusted institutional behavior." (Doc. 10-26, p. 73; Doc. 10-32, p. 39; Doc. 10-35, p. 19). The court thus finds that White presented this claim to the state courts.

Neither the ACCA nor the circuit court specifically referenced White's allegation that some records counsel failed to uncover included evidence of his "well-adjusted institutional behavior." But both the ACCA and the circuit court made clear that they were rejecting White's failure to obtain records claim, in its entirety, for failing to meet the pleading requirements of Rule 32.3 or failing to state a claim for relief under Rule 32.7(d). So the court presumes they adjudicated this claim on the merits. *Harrington*, 562 U.S. at 99.

White has not shown that the ACCA's ruling was unreasonable under § 2254(d)(1) or § 2254(d)(2). Unlike White's federal habeas petition, White's Rule 32 petition did not explain what information in his institutional records showed that he had adjusted well to prison life. Nor did White explain how this information was likely to change the sentencing outcome. So White isn't entitled to habeas relief on this subclaim.

    *g.    If counsel had investigated adequately for either phase, counsel could have argued residual doubt at Mr. White's sentencing.*

White next asserts that counsel was ineffective for failing to argue residual doubt at sentencing, which White says would have been an effective defense to the death penalty. White never presented this claim to the state courts. And Alabama Rules of Criminal Procedure 32.2(c) (statute of limitations bar) and 32.2(b) (successive petition bar) would prevent White from bringing this claim in state court now. So this subclaim is procedurally defaulted unless White can establish that he meets an exception to the exhaustion requirement. *See Bailey*, 172 F.3d at 1303. As explained, White

hasn't shown that the no corrective process exception applies, that the State courts' denial of funds excuses his failure to exhaust, or that his postconviction counsel were ineffective. *See* Part V.1.J.i.a., *supra*. Nor has White shown that hiring an expert or mitigation specialist was required to bring this subclaim in state court. Thus, White's claim that counsel was ineffective for failing to argue residual doubt at sentencing is procedurally defaulted unless White can show that he is actually innocent of the death penalty.

### iii. Counsel's failure to investigate and present available mitigating evidence at White's capital sentencing prejudiced him.

White next argues that his trial counsel's failure to investigate and present available mitigating evidence at his capital sentencing prejudiced him. This argument has two parts. First, White asserts that counsel's failure to present the evidence of his upbringing, family background, personal and family history of mental illness, cognitive problems, history of childhood sexual abuse, and psychological damage from traumatic childhood experiences discussed above prejudiced him because this evidence established statutory and non-statutory mitigating factors. Second, White contends that he was prejudiced during the judicial sentencing phase by counsel's failure to present additional mitigating evidence to support the jury's life verdict.

The court doesn't read the first part of this argument, which references the alleged attorney errors discussed in subclaims J(1)(a)-(d) and J(2)(a)(-g), as a new subclaim. Instead, the court reads this argument as asserting that there's a reasonable probability that the penalty phase errors White has pointed out affected the sentencing outcome because the evidence counsel failed to present was relevant to several mitigating factors. As explained above, the ineffective assistance of counsel claims presented in subclaims J(1)(a)-(d) and J(2)(a)-(g) are either procedurally defaulted or fail on the merits. Thus, this argument doesn't entitle White to habeas relief.

As for his argument that counsel failed to present evidence during the judicial sentencing hearing, White exhausted this claim in state court. (*See* Doc. 10-26, pp. 95–96; Doc. 10-32, p. 44; Doc. 10-35, pp. 23–24). In rejecting this claim, the ACCA found:

Clearly, this claim was correctly summarily dismissed because White failed to plead what additional evidence should have been presented at the sentencing hearing before the judge. White failed to comply with the full-fact pleading requirements of Rule 32.3, Ala. R. Crim. P.

Moreover, this claim was correctly summarily dismissed because it failed to state a claim that would entitle White to any relief. See Rule 32.7(d), Ala. R. Crim. P. We have held that

" '[a]ppellant's contention that his trial counsel rendered ineffective assistance of counsel during the penalty phase of the trial is repudiated by the fact that the jury recommended life in this case. Lewis v. State, 398 So.2d 432 (Fla. 1981); Douglas v. State, 373 So.2d 895 (Fla. 1979). Further, we refuse to find counsel ineffective by relying on the jury recommendation and failing to present further mitigating evidence to the judge. Lewis.' "

Hooks v. State, 21 So.3d 772, 791 (Ala. Crim. App. 2008), quoting Buford v. State, 492 So.2d 355, 359 (Fla. 1986).

This claim was correctly summarily dismissed based on defects in the pleadings and because it was without merit. White is due no relief on this claim.

*White*, 343 So.3d at 1174–75.

White hasn't shown that the ACCA's decision was either an unreasonable application of *Strickland* or unreasonable determination of the facts *See* 28 U.S.C. § 2254(d)(1) and (d)(2). As the ACCA noted, White failed to specify the new evidence that should have been presented during the judicial phase of sentencing. (Doc. 10-26, p. 95). And White has not established that it was contrary to or an unreasonable application of *Strickland* for the ACCA to find that counsels' decision to rely on the jury's 9-3 life recommendation rather than present more evidence at the judicial sentencing was not deficient performance. As a result, the court finds that White isn't entitled to habeas relief on this claim.

### iv. Counsel were ineffective for failing to object to trial court's jury instructions.

White next argues that counsel was ineffective for failing to object to the trial court's penalty phase jury instructions on how to vote after weighing the aggravating and mitigating circumstances. White exhausted this claim in state court. (*See* Doc. 10-26, pp. 94–95; Doc. 10-32, p. 43; Doc. 10-35, p. 23). The ACCA rejected this claim because it held on direct appeal that the trial court properly instructed the jury on how to vote after weighing the relevant factors:

> [T]his Court addressed this specific issue on direct appeal and stated:
>
> "White's contention that the circuit court failed to inform the jury how to vote after weighing the aggravating and the mitigating circumstances, i.e., to vote for death if the aggravation outweighs the mitigation or for life without the possibility of parole if the mitigation outweighs the aggravation, is refuted by the record. At trial, the circuit court instructed the jury as follows:
>
> " 'So ladies and gentlemen, if, after a full and fair consideration of all the evidence in this case, you are convinced beyond a reasonable doubt, that at least one aggravating circumstance does exist. And you are convinced that that aggravating circumstance outweighs any mitigating circumstance that has been offered. Then the form of your verdict would be:
>
> " ' "We the jury, find the Defendant to be punished by death." '
>
> " '....
>
> " 'If, on the other hand, you find that the mitigating circumstances outweigh the aggravating circumstances, your verdict would be:
>
> " ' "We, the jury, find that the Defendant be punished of life imprisonment without parole."
>
> "(R. 730.)

> "Because the circuit court instructed the jury on how to vote after it weighed the aggravating circumstances and the mitigating circumstances, White's argument to the contrary is without merit. <u>Albarran [v. State]</u>, 96 So.3d [131] at 160 [ (Ala. Crim. App. 2011) ] ('This assertion is refuted by the record and is without merit.'). Accordingly, this issue does not entitle White to any relief."

> <u>White</u>, 179 So.3d at 220.

> "[B]ecause the underlying claims have no merit, the fact that [the petitioner's] lawyer did not raise those claims cannot have resulted in any prejudice to [the petitioner]." <u>Magwood v. State</u>, 689 So.2d 959, 974 (Ala. Crim. App. 1996).

*White*, 343 So. 3d at 1173–74.

White says that the ACCA's decision was contrary to and a misapplication of *Strickland* because it conflated *Strickland* prejudice with a finding of no plain error on direct appeal. The court disagrees. The court has no "grave doubt" about whether the ACCA applied the prejudice standard from *Strickland* when resolving this claim. *See Romine*, 253 F.3d at 1365. And the ACCA's direct appeal ruling wasn't simply that White had failed to establish plain error from the jury instruction. Instead, the ACCA found that White's argument that the trial court didn't properly instruct the jury was "refuted by the record" and "without merit." *See White*, 179 So. 3d at 220. The court thus cannot say that no reasonable jurist would agree with the ACCA's collateral proceeding finding that counsel's failure to object to the penalty phase instructions wouldn't have changed the outcome.

White also says that the ACCA's segregation of this ineffective assistance of counsel claim from his other ineffective assistance of counsel claims was an unreasonable application of *Strickland*. The court again disagrees. As the ACCA found and the record reflects, the trial court properly instructed the jurors on how the jurors should vote once they weighed the aggravating and mitigating factors. (*See* Doc. 10-15, p. 187). So White suffered no appreciable prejudice from his attorneys' failure to object to the penalty phase instructions. Thus, the ACCA didn't need to consider this claim in

assessing whether the cumulative effect of trial counsel's alleged errors prejudiced White. *See Baker*, 432 F.3d at 1223 (noting that cumulative errors doctrine considers whether harmless or plain ***errors*** combined to prejudice a defendant). Indeed, "[f]ailing to make a meritless objection does not constitute deficient performance." *Denson v. United States*, 804 F.3d 1339, 1342 (11th Cir. 2015). So even if the court were to consider this claim de novo, the court would find that White hadn't established deficient performance and thus this claim needn't be considered in assessing the cumulative effect of counsel's alleged errors. In short, White isn't entitled to habeas relief on this claim.

### v.  Cumulative effects of counsel's deficient performance at the penalty and sentencing phases prejudiced White.

White's final ineffective assistance of counsel claim is that the attorney errors discussed above, combined with the waiver of a penalty phase opening statement and an allegedly deficient closing argument, had the cumulative effect of prejudicing White. White exhausted this claim in state court. (*See* Doc. 10-26, pp. 96–98; Doc. 10-32, pp. 45–49; Doc. 10-35, pp. 25–29). The ACCA rejected this claim, reasoning that White had failed to show cumulative prejudice because each of his penalty phase ineffective assistance of counsel claims were subject to summary dismissal:

> White argues that the cumulative effect of his lawyer's errors in the penalty phase entitled him to relief.
>
> "Taylor ... contends that the allegations offered in support of a claim of ineffective assistance of counsel must be considered cumulatively, and he cites <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). However, this Court has noted: 'Other states and federal courts are not in agreement as to whether the "cumulative effect" analysis applies to <u>Strickland</u> claims'; this Court has also stated: 'We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claims of ineffective assistance of counsel.' <u>Brooks v. State</u>, 929 So.2d 491, 514 (Ala. Crim. App. 2005), quoted in <u>Scott v. State</u>, 262 So.3d 1239, 1253 (Ala. Crim. App. 2010); see also <u>McNabb v. State</u>, 991 So.2d 313, 332 (Ala.

Crim. App. 2007); and <u>Hunt v. State</u>, 940 So.2d 1041, 1071 (Ala. Crim. App. 2005). More to the point, however, is the fact that even when a cumulative-effect analysis is considered, only claims that are properly pleaded and not otherwise due to be summarily dismissed are considered in that analysis. A cumulative-effect analysis does not eliminate the pleading requirements established in Rule 32, Ala. R. Crim. P. An analysis of claims of ineffective assistance of counsel, including a cumulative-effect analysis, is performed only on properly pleaded claims that are not summarily dismissed for pleading deficiencies or on procedural grounds. Therefore, even if a cumulative-effect analysis were required by Alabama law, that factor would not eliminate Taylor's obligation to plead each claim of ineffective assistance of counsel in compliance with the directives of Rule 32."

<u>Taylor v. State</u>, 157 So.3d 131, 140 (Ala. Crim. App. 2010). Accordingly, White is due no relief on this claim.

*White*, 343 So. 3d at 1176.

Contrary to White's assertion, this ruling is an adjudication on the merits that is entitled to AEDPA deference under § 2254(d). *See Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). And in assessing the reasonableness of the state courts' decision to reject White's cumulative prejudice claim, the court's review is not strictly limited "to the particular *justifications* that the state court provided." *Pye*, 50 F.4th at 1036.

It wasn't unreasonable for the state courts to determine that White hadn't established cumulative prejudice. As discussed, many of White's individual ineffective assistance of counsel claims are either procedurally defaulted or fail to establish deficient performance. So only these five alleged errors are subject to a cumulative prejudice analysis: (1) counsel did not interview White's family or others about White's background; (2) counsel failed

80

to present evidence related to White's conception, relationship with foster family, and impact of adoption; (3) counsel failed to present evidence of White's mental disorders; (4) counsel failed to present evidence of good behavior and adaptability in prison; and (5) counsel waived penalty phase opening statements and gave an allegedly deficient closing argument. Even considering the cumulative effect of these alleged errors, the court cannot say that the state courts unreasonably determined that there was no substantial likelihood of a different sentencing outcome. Comparison of White's new mitigating evidence with the mitigation evidence presented (and unaffected aggravation) does not "paint[ ] a vastly different picture" of the sentencing circumstances. *See Williams v. Allen*, 542 F.3d 1326, 1342 (11th Cir. 2008). Thus, the state courts' rejection of White's cumulative-prejudice argument "wasn't contrary to or an unreasonable application of the Supreme Court's precedents, based on an unreasonable determination of the facts, or so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *See Pye*, 50 F.4th at 1056 (quotations omitted).

—

In sum, none of White's guilt or penalty phase ineffective assistance of counsel claims entitle him to habeas relief. The court now turns to White's substantive claims related to alleged trial errors and the constitutionality of Alabama's capital sentencing scheme both facially and as applied to White.

## 2.    Evidence from Sierra Black case

White next challenges the admission of the evidence of the rape and murder of Sierra Black under *Alabama Rule of Evidence* 404(b). On direct appeal, White argued both that the introduction of this evidence was improper, (doc. 10-19, pp. 26–39; doc. 10-20, pp. 143–50; doc. 10-23, pp. 24–35), and that the trial court's jury instructions inadequately gave the jury guidance on how to view the 404(b) evidence (doc. 10-19, pp. 40–42; doc. 10-20, pp. 150–53; doc. 10-23, pp. 36–39). The ACCA, which was the last state court to issue a reasoned opinion on this issue, rejected White's argument that the circuit court erred in allowing the State to present evidence of his involvement in the Black rape/murder under Rule 404(b):

At trial, White's theory was that he was not the individual who murdered Parker. Accordingly, White's identity as the individual who murdered Parker was at issue. "Considering there was no eyewitness to [Parker's] murder, it was necessary for the State to present other evidence proving the identity of the killer." *Petric v. State*, 157 So.3d 176, 192 (Ala.Crim.App.2013). Further, the circumstances of the Black rape/murder and Parker rape/murder were sufficiently similar to admit evidence of the Black rape/murder under the identity exception contained in Rule 404(b). White murdered both Parker and Black by strangling them to death with a soft ligature, a method of strangulation that is extremely rare. In fact, he strangled both women with their clothing. In both rapes, White did not wear a condom and left his semen on his victims. The State established that both victims were young, black women with similar body types. The State presented evidence indicating that items belonging to both women were kept by the murderer. Further, the State established that White murdered Black slightly under four months after Parker was murdered. Because the evidence established that White's two crimes were peculiarly distinctive, the circuit "court did not exceed its discretion in finding that the evidence of [White's] bad acts against [Black] was admissible under Rule 404(b) as proof of [his] identity [as Parker's] killer." *Petric*, 157 So.3d at 193.

Further, this Court has thoroughly reviewed the record and holds that the probative value of the evidence establishing that White raped and murdered Black was not substantially outweighed by unfair prejudice. *See Averette v. State*, 469 So.2d 1371, 1373–74 (Ala.Crim.App.1985) (holding that "not only must it be determined that the other offenses are material and relevant to an issue other than the character of the accused and fall within an exception to the exclusionary rule, but the probative value must not be substantially outweighed by undue prejudice"); Rule 403, Ala. R. Evid. (providing that, "[a]lthough

> relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").

*See White*, 179 So. 3d at 186 (footnote omitted).

In addressing the prejudicial effect of the evidence that established that White raped and murdered Black, the ACCA noted:

> As explained above, White's identity as Parker's killer was at issue in this case. Thus, White's involvement in the Black murder was relevant to prove his identity as Parker's rapist and murderer. Although the evidence establishing that White raped and murdered Black was prejudicial in that it established his identity in the Parker rape/murder, it was not unduly or unfairly prejudicial. Both the State and defense counsel informed the jury not to let emotions enter the deliberations. Additionally, as discussed below, the circuit court instructed the jury that it could consider evidence of the Black rape/murder only for the purpose of establishing White's identity in the Parker rape/murder. Accordingly, this Court holds that the circuit court acted within its broad discretion in determining that the probative value of evidence relating to the Black rape/murder was not substantially outweighed by undue prejudice.
>
> Because evidence relating to the Black rape/murder was admissible under Rule 404(b) to establish White's identity as Parker's rapist and murderer and because such evidence was not unduly prejudicial, the circuit court did not clearly abuse its discretion by allowing such evidence to be admitted. Therefore, this issue does not entitle White to any relief.

*See id.* at 187.

The ACCA then found that the circuit court's instructions properly limited the jury's consideration of Black's rape/murder to the question of White's identity as Parker's killer: "After informing the jury of the possible purposes for which evidence of collateral crimes may be admitted, [the circuit court] then restricted the jury's consideration of White's collateral crimes to determining his identity only. . . . Consequently, no error, much less plain error, resulted from the circuit court's jury instruction." *See id.* at 188–89.

## A.    White failed to fairly present a federal law claim

Respondent asserts that White's claim related to the admission of evidence of the Sierra Black rape/murder isn't properly before the court because it raises state law issues only. As explained, this court's review under § 2254 is limited to answering federal constitutional questions. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). So this court cannot grant White a writ of habeas corpus based only on his argument that the state courts erroneously applied *Alabama Rule of Evidence* 404(b) to allow introduction of the evidence of Black's rape/murder. *See Thigpen v. Thigpen*, 926 F.2d 1003, 1011 (11th Cir. 1991).

White, however, asserts in his reply brief that he is raising a Due Process Clause challenge to the admission of the Rule 404(b) evidence. As White notes, habeas relief is appropriate "if a state trial judge erroneously admitted evidence in violation of a state law and the error made the petitioner's trial so fundamentally unfair that the conviction was obtained in violation of the due process clause of the fourteenth amendment." *Id.* at 1012; *see also Andrew v. White*, 604 U.S. 86, 88 (2025) (noting that it's been clearly established since at least 1991 "that when evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" (quotations omitted)).

The problem for White is that his federal habeas reply brief is the first time he articulated the federal law basis for his Rule 404(b) evidence claim. Citing Alabama state law cases, White's opening brief to the ACCA on direct appeal asserted that the Rule 404(b) evidence related to the Black murder was

inadmissible because (a) the two offenses weren't so similar as to constitute signature crimes, and (b) the element of rape in the two cases could not be meaningfully compared. (Doc. 10-19, pp. 29–36). White then said that even if admissible under Rule 404(b), the evidence of the Black offense should have been excluded under *Alabama Rule of Evidence* 403's balancing test. (*See id.*, pp. 36–39). White finally concluded the Rule 404(b) section of his brief by stating: "The wholesale and overwhelming admission of evidence of the Black offense violated Justin White's rights to due process, a fair trial, the presumption of innocence, and a reliable conviction and sentence as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the corresponding provisions of the Alabama Constitution, and Alabama law." (*Id.*, p. 39). White never mentioned or cited cases that explained that the Due Process Clause is violated when unduly prejudicial evidence renders a trial fundamentally unfair. (*See id.*, pp. 29–39).

White's reply brief reiterated White's assertion that it was error to admit evidence of the Black offense under Alabama state law. (*See* Doc. 10-20, pp. 143–50). But White did not cite any federal basis for granting him relief on his Rule 404(b) argument. (*See id.*). And like his opening brief to the ACCA, White's cert petition to the Alabama Supreme Court referred to federal law only in its closing paragraph: "This Court should grant certiorari and hold the State's abuse of 404(b) evidence to argue Mr. White's bad character violated Mr. White's right to due process, a fair trial, presumption of innocence and a reliable sentencing as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Alabama law." (Doc. 10-23, p. 35). Again, White failed to explain or cite cases that held that the Due Process Clause is violated when unduly prejudicial evidence renders a trial fundamentally unfair. (*See id.*, pp. 24–35).

White's reliance on state law continued with his federal habeas petition. As discussed, a habeas petition must "specify all the grounds for relief available to the petitioner." *See* Rule 2(c) of the Rules Governing § 2254 Cases in the U.S. District Courts. Yet White's Rule 404(b) claim did not specify how the admission of the Rule 404(b) evidence violated his constitutional rights. Instead, like in his state court filings, White simply stated: "The wholesale and overwhelming admission of evidence from the Sierra Black case violated Mr. White's right to due process, a fair trial, the presumption of innocence, and a

reliable conviction and sentence as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments, the corresponding provisions of the Alabama Constitution, and Alabama law." (Doc. 56, p. 160). Only in his reply brief did White clearly articulate his Due Process Clause claim or explain the federal law authorities that he was relying on.

For a claim to be fully exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat-similar state-law claim was made." *Snowden*, 135 F.3d at 735. Instead, "[t]he ground relied upon must be presented face-up and squarely; the federal question must be plainly defined. Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick." *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1345 (11th Cir. 2004). Thus, both this court and the Eleventh Circuit have found that merely tacking on a laundry list of federal amendments to a state-law based argument presented to the state courts will not satisfy the exhaustion requirement. *See McNair v. Campbell*, 416 F.3d 1291, 1302–04 (11th Cir. 2005); *George v. Raybon*, 2025 WL 1195569, at *14–15 (N.D. Ala. Apr. 24, 2025). As the brief references to federal law in White's state court filings are nearly identical to those that weren't found to satisfy the exhaustion requirement in *McNair* and *George*, the court finds that White did not adequately exhaust a Due Process Clause claim based on the introduction of the Rule 404(b) evidence.

Because White failed to exhaust his Due Process Clause claim, it is procedurally barred. *See McNair*, 416 F.3d at 1304.[2] And the court cannot grant White a writ of habeas corpus based only on his claim that the state courts erroneously applied *Alabama Rule of Evidence* 404(b). *See Thigpen*, 926 F.2d at 1011. Thus, White's claim based on the introduction of evidence from the Sierra Black case isn't properly before the court and is subject to dismissal.

---

[2] "[T]here is no conceivable excuse for [White's] failure to raise his [Due Process Clause] claim in state court and no fundamental miscarriage of justice will result from its default." *See McNair*, 416 F.3d at 1304 n.9. So no exception to the exhaustion requirement applies. *See id.*

**B.      White's Due Process Clause claim also fails on the merits**

Alternatively, the court rejects White's Rule 404(b)-based Due Process Clause claim on the merits. Under the Due Process Clause, the court's "initial inquiry . . . is whether the judge erred, under Alabama law, in admitting" the evidence of Black's rape/murder. *See id.* at 1012. Evidence of Sierra Black's rape/murder was relevant to proving White's identity as the rapist/murderer of Jasmine Parker. Because there were no eyewitnesses to Parker's murder, the State's ability to prove White's identity as the perpetrator was one of the main issues litigated during the guilt phase of trial. And as the ACCA pointed out, the Black rape/murder and the Parker rape/murder shared enough similarities to be considered "signature crimes" under Alabama law. *See Petric v. State*, 157 So. 3d 176, 192 (Ala. 2013) (discussing signature crime standard). Parker and Black were murdered within four months of each other and were both young, black women with similar body types. They were also both strangled to death by their own clothing, which is a rare method of strangulation. Finally, White's semen was found in both victims, and the evidence showed that personal items belonging to the two victims were taken from them. Given all these similarities, evidence that White raped/murdered Black was admissible to prove his identity as the person who raped/murdered Parker.

And the court rejects White's argument that (a) the Sierra Black evidence wasn't admissible because there was inadequate evidence of the nature of White's sexual encounter with Parker, and (b) introduction of the Sierra Black evidence wasn't reasonably necessary to the State's case. Again, because there were no eyewitnesses to Parker's murder, evidence of Black's murder was reasonably necessary to establish White's identity as the perpetrator. There was also enough evidence for the jury to determine that White's sexual encounter with Parker was not consensual and was connected to her murder. White was identified as the likely male contributor to the semen found on Parker's right lower leg and vaginal swab. (Doc. 10-13, pp. 194–96). No other male contributor's DNA was found in the sperm samples submitted to DFS for testing. And Parker's mother found Parker naked from the waist down with her shirt pulled up to her neck. (*See id.*, p. 137). So while White contends that a reasonable juror could have found that his sexual encounter

with Parker was consensual, a reasonable juror could also infer from this evidence that White raped and murdered Parker.

Plus, the probative value of the evidence related to Black's rape/murder was not substantially outweighed by the danger of unfair prejudice under *Alabama Rule of Evidence* 403. The probative value of evidence that established that White raped/murdered Black was high because the only other evidence linking White to Parker's murder was the DNA evidence placing him at the scene. And the prejudicial effect of this evidence was reduced by the court's jury instructions and the parties' assertions that the jury shouldn't let emotions guide their deliberations. Though White argues that the circuit court's jury instructions failed to limit the jury's consideration of the evidence that White murdered Black to the issue of intent, the court agrees with the ACCA that the circuit court properly instructed the jury on how it could consider the Rule 404(b) evidence. *See White*, 179 So. 3d at 189 (explaining why the circuit court's jury instructions were appropriate).

The court thus finds that the evidence that White raped/murdered Black was relevant and admissible to prove White's identity as the person who raped/murdered Parker, and the danger that admission of this evidence would unduly prejudice White did not substantially outweigh its probative value. As a result, admitting evidence related to Black's murder did not make White's trial fundamentally unfair in violation of the Due Process Clause. *See Thigpen*, 926 F.2d at 1019. The court recognizes that White asserts that the volume of Rule 404(b) evidence that was admitted was inappropriate. But "[t]he fact that the State proved" Black's rape/murder "in meticulous detail was not error under Alabama law." *See Perkins v. Dunn*, 2019 WL 4538737, at *38 (N.D. Ala. Sept. 19, 2019) (quotations omitted). And White hasn't shown that any of this evidence was false or misleading or that he didn't have the opportunity to challenge the evidence during trial. The court thus finds that White hasn't established that the introduction of this relevant and admissible evidence was so unfairly prejudicial that it rendered his trial fundamentally unfair in violation of the Due Process Clause. So White isn't entitled to relief on his claim

related to the introduction of evidence of his involvement in the Black rape/murder.[3]

### 3.    Trial court's rejection of jury's life verdict

White's next set of claims challenge the trial court judge's override of the jury's 9-3 recommendation of a life sentence. According to White, the override decision: (1) conflicted with Alabama Supreme Court precedent, (2) failed to appropriately weigh the mitigating circumstance of White's age, (3) gave too little weight to White's ADHD and psychological disorders, (4) improperly excluded mitigating evidence from consideration, and (5) was unconstitutional.

### A.    *Ex parte Taylor* and *Ex parte Carroll*

White first asserts that the judicial override decision conflicted with Alabama Supreme Court precedent on how and when a trial court may override a jury's verdict of life without the possibility of parole. This claim was exhausted during White's appeal of the circuit court's sentencing order on return from remand. *(See* Doc. 10-21, pp. 18–27; Doc. 10-23, pp. 40–47). But the court agrees with the Respondent that it cannot grant relief based on most of the arguments made within this subclaim because they are arguments based on state law. *See* 28 U.S.C. § 2255(a); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

There are, however, four arguments made within this claim that raise federal questions: (1) whether the trial court imposed a mandatory death sentence in violation of the U.S. Constitution; (2) whether the trial court violated the Eighth Amendment by impermissibly considering lack of remorse as an aggravating factor; (3) whether the trial court's consideration of White's lack of remorse violated his Fifth Amendment privilege against self-incrimination; and (4) whether the trial court's statement that Jefferson

---

[3] Portions of White's briefs could be read as asserting that the introduction of the Rule 404(b) evidence violated his Eighth Amendment rights. But "[t]he Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules" in capital cases. *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994). So White cannot challenge the admission of this evidence under the Eighth Amendment. *See id.*

County juries suffer from "pass the buck" syndrome conflicts with the individualized consideration of mitigating factors that the Eighth and Fourteenth Amendments require. So the court will address each of these arguments in turn.

1. *Mandatory death sentence*: The first of these arguments is that the trial judge improperly determined that White wouldn't be punished by a life without parole sentence because he was already serving a life without parole sentence for Black's murder. According to White, this statement shows that the trial judge believed that a sentence of death was mandatory, which violated the Constitution's prohibition on mandatory death sentences.

In his amended sentencing order, the trial judge explained that he gave great weight to the jury's recommendation of a life sentence but that he did

> not believe that the recommendation of the jury fully accounted for the great weight that should have been given the evidence regarding the additional killing of Sierra Black, and the fact that the defendant was already under a sentence of Life Without Parole in the Black murder case. To not increase the defendant's sentence in the Parker murder, would be to give the defendant no punishment at all as it relates to her death.

(Doc. 10-18, p. 22).

White contends that the trial court's belief that he would not be punished for Parker's murder if he received a life without the possibility of parole sentence was legally incorrect and effectively rendered White's death sentence mandatory. As White points out, mandatory death sentences violate the Eighth Amendment because "consideration of the character and record of the individual offender and the circumstances of the particular offense" are "a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett v. Ohio*, 438 U.S. 586, 601 (1978) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (quotation marks omitted)).

The ACCA rejected this argument finding "nothing in the circuit court's statement indicates that it believed that a sentence of death was mandatory in violation of *Woodson*, *Lockett*, and *Eddings*." *White*, 179 So. 3d at 231. Instead,

the ACCA found that the circuit court was merely explaining "why it believed that the jury failed to give adequate weight to the aggravating circumstance that White previously had been convicted of another capital offense or a felony involving the use or threat of violence to the person." *See id.* (quotations omitted). The ACCA's analysis shows that it recognized that under Supreme Court precedent it would have been unconstitutional for the trial court to find that White's life without parole sentence for Black's murder meant that a death sentence was required for Parker's murder. So the ACCA's decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent under § 2254(d)(1). And White has not shown that the ACCA's interpretation of the trial judge's statements was an unreasonable determination of the facts under § 2254(d)(2). As the ACCA noted, nothing in the trial judge's wording suggested that the thought he must impose a death sentence and couldn't impose a sentence of life without parole. The statement is instead better read as explaining that the trial court weighed White's previous conviction heavily when considering the relevant aggravating factors. The court thus finds that this argument doesn't entitle White to habeas relief.

2. *Remorse*: White's next two arguments attack the sentencing order's statement that the trial court judge "looked for, but never found, any sign that the defendant had the slightest bit of remorse for his actions in murdering Jasmine." (*See* Doc. 10-18, pp. 22–23). White first asserts that the circuit court impermissibly treated lack of remorse as an independent aggravating circumstance, which violates the Eighth Amendment's requirement that "[s]tates must give narrow and precise definition to the aggravating factors that can result in a capital sentence." *See Roper v. Simmons*, 543 U.S. 551, 568 (2005).

The ACCA rejected this argument because it found that the trial court judge did not treat White's lack of remorse as an aggravating circumstance:

> [U]pon reviewing the entire amended sentencing order in the instant case, this Court does not believe that the circuit court's observation of White's lack of remorse demonstrated that the circuit court considered a nonstatutory aggravating circumstance. Under the section of the amended sentencing order entitled "Aggravating Circumstances," the circuit court

> found that: "1) the capital offense was committed while the
> defendant was engaged in a rape; 2) the capital offense was
> committed while the defendant was engaged in a burglary;
> [and] 3) the defendant was previously convicted of another
> capital offense, which was the murder and rape of Sierra
> Black." (Supp. C. 18.) The circuit court did not find lack of
> remorse as a aggravating circumstance. *See Lane v. State*, 169
> So.3d 1076, 1132 (Ala.Crim.App.2013). Rather, the circuit court
> mentioned White's apparent lack of remorse when discussing
> why it had rejected the sentencing recommendation of the jury.
> Further, White's lack of remorse tended to undermine
> mitigation evidence indicating that White suffered from
> impulse control problems that may have contributed to
> Jasmine's murder. *Hosch v. State*, 155 So.3d 1048, 1096
> (Ala.Crim.App.2013) (lack of remorse may be considered when
> it undermines mitigating evidence). Therefore, this issue is
> without merit.

*White*, 179 So. 3d 232–33.

White has failed to show that the ACCA's decision was unreasonable
under either § 2254(d)(1) or (d)(2). The ACCA was not unreasonable when it
made the factual determination that the circuit court "did not find lack of
remorse as a aggravating circumstance." As the ACCA noted, the sentencing
order specifically stated that there were only 3 aggravating circumstances: "1)
the capital offense was committed while the defendant was engaged in a rape;
2) the capital offense was committed while the defendant was engaged in a
burglary; 3) the defendant was previously convicted of another capital offense,
which was the murder and rape of Sierra Black." (Doc. 10-18, p. 19). Although
the sentencing order did reference White's apparent lack of remorse, those
comments were in a separate section of the sentencing order that discussed the
court's decision to override the jury's recommended sentence. And because the
ACCA reasonably found that remorse wasn't treated as an aggravating
circumstance, the ACCA's rejection of White's argument was not contrary to or
an unreasonable application of clearly established federal law. To the extent
that White argues that the ACCA's analysis conflicted with Alabama law, that

argument doesn't support granting White habeas relief. *See* 28 U.S.C. § 2254(a).

White's second remorse-related argument is that the trial court judge's consideration of a lack of remorse violated his Fifth Amendment privilege against self-incrimination. The ACCA rejected this argument for two reasons. First, the ACCA made a factual finding that the circuit court's comments about lack of remorse weren't directed at White's failure to testify:

> In explaining why it rejected the sentencing recommendation of the jury, the circuit court noted that "during the trial, the Court looked for, but never found, any sign that [White] had the slightest bit of remorse for his actions in murdering Jasmine." (Supp. C. 21–22.) The circuit court's statement did not, as White contends, relate to his failure to testify. Rather, the circuit court's statement related to its observation of White's demeanor during the trial. Cf. Kelley v. State, [Ms. CR–10–0642, Mar. 14, 2014] (holding that the prosecutor's comment relating to the defendant's demeanor at trial and lack of remorse was not error). Therefore, White's argument is without merit.

*White*, 179 So. 3d at 233 (footnote omitted). Second, the ACCA determined that "White . . . has not cited any controlling caselaw holding that mere mention of White's lack of remorse by the circuit court in its discussion of why it overrode the jury's recommendation violated his privilege against self-incrimination." *See id.*

The ACCA's factual finding was not an unreasonable determination of the facts under § 2254(d)(2). Instead, the most natural reading of the circuit court's order is that the circuit court was commenting on White's demeanor and not his silence at trial. And the ACCA correctly held that White has cited no controlling authority that would establish that the circuit court's comments violated White's Fifth Amendment rights. *Griffin v. California*, 380 U.S. 609, 615 (1965), which is the Supreme Court precedent that White relies on, held that the Fifth Amendment "forbids either comments by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." It says nothing about whether a sentencer may consider a defendant's

demeanor at trial. Thus, White hasn't shown that the ACCA's adjudication of this claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As a result, White is not entitled to habeas relief on either of his arguments related to the circuit court's comments on White's lack of remorse.

3. *"Pass the buck" syndrome*: This claim's final federal law argument is that the circuit court's statement that Jefferson County juries suffer from "pass the buck" syndrome deprived White of his Eighth and Fourteenth Amendment right to an "individualized consideration of mitigating factors." *See Eddings v. Oklahoma*, 455 U.S. 104, 105 (1982). As White notes, the amended sentencing order stated that the trial court judge believed that the jury may have recommended that White receive a life sentence because Jefferson County juries suffer from "pass the buck" syndrome:

> Of course, the last non-statutory mitigating circumstance to be considered by the Court was the jury's advisory sentencing verdict which this Court has already discussed. Over my past years of experience, the Court has realized that juries can be unpredictable. Although the court cannot see into the minds of a juror, the Court believes that juries in Jefferson County understand through the media and from prior jury service that their sentencing verdict is advisory and that the trial judge will issue the final sentence. This, the Court believes, may cause a kind of "pass the buck" syndrome to exist in the jury's mind as they know the trial judge will make the final decision. The Court finds that this probably influenced the jury in making a recommendation which was contrary to the evidence presented.

(Doc. 10-18, p. 25).

The ACCA determined that even if the circuit court erred in making this statement, the error was harmless:

> The record in the instant case demonstrates that the statement of which White complains was harmless and that it did not affect his substantial rights. The circuit court's statement came

> at the end of the section of the amended sentencing order in which the circuit court gave its reasons for overriding the jury's recommendation. Before this statement, the circuit court had already determined [that it did not believe] "that the recommendation of the jury fully accounted for the great weight that it should have given to the evidence regarding the additional killing of Sierra Black, and the fact that the defendant was already under a sentence of life without parole in the Black murder case." (Supp. C. 21.) Here, the circuit court gave the jury's recommendation great weight and provided detailed reasons why it rejected the jury's recommendation. Accordingly, error, if any, in the circuit court's statement that juries tend to rely on the court as the ultimate decision maker was harmless. Rule 45A, Ala. R.App. P.

*White*, 179 So. 3d at 235.

The court agrees with the ACCA's analysis. This court "cannot reverse a conviction or order a new sentencing hearing" based on a harmless error. *See Mason v. Allen*, 605 F.3d 1114, 1123 (11th Cir. 2010). "In habeas proceedings," this court "review[s] whether a constitutional violation is harmless by determining whether the error had substantial or injurious effect or influence" on the conviction or sentence. *See id.* To show substantial or injurious effect, White must show that there is "more than a reasonable possibility that the error contributed to [his] sentence." *Horsley v. Alabama*, 45 F.3d 1486, 1493 (11th Cir. 1995).

As the ACCA noted, the circuit court judge said that he gave great weight to the jury's verdict when balancing the aggravating and mitigating factors. But in balancing those factors, the circuit court determined that the jury's recommendation did not fully account for the great weight that should have been given to White's previous conviction for the capital murder of Sierra Black. And the circuit court judge did not override the jury's verdict ***because*** he believes all Jefferson County juries suffer from "pass the buck" syndrome. Instead, the circuit court judge found that the jury's verdict "was contrary to the evidence presented" and opined that the reason for that could be that Jefferson County juries understood that their verdicts were merely advisory.

In sum, this court is unconvinced that the circuit court's belief that Jefferson County juries suffer from "pass the buck" syndrome "had a substantial and injurious effect or influence" on White's sentence. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). So this statement in the sentencing order doesn't entitle White to habeas relief.

—

To sum up, most of the arguments White makes within this subclaim are state-law claims that do not entitle White to habeas relief. *See* 28 U.S.C. § 2254(a). And the court rejects the four federal law arguments that White makes. So the court will not grant White habeas relief on this subclaim.

## B.    Weight given Mr. White's young age

White next asserts that the circuit court erred in not affording his young age great weight when evaluating the relevant mitigating factors. White exhausted this claim during his appeal of the amended sentencing order on return from remand. (*See* Doc. 10-21, pp. 27–31; Doc. 10-23, pp. 47–50). And because White relies on Supreme Court precedent to support this argument, the court rejects Respondent's assertion that this claim involves only state-law concerns.

The ACCA rejected White's argument that the circuit court inadequately considered his age noting that the circuit court judge said that he found the fact that White was only 19 to be a statutory mitigating circumstance but determined that this factor was entitled to little weight because of White's criminal record:

> In the instant case, the circuit court found White's age at the time of the offense to be a mitigating factor. The weight to be assigned that mitigation is completely within the circuit court's discretion. There is nothing in the record indicating that the circuit court abused its discretion in weighing this circumstance; therefore, this issue does not entitle White to any relief.

*White*, 179 So. 3d at 236 (citation omitted).

The ACCA's adjudication of this claim wasn't unreasonable under either § 2254(d)(1) or (d)(2). White cites two strands of Supreme Court precedent to support this claim. First, White cites *Eddings*, which held that a sentencer cannot "refuse to consider, *as a matter of law*, any relevant mitigating evidence." 455 U.S. at 114. As the ACCA correctly recognized, the rule from *Eddings* is that "[t]he trial court may determine the appropriate weight to be afforded . . . mitigation, but it may not exclude such evidence, as a matter of law, from consideration altogether." *Clark v. Atty. Gen., Fla.*, 821 F.3d 1270, 1286 (11th Cir. 2016). The Constitution thus "does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight." *Id.* (quotations omitted).

The circuit court considered White's age at the time of the offense and found that it was a statutory mitigating factor. Thus, the circuit court's consideration of White's age satisfied *Eddings*' requirements. And the court reject's White's argument that *Eddings* treats age different from other mitigating circumstances. To support this argument, White cites this statement from *Eddings*: "just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in sentencing." *Eddings*, 455 U.S. at 116. But White takes this quote out of context. The Court's reference to Eddings' age being a mitigating factor "of great weight" was referring to the trial judge's finding *in that particular case* that the defendant's "youth was a mitigating factor of great weight." *See id.* at 108–09. It was not meant to create a per se rule that an offender's youth should always be given great weight when balancing the aggravating and mitigating factors. And even if *Eddings* required "the chronological age of a **minor**" to be given great weight, this requirement wouldn't apply here because White was 19 when he committed his offense. Thus, the state courts' adjudication of this claim wasn't contrary to or an unreasonable application of *Eddings*.

The second strand of cases that White cites categorically ban imposing certain sentencing practices on juvenile offenders. *Roper v. Simmons* forbid imposition of the death penalty on offenders who were under 18 at the time of their offense. 543 U.S. at 578. *Graham v. Florida* prohibited a sentence of life without the possibility of parole for juvenile offenders who did not commit a

homicide. *See* 560 U.S. 48, 82 (2010). And *Miller v. Alabama* held that mandatory life without parole for juvenile offenders convicted of a homicide was unconstitutional "because a judge or jury must have the opportunity to hear mitigating circumstances before imposing the harshest possible penalty for juveniles." 567 U.S. 460, 489 (2012). According to White, the rationale behind these cases shows that the "diminished culpability of a 19-year-old defendant merits significant weight mitigating for a life sentence." (Doc. 56, pp. 168–69). But none of these cases clearly establish that an adult offender's youth must be given great weight by the sentencing judge. Thus, White cannot rely on these cases to establish that the state courts erred under § 2254(d)(1). White is not entitled to relief on his claim that the circuit court failed to appropriately weigh the mitigating circumstance of his age.

## C.    Weight given Mr. White's ADHD and psychological disorder

White next contends that the circuit court did not adequately consider evidence of his ADHD and intermittent explosive disorder, which White characterizes as "uncontested mitigating evidence" that he suffers from a serious psychological disease. White exhausted this argument during his direct appeal of the amended sentencing order. (*See* Doc. 10-21, pp. 31–33; Doc. 10-23, pp. 50–51). And because White relies on Supreme Court precedent to support this argument, the court again rejects Respondent's argument that this claim isn't properly before this court because it involves only state-law issues.

In rejecting this argument, the ACCA noted that while *Lockett* requires the sentencer to consider all evidence offered in mitigation, "[m]erely because an accused proffers evidence of a mitigating circumstance does not require the judge or jury to find the existence of that fact." *White*, 179 So. 3d at 236. The ACCA then concluded:

> In the instant case, the circuit court found White's diagnoses of ADHD and IED to be mitigating evidence and weighed them as such. The weight to be assigned that mitigation is completely within the circuit court's discretion. *Riley*, 166 So.3d at 719. There is nothing in the record indicating that the circuit court

> abused its discretion in weighing these mitigating circumstances. Accordingly, White is due no relief on this claim.

*White*, 179 So. 3d at 237.

As discussed, the ACCA correctly articulated the rule from *Lockett* and *Eddings* as the Constitution "does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight." *See Clark*, 821 F.3d at 1286. And it is clear from the sentencing order that the circuit court fully considered White's ADHD and impulse disorder when deciding what sentence to impose. (Doc. 10-18, pp. 21–22). In fact, other than the jury's recommendation of a life sentence these were the only two non-statutory mitigating circumstances that the circuit court found existed. (*See id.*, p. 21).

So the ACCA's determination that the circuit court judge had discretion over what weight to assign mitigating evidence of White's ADHD and impulse disorder did not conflict with clearly established federal law. White is not entitled to habeas relief on this claim.

## D.    Exclusion of mitigating evidence from consideration

White next asserts that the circuit court improperly excluded this mitigating evidence from its consideration: (1) evidence that White had long suffered from a "serious psychological disease"; (2) evidence that White had been diagnosed with mental disorders from a young age and had consistently been in the care of a psychologist or psychiatrist from the age of 4 to the age of 19; (3) evidence that White was admitted to a mental health hospital when he was in middle school; (4) evidence that White's emotional problems likely stemmed in part from his adoption, the absence of information about his birth father, and abandonment by his birth mother; (5) evidence that White had a family who loved and cared for him; and (6) evidence that the victim's family asked for forgiveness. White exhausted this claim during his direct appeal of the amended sentencing order. (Doc. 10-21, pp. 33–35; Doc. 10-23, pp. 52–54). And because this argument relies on Supreme Court precedent, the court once again rejects Respondent's assertion that this claim involves only state-law issues.

1. *Mental health + family's love and concern*: In considering this claim, the ACCA first addressed the evidence related to White's mental health and his family's love and concern for him. The ACCA again correctly explained that while "[t]he circuit court must consider evidence offered in mitigation, . . . it is not obliged to find that the evidence constitutes a mitigating circumstance." *White*, 179 So. 3d at 237. The ACCA then found that the circuit court complied with the requirement that it consider White's mitigating evidence:

> In the instant case, the record clearly demonstrates that the circuit court considered all mitigating evidence offered by White. In its amended sentencing order, the circuit court noted that during the penalty phase White presented evidence consisting of testimony from his adoptive mother and father. The circuit court also noted that White had "called an expert witness who testified regarding White's background from a review of medical records, mental health treatment records, and school records." (Supp. C. 16–17.) Before sentencing White, the circuit court "received, reviewed and considered a written presentence investigation report." (Supp. C. 17.) The circuit court noted that "[n]onstatutory mitigating circumstances *included* testimony and a finding by the Court that the defendant [suffered from ADHD and IED]." (Supp. C. 23; emphasis added.) Although White argues that the circuit court did not consider his diagnosis of IED, the circuit court found it to be a nonstatutory mitigating circumstance. Because the record demonstrates that the circuit court considered the mitigating evidence presented, White is due no relief on this claim.

*See id.* at 238.

White has not shown that he is entitled to relief under either § 2254(d)(1) or (d)(2). While the sentencing court must consider mitigating evidence offered by a capital defendant, "the failure to reference non-statutory mitigating circumstances in a sentencing report is an insufficient basis to entitle a federal habeas petitioner to relief." *See Clark*, 821 F.3d at 1287. And it was not an unreasonable determination of the facts for the ACCA to find that the circuit

court considered the mitigating evidence that White presented. As the ACCA found, White's serious psychological disease was his intermittent explosive disorder, which the circuit court discussed and found was a mitigating circumstance. The circuit court also stated that "[n]on-statutory mitigating circumstances included testimony" about White's ADHD and intermittent explosive disorder. (Doc. 10-18, p. 24). It's reasonable to conclude that the testimony the circuit court was referring to included testimony about White's mental health treatment from age 4 to 19, White's hospitalization, and White's emotional issues stemming from his issues with his adoption. And while the sentencing order does not expressly reference the fact that White's family loved and cared for him, nothing in the record suggests that the circuit court judge excluded this evidence from his consideration. Instead, the circuit court recognized that White's penalty phase evidence included the testimony from his adoptive parents. (*See id.*, p. 17).

In short, White hasn't shown that he's entitled to habeas relief on his claim related to the circuit court's alleged failure to consider mitigating evidence related to White's mental health and his family's love and concern for him.

2. *Forgiveness from victim's family*: The final category of mitigating evidence that White says the circuit court overlooked is testimony from Parker's mother that White says shows that she asked for his forgiveness. The ACCA rejected this argument because it found that Ms. Parker did not ask for White's forgiveness:

> Vanessa Parker did not ask for forgiveness for White or recommend that the circuit court impose a sentence of life in prison without the possibility of parole. Rather, during cross-examination Vanessa was asked whether she had told a detective "that you have to forgive people, so that God can forgive you." (R. 638.) Vanessa replied, "Absolutely. I believe that." (R. 638.) . . . Vanessa's testimony established that she believed that she had to forgive others so that God would forgive her. She did not, as White asserts, ask for forgiveness for White. Because Vanessa did not ask for forgiveness for White, this argument is refuted by the record and is without merit. *See*

> *Albarran*, 96 So.3d at 160 (recognizing that claims that are refuted by the record are without merit).

*White,* 179 So. 3d at 238.

White has not argued, much less shown by clear and convincing evidence, that the ACCA's characterization of Vanessa Parker's testimony is erroneous. And review of the record establishes that the ACCA's interpretation of this testimony is a permissible one. (*See* Doc. 10-15, p. 95). So the court presumes that the ACCA's determination of this factual issue is correct. *See* 28 U.S.C. § 2254(e)(1). Because under this view of the evidence the victim's family did not ask for leniency or White's forgiveness, White has not shown that he is entitled to habeas relief on his claim that the circuit court judge impermissibly failed to consider that the victim's family had asked for forgiveness.

### E.    Constitutionality of judicial override

White next asserts that Alabama's former capital sentencing scheme, which allowed the trial court judge to override the jury's recommendation of a life sentence, violates his Eighth, Sixth, and Fourteenth Amendment rights. White exhausted this claim during his direct appeal on return from remand, (*see* doc. 10-21, pp. 35–44; doc. 10-23, pp. 54–62), and like the ACCA, the court will address each alleged constitutional violation in turn.

1. *Eighth Amendment*: White first asserts that judicial override leads to the type of arbitrary and capricious judgments that offend the Eighth Amendment's prohibition on cruel and unusual punishments. The ACCA rejected this argument noting that in *Harris v. Alabama*, 513 U.S. 504 (1994), the Supreme Court found that Alabama's judicial override provision did not violate the Eighth Amendment. *See White*, 179 So. 3d at 239. The ACCA then rejected White's argument that Alabama's judicial override procedure was standardless:

> In rejecting the argument that Alabama's judicial-override provision is standardless, the Alabama Supreme Court has held:
>
> " 'This Court in *Ex parte Apicella*, 809 So.2d 865 (Ala.2001), upheld the constitutionality of having a judge, not the jury,

determine the punishment in a capital case. In *Ex parte Taylor*, 808 So.2d 1215 (Ala.2001), this Court held that the capital-sentencing procedure set forth in §§ 13A–5–47 and 13A–5–53, Ala.Code 1975, provided sufficient guidance to prevent the arbitrary and capricious imposition of a death sentence. Specifically, the Court noted that the capital-sentencing procedure "ensures that the trial judge is given adequate information and sufficient guidance in deciding whether to accept or to reject a jury's recommended sentence" and that § 13A–5–53, Ala.Code 1975, provided sufficient guidelines for an appellate determination of "whether a trial judge's override of the jury's recommendation is appropriate in a particular case." 808 So.2d at 1219.'

"*Ex parte Jackson*, 836 So.2d 979, 989 (Ala.2002). *See also Ex parte Carroll*, 852 So.2d 833, 836 (Ala.2002) (establishing standard under which the circuit court must weigh a jury's recommendation of life in prison without the possibility of parole). Accordingly, Mitchell's argument that Alabama's judicial-override provision is 'standardless' and thus 'unconstitutional' is without merit."

*Mitchell v. State*, 84 So.3d 968, 993 (Ala.Crim.App.2010)

As in *Mitchell*, White's argument that Alabama's judicial-override provision is unconstitutionally standardless is without merit. *Id.* Therefore, this issue does not entitle him to any relief.

*See White*, 179 So. 3d at 239.

The ACCA's decision was not contrary to or an unreasonable application of Supreme Court precedent. As the ACCA noted, in *Harris* the Supreme Court considered Alabama's former judicial override provision and held that the Constitution isn't "offended when a State . . . requires the sentencing judge to consider a jury's recommendation [about whether to impose a capital sentence] and trusts the judge to give it the proper weight." 513 U.S. at 515. In reaching this conclusion, the Court necessarily found that Alabama's sentencing "scheme adequately channels the sentencer's discretion so as to prevent

arbitrary results." *See id.* at 511. Thus, binding Supreme Court precedent forecloses White's argument that Alabama's former judicial override provision is arbitrary, capricious, and standardless in violation of the Eighth Amendment. *See Hays v. Alabama*, 85 F.3d 1492, 1501 (11th Cir. 1996) (relying on *Harris* to find that Alabama's sentencing scheme adequately channeled the sentencing judge's discretion and was not standardless); *Brownlee v. Haley*, 306 F.3d 1043, 1077 (11th Cir. 2002) ("Alabama's capital sentencing scheme is consonant with the Eighth Amendment even though it does not specify the precise weight that a judge must give to the jury's verdict"). As a result, White isn't entitled to habeas relief on this claim.

2. *Sixth Amendment*: White next asserts that Alabama's former judicial override provision violates the Sixth Amendment as shown by the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002). The ACCA disagreed:

> White was convicted of capital offenses that have corresponding aggravating circumstances, i.e., murder during the course of a rape and murder during the course of a burglary. See §§ 13A–5–40(a)(3), 13A–5–40(a)(4), 13A–5–49(4), Ala.Code 1975. Accordingly, the jury's verdict finding White guilty of the two counts of capital murder established that the jury unanimously found that aggravating circumstances existed. Because the jury's guilt-phase verdict established that the jury found a fact necessary to expose White to a sentence of death, White's Sixth Amendment right to a jury was not violated.
>
> "To the extent White argues that the Supreme Court's holding in Ring was violated because the jury did not unanimously find that the aggravating circumstances outweighed the mitigating circumstances, this argument is likewise without merit. In *Waldrop*, the Alabama Supreme Court addressed an identical issue and held:
>
> "'The determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, *Ring* [*v. Arizona*, 536 U.S. 584 (2002),] and *Apprendi* [*v. New Jersey*, 530 U.S. 466

> (2000),] do not require that a jury weigh the aggravating circumstances and the mitigating circumstances[.] . . .
>
> Because the balancing of the aggravating and mitigating circumstances, i.e., the sentencing determination itself, is not a finding of fact that was necessary to expose White to a sentence of death, his death sentence does not violate Ring and Apprendi. Consequently, White is not entitled to any relief on this issue.

*White*, 179 So. 3d at 240–41.

The ACCA's analysis of White's Sixth Amendment claim under *Ring v. Arizona* was not contrary to or an unreasonable application of clearly established federal law. In *Ring*, the Supreme Court held that "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589. But "[t]he holding of *Ring* is narrow" all "the Sixth Amendment's guarantee of jury trials requires [is] that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury." *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1198 (11th Cir. 2013); *see also Waldrop v. Comm'r, Ala. Dep't of Corr.*, 711 F. App'x 900, 923–24 (11th Cir. 2017).

In the guilt phase, the jury unanimously convicted White of murder during a rape in violation of Ala. Code § 13A-5-40(a)(3) and murder during a burglary in violation of Ala. Code § 13A-5-40(a)(4). That the capital offense was committed during a rape or burglary is a statutory aggravating circumstance. *See* Ala. Code § 13A-5-49(4). And only one aggravating circumstance needed to exist for White to be death penalty eligible. Because the jury unanimously found beyond a reasonable doubt the existence of the only "aggravating circumstance necessary for imposition of the death penalty," *Ring*, 536 U.S. at 609, White's sentence does not conflict with the clearly established holding in *Ring* or violate White's Sixth Amendment right to a jury.

*Ring* also "does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances." *Lee*, 726 F.3d at 1198. Thus, White hasn't shown that clearly established law requires "that the jury weigh the aggravating and mitigating circumstances." *See id.*

Finally, White hasn't shown that this construction of *Ring* violates clearly established law because it undermines the reliability of the capital sentencing process or unfairly makes it where only certain defendants are automatically subject to the death penalty at the end of the guilt phase. "Nothing in *Ring*— or any other Supreme Court decision—forbids the use of an aggravating circumstance implicit in a jury's verdict." *Id.* And White has failed to explain how *Adams v. Texas*, 448 U.S. 38, 46–47 (1980), which he seems to cite to support the assertion that jurors are less likely to find aggravating circumstances during the penalty phase, supports his Sixth Amendment claim.

The court thus finds that White isn't entitled to habeas relief based on his claim that the judicial override violated his Sixth Amendment rights.

3. *Equal Protection*: White finally asserts that judicial override violates the Equal Protection Clause because it has led to trial court judges treating similarly situated capital defendants differently. The ACCA rejected this argument for two reasons. First, the ACCA noted that "White has not provided any evidence indicating that similarly situated capital-murder defendants have been treated differently." *White*, 179 So. 3d at 242. So the ACCA found that White "has failed to meet his burden establish that an Equal Protection Clause violation resulted from the circuit court's decision to override the jury's recommendation." *Id.* Second, the ACCA explained that it had repeatedly rejected challenges to judicial override under the Equal Protection Clause. *See id.*

White has not shown that the ACCA's adjudication of this claim was contrary to or an unreasonable application of clearly established federal law. As the ACCA explained, White has provided no examples of similarly situated capital defendants being treated differently under judicial override. And the Equal Protection Clause isn't offended just because there are different outcomes in different capital cases. It is also likely that "the 'disparate treatment' about which [White] complains is the result of individualized sentencing based upon 'disparate' facts and the sentencer's assessment of aggravating and mitigating circumstances in the respective cases." *Hodges v. Hamm*, 2024 WL 4045945, at *109 (M.D. Ala. Sept. 4, 2024). Plus, while White notes that *Harris* did not address whether Alabama's judicial override provision violated the Equal Protection Clause, the fact that *Harris* does not

106

foreclose White's equal protection claim does not mean that it's clearly established that White's equal protection claim has merit. In fact, *Harris* suggests that something more than disparate treatment of jury verdicts is needed to state an equal protection claim. *See* 513 U.S. at 515 ("The disparate treatment of jury verdicts simply reflects the fact that, in the subjective weighing process, the emphasis given to each decisional criterion must of necessity vary in order to account for the particular circumstances of each case."). White is not entitled to habeas relief on his claim that judicial override violates the Equal Protection Clause.

—

To sum up, the court rejects White's challenges to the judicial override of the jury's life verdict under the Sixth, Eighth, and Fourteenth Amendments.

### 4.    *J.E.B. v. Alabama* jury selection claim

White's next claim is a substantive *J.E.B. v. Alabama* jury selection claim that asserts that the State's use of peremptory strikes to remove women from the venire was discriminatory. White exhausted this claim on direct appeal. (Doc. 10-19, pp. 71–79; Doc. 10-23, pp. 62–73). As discussed, the ACCA rejected this argument: "In sum, the State's number of peremptory strikes against women does not raise an inference of discrimination. . . . And nothing in the record—from the type and manner of questions asked to the State's use of its strikes—indicates that the State treated women disparately." *See White*, 179 So. 3d at 202.

The court adopts the analysis from Part V.1.H., *supra*, and finds that the ACCA's decision wasn't unreasonable under either § 2254(d)(1) or § 2254(d)(2). It was reasonable for the ACCA to find that the statistical disparities and other facts that White points to fail to raise an inference of purposeful discrimination.

### 5.    Constitutionality of Alabama's capital sentencing scheme

White's next set of claims assert that Alabama's capital-sentencing statute is unconstitutional both facially and as-applied to White.

### A.    Constitutional challenge under *Hurst v. Florida*

White first asserts that the Supreme Court's invalidation of Florida's judicial override procedure in *Hurst v. Florida*, 577 U.S. 92 (2016), establishes that the trial court's override decision and Alabama's capital sentencing scheme are unconstitutional. White exhausted this claim during his Rule 32 proceedings. (*See* Doc. 10-27, pp. 1–20; Doc. 10-32, pp. 85–100; Doc. 10-35, pp. 66–80). And the ACCA rejected White's *Hurst* claim because it found that *Hurst* did not apply retroactively to cases on collateral review. *See White*, 343 So. 3d at 1190.

Since the ACCA decided White's appeal, both the United States Supreme Court and the Eleventh Circuit have confirmed that *Hurst* is not retroactively applicable to cases on collateral review. *See McKinney v. Arizona*, 589 U.S. 139, 145 (2020*); Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322, 1335–37 (11th Cir. 2019). Thus, it was not contrary to or an unreasonable application of clearly established federal law for the ACCA to find that White is not entitled to relief on his *Hurst* claim.

### B.    Evolving standards of decency challenges

White next brings three Eighth Amendment evolving standards of decency challenges to his death penalty sentence. First, White asserts that evolving standards of decency no longer tolerate judicial override. Second, White argues that he is categorically excluded from the death penalty because evolving standards of decency reject the death penalty's use on people with long-term severe mental illness. Finally, White contends that he is categorically excluded from the death penalty because the scientific community now recognizes that teenagers' brains have not matured and developed. Thus, it is cruel and unusual punishment to impose the death penalty on someone whose offense occurred when they were under 21.

White brought each of these claims in his Rule 32 proceedings. (*See* Doc. 10-27, pp. 20–64; Doc. 10-32, pp. 100–09; Doc. 10-35, pp. 80–89). But the ACCA determined that these claims were procedurally defaulted because they could have been raised at trial or on direct appeal but were not. *See White*, 343 So. 3d at 1191 (citing Ala. R. Crim. P. 32.2(a)(3) and (a)(5)). Because the ACCA rejected these claims only because of a state procedural bar, Respondent

asserts that state-law based procedural default bars the court from considering these claims on federal habeas review. *See Atkins v. Singletary*, 965 F.2d 952, 956 (11th Cir. 1992).

1. *Procedural default*: "As a general rule, a federal habeas court may not review state court decisions on federal claims that rest on state law grounds, including procedural default grounds, that are 'independent and adequate' to support the judgment." *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1335 (11th Cir. 2012). This court applies a three-part test to "determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision." *See id.* at 1335–36. "First, the last state court rendering a judgment in the case must clearly and expressly say that it is relying on state procedural rules to resolve a federal claim without reaching the merits of the claim." *Id.* at 1336. "Second, the state court decision must rest solidly on state law grounds, and may not be intertwined with an interpretation of federal law." *Id.* (quotations omitted). "Finally, the state procedural rule must be adequate; *i.e.*, it may not be applied in an arbitrary or unprecedented fashion." *Id.* "[T]o be considered adequate for purposes of the procedural default doctrine[,] . . . [t]he state court's procedural rule cannot be 'manifestly unfair' in its treatment of the petitioner's federal constitutional claim." *Id.*

The first two elements of this test are easily met. The ACCA explained that it was rejecting White's evolving standards of decency challenges because: "All the above issues could have been raised at trial or on direct appeal and are procedurally barred in this postconviction proceeding." *See White*, 343 So. 3d at 1191. Thus, the court "clearly and expressly" stated that it was relying on state procedural rules to resolve these federal claims. *See Boyd*, 697 F.3d at 1336. And the ACCA cited only Ala. R. Crim. P. 32.2(a)(3) and (a)(5) in rejecting these claims. *See White*, 343 So. 3d at 1191. So the ACCA's decision "rest[ed] solidly on state law grounds." *See Boyd*, 697 F.3d at 1336.

As for the third element, the procedural bars found in Rules 32.2(a)(3) and (a)(5) are firmly established and regularly followed by Alabama appellate courts. *See Hooks v. State*, 822 So. 2d 476, 481 (Ala. Crim. App. 2000) ("Alabama has never recognized any exceptions to the procedural default grounds contained in Rule 32, Ala. Crim. P."); *see also Brownlee*, 306 F.3d at

1065–66 (applying procedural default to claims denied under Rules 32.2(a)(3) and (a)(5)). But White asserts that it was arbitrary and manifestly unfair for the ACCA to find that these subclaims were procedurally barred because they were "centered on an evolving standard of decency which by its very nature—[is] an evolutionary one—or a scientific discovery or recognition which may not have been ripe at the time of trial or direct appeal." (*See* Doc. 61, pp. 99–100).

It cannot be that merely characterizing an Eighth Amendment claim as an evolving standards of decency claim means that state and federal rules related to procedural bars do not apply to that claim. If that were the rule, then well-established habeas principles such as the exhaustion requirement and prohibition on second or successive petitions would rarely apply to Eighth Amendment claims. White cites no authority that would support this differential treatment of claims brought under the Eighth Amendment.

Plus, this court is to "defer to the state court's findings regarding procedural default." *Ferguson v. Sec'y for Dep't of Corr.*, 580 F.3d 1183, 1193 (11th Cir. 2009). And the state court's determination that White could have brought these three subclaims during trial or on direct appeal was reasonable. White's claim that the Eighth Amendment prohibits the execution of severely mentally ill individuals relies heavily on the rationale in *Atkins v. Virginia*, 536 U.S. 304 (2002), and other Supreme Court cases decided well before White's conviction and sentence. And while White cites some recent studies and articles on severe mental illness and the death penalty, many of the studies, statistics, resolutions, and polling data presented to the state courts were available when White filed his direct appeal. (*See* Doc. 10-27, pp. 24–63). White's claim that his age at the time of Parker's murder categorically excludes him from the death penalty relies on the rationale of *Atkins* and *Roper*, which were both decided before his trial and appeal. And though White's state court filings alluded to recent scientific studies that showed that "[c]hildren's brains are not done developing until they reach their mid-20s," he did not cite those studies or explain when they were conducted. (*See id.*, pp. 63–64). So the state court did not err in finding that White could have brought his claims that his mental illness and age categorically exclude him from the death penalty either during his trial or on direct appeal.

The court recognizes that White's claim that evolving standards of decency establish that judicial override violates the Eighth Amendment is based on the fact that following *Hurst* (which was decided after White's direct appeal was finalized) Alabama was the only state that allowed a judge to be the one to weigh the aggravating and mitigating circumstances in capital cases. But as discussed, *Hurst* is not retroactive. *See McKinney*, 589 U.S. at 145. And even pre-*Hurst*, only 3 states allowed for judicial override. Thus, the court cannot say that it was manifestly unfair for the state courts to find that White could have brought his evolving standards of decency challenge to judicial override during his trial or direct appeal. As a result, state-barred procedural default applies to all three of the evolving standards of decency challenges brought in White's original Rule 32 petition.

2. *Cause*: To overcome procedural default, White must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).[4] A petitioner may establish cause when "a constitutional claim is so novel that its legal basis is not reasonably available to counsel." *Reed v. Ross*, 468 U.S. 1, 16 (1984). But White's evolving standards of decency claims ask the court to disregard binding Eighth Amendment precedent regarding capital punishment and rule that national trends prohibit capital punishment for individuals who were sentenced to death by a judge, suffer from a severe mental illness, or were under the age of 21 at the time of their offense. And many of the cases, studies, and other developments that White uses to support these claims existed at the time of White's trial and direct appeal. "Lower courts are bound by precedent," so "a district court cannot ignore binding precedent to generate constitutional cause to excuse procedural default." *Sneed v. Raybon*, 2022 WL 3974490, at *17 (N.D. Ala. Aug. 31, 2022). The court thus finds that White hasn't shown cause for his procedural default.

3. *Prejudice*: White also hasn't established prejudice, which requires White to identify a constitutional claim capable of "creat[ing] a reasonable

---

[4] As explained in Part V.1.J., the court will address whether White is actually innocent of the death penalty, and thus it would be a fundamental miscarriage of justice for the court to refuse to consider his defaulted claims, only after the court has addressed each of White's arguments in favor of vacating his sentence of death. *See Dretke*, 541 U.S. at 393–94.

probability that the result of his [penalty phase] would have been different"
*Mincey v. Head*, 206 F.3d 1106, 1138 (11th Cir. 2000) (cleaned up). To be
certain, even if the court were to excuse White's procedural default and review
his evolving standards of decency claims de novo, the court would reject those
claims on the merits.

White's claim that Alabama's judicial override provision violated the
Eighth Amendment conflicts with the Supreme Court's decision in *Harris*. *See*
513 U.S. at 515. And even after *Hurst* the Supreme Court has held that the
Constitution does "not require jury weighing of aggravating and mitigating
circumstances." *McKinney*, 589 U.S. 145. Thus, death sentences under
Alabama's judicial override provision have continued to be upheld as long as
"the sentencing jury made the necessary death-eligible finding." *See Miller v.
Comm'r, Ala. Dep't of Corr.*, 826 F. App'x 743, 749–50 (11th Cir. 2020). Here,
the jury made that finding when it unanimously found White guilty of
committing murder during a rape and burglary.

Plus, the court rejects White's argument that the repeal of judicial
override in Florida and Delaware shows that evolving standards of decency no
longer tolerate imposition of the death penalty on someone sentenced to death
by a judge. As discussed, the Supreme Court has held that "the States that
leave the ultimate life-or-death decision to the judge may continue to do so."
*McKinney*, 589 U.S. at 145. And while Delaware has applied its repeal of
judicial override retroactively, *see Powell v. Delaware*, 153 A.3d 69, 76 (Del.
2016), Florida does not apply *Hurst* retroactively to defendants whose death
sentences were final when the Supreme Court decided *Ring*, *see Hitchcock v.
State*, 226 So. 3d 216, 217 (Fla. 2017). Thus, the developments that White
points to do not prevent imposing the death penalty on an individual sentenced
under Alabama's former practice of judicial weighing and override.

Individuals who suffer from the mental impairments that White suffers
from are also not categorically excluded from the death penalty. In *Atkins v.
Virginia*, the Supreme Court held that the Eighth Amendment prohibits the
execution of the intellectually disabled. *See* 536 U.S. at 321. *Atkins* did not
address whether the death penalty may be imposed on the severely mentally
ill. But the Supreme Court has addressed imposition of the death penalty on
individuals suffering from mental disorders in *Ford v. Wainwright*, 477 U.S.

399 (1986), and *Panetti v. Quarterman*, 551 U.S. 930 (2007). Under those cases, the Eighth Amendment forbids the execution of a prisoner whose mental illness prevents him from having "a rational understanding of the reason for [his] execution." *Panetti*, 551 U.S. at 958. But "[t]he mental state requisite for competence to suffer capital punishment neither presumes nor requires a person who would be considered 'normal' or even 'rational,' in a layperson's understanding of those terms." *Id.* at 959. Thus, nothing in *Atkins*, *Ford*, or *Panetti* "bars states from executing those who are mentally ill." *See Rockwell v. Davis*, 853 F.3d 758, 763 & n.14 (5th Cir. 2017). In fact, binding precedent provides that "sans a decision from the Supreme Court barring the execution of mentally ill prisoners," this court is to reject habeas claims that assert that "*Atkins* applies equally to persons who are unable to control their conduct due to mental illness." *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1370 (11th Cir. 2009) (quotations omitted).

Rather than apply *Atkins*' rationale to categorically exclude imposition of the death penalty on the severely mentally ill, the Supreme Court has continued to hold that it is only when a prisoner's mental illness makes his "concept of reality . . . so impair[ed] that he cannot grasp the execution's meaning or purpose or the link between [his] crime and punishment" that the Eighth Amendment forbids execution. *See Madison v. Alabama*, 586 U.S. 265, 269 (2019) (quotations omitted). And the lower courts have continued to reject claims that the severely mentally ill are like the intellectually disabled and juvenile offenders and are thus ineligible for the death penalty. *See, e.g.*, *Smith v. Davis*, 927 F.3d 313, 339 (5th Cir. 2019); *Shanklin*, 2024 WL 1321152, at *70–71; *Gill v. Sec'y, Fla. Dep't of Corr.*, 2022 WL 9348538, at *32 (M.D. Fla. Oct. 14, 2022). As a result, White's argument that his mental illnesses categorically exclude him from death penalty eligibility fails.

White's argument that his age at the time of the offense categorically excludes him from the death penalty also fails. In *Roper*, the Supreme Court held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." 543 U.S. at 578. In reaching this conclusion, the court recognized that "[d]rawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules," because the "qualities that distinguish juveniles from adults do not disappear when an individual

turns 18." *See id.* at 574. The Court nonetheless found that "a line must be drawn" and because "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood[,] [i]t is . . . the age at which the line for death eligibility ought to rest." *See id.*

The Eleventh Circuit has held that this language at least suggests that the Eighth Amendment allows imposition of the death penalty on young adults who assert that their mental and emotional age at the time of their offenses were under 18. *See Melton v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1234, 1237 (11th Cir. 2015). Other circuits have gone further. For example, the Fourth Circuit has held that lower courts "have no authority to hold that executing those who are older than 18 violates the Eighth Amendment . . . because . . . whether a change to *Roper* should occur is for the Supreme Court to say." *United States v. Roof*, 10 F.4th 314, 379 (4th Cir. 2021) (cleaned up). This court agrees that it is for the Supreme Court, not this court, to decide whether to extend *Roper* to young adults who are over the age of 18.

In sum, White has failed to establish a possibility, much less a reasonable probability, that these three evolving standards of decency challenges to his death sentence would have changed the outcome of his penalty phase. Thus, White has not established that cause and prejudice overcome the state-barred procedural default that applies to these claims.

### 6.    Judicial override repeal + evolving standards of decency

White's final claim is that Alabama's statutory repeal of judicial override establishes that evolving standards of decency no longer tolerate imposition of the death penalty on someone, like White, who was sentenced to death by a judge. As explained, around the time the circuit court dismissed White's original Rule 32 petition, the Alabama Legislature repealed judicial override for all capital murder defendants charged after April 11, 2017. *See* Ala. Code § 13A-5-47.1. White responded by filing a second Rule 32 petition that asserted two claims for relief based on this new legislative enactment: (a) evolving standards of decency under the Eighth and Fourteenth Amendments now bar imposing a death sentence through judicial override, and (b) the repeal of judicial override constitutes a new substantive rule of criminal procedure that should be applied retroactively. (*See* Doc. 54-1, pp. 28–43; Doc. 54-3, pp. 14–25;

Doc. 54-4, pp. 7–10). The only claim at issue in White's federal habeas petition is whether evolving standards of decency no longer permit a death sentence when the jury has determined that a life sentence was warranted. (*See* Doc. 56, pp. 212–26).

## A.   Standard of Review

The parties dispute what standard of review the court should apply to this claim. First, Respondent asserts that Alabama's statutory repeal of judicial override is a state-law matter that shouldn't be considered by this court on federal habeas review. (See Doc. 60, p. 30). But the substance of White's claim is that just as changes in the states' capital sentencing schemes led to the Supreme Court's decisions in *Atkins* and *Roper*, the states' now unanimous rejection of judicial override should lead to the conclusion that judicial override violates the Eighth Amendment. Thus, the court rejects Respondent's argument that White's claim doesn't allege a "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2255(a).

Second, White asserts that the court should review the merits of his evolving standards of decency claim de novo because the ACCA overlooked this claim and did not adjudicate the claim on the merits. "When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). "To determine whether the presumption has been rebutted," this court looks "to the state court's decision and the record in the case to determine whether the evidence leads very clearly to the conclusion that [the] federal claim was inadvertently overlooked in state court." *Childers v. Floyd*, 736 F.3d 1331, 1334 (11th Cir. 2013) (en banc) (footnote and quotations omitted).

In dismissing White's second Rule 32 petition, the circuit court simply held that "the Court is of the opinion that no material issue of fact or law exists which would entitle Petitioner to relief." (Doc. 54-1, p. 15). The ACCA affirmed, focusing most of its analysis on whether the Alabama Legislature's repeal of judicial override should be applied retroactively under the retroactivity framework established by the United States Supreme Court in *Teague v. Lane*,

489 U.S. 288 (1989). (*See* Doc. 54-3, pp. 70–73). But in explaining White's argument, the ACCA also quoted this portion of the evolving standards of decency section of White's brief: "[b]y repealing judicial override and creating a unanimous national consensus that judicial override is no longer tolerated in modern society, Alabama created a new substantive rule of constitutional law under the Eighth Amendment." (*See id.*, p. 70 (quoting *id.*, p. 18)). The ACCA also held that:

> [C]ontrary to White's contention, the amended statutes are not a "new substantive rule of constitutional law." Neither the United States Supreme Court, the Alabama Supreme Court, nor this Court has ever held that there is a constitutional requirement that a jury render the final sentencing verdict in a capital-murder trial. See State v. Mitchell, 377 So. 3d 94, 125 (Ala. Crim. App. 2022) (noting that "Alabama's capital-sentencing scheme, including judicial override, [is] constitutional"). Thus, the amended statutes represent nothing more than the Legislature's decision to accord the jury the final sentencing verdict in a capital-murder trial. That decision might have been, as White suggests, based on the Legislature's desire to align Alabama's capital-sentencing scheme with the rest of the country, but it was not a decision that was mandated by either the United States Constitution or the Alabama Constitution.

(*Id.*, pp. 72–73). The Alabama Supreme Court denied White's petition for writ of certiorari without a written opinion. (Doc. 54-4, p. 25).

Having reviewed the record and the ACCA's ruling, the court is not "very clearly" led to the conclusion that the ACCA overlooked White's evolving standards of decency claim. *See Childers*, 736 F.3d at 1334. While the ACCA did not use the phrase "evolving standards of decency" in evaluating White's claims, it did hold that the U.S. Constitution did not require that "a jury render the final sentencing verdict in a capital-murder trial." (Doc. 54-3, pp. 72–73). And although White's cert petition asserted that the ACCA "ignored that the abolition of judicial override . . . signifies the type of evolving standards of decency that warrants Mr. White relief," he notably did not argue in either his

application for rehearing with the ACCA or cert petition that the ACCA overlooked his claim that judicial override now violates the Eighth Amendment. (*See* Doc. 54-3, p. 61; Doc. 54-4, pp. 7–8). Thus, White's litigation strategy also supports finding that it is unlikely that the ACCA overlooked White's Eighth Amendment claim. *See Johnson*, 568 U.S. at 306.

The court will therefore apply AEDPA deference to White's claim that Alabama's repeal of judicial override means that evolving standards of decency do not permit a death sentence when the jury recommended life without parole.

### B.    Merits

The ACCA's rejection of White's evolving standards of decency claim based on Alabama's repeal of judicial override was not unreasonable under either § 2254(d)(1) or (d)(2). First, *Harris* rejected an Eighth Amendment challenge to Alabama's judicial override provision. *See* 513 U.S. at 515. And because *Harris* "remains binding precedent," lower courts "cannot hold that Alabama's use of an advisory jury to recommend punishment in [Mr. White's] case was unconstitutional." *See Miller*, 826 F. App'x at 749.

Second, in repealing judicial override, the Alabama Legislature made clear that this amendment to Alabama's capital sentencing scheme "shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to April 11, 2017." *See* Ala. Code § 13A-5-47.1. This non-retroactivity provision is consistent with the Supreme Court's determination that "*Ring* and *Hurst* do not apply retroactively on collateral review." *McKinney*, 589 U.S. at 145. So it appears that there is no national consensus that it is cruel or unusual to impose the death penalty on someone sentenced under a judicial override provision that has since been repealed. Thus, it was not contrary to or an unreasonable application of federal law for the ACCA to reject White's evolving standards of decency claim related to Alabama's repeal of judicial ride.

Nor could the court grant White habeas relief even if the court agreed with White's argument that this claim should be reviewed de novo. Like the ACCA, this court is bound by *Harris*'s holding that Alabama's former judicial override provision did not violate the Eighth Amendment. *See Hohn v. United States*, 524 U.S. 236, 252–53 (1998). So even if "it is unclear whether AEDPA

deference applies," the court finds that this claim must be rejected. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

### 7.    Actual Innocence

The court has now addressed all nondefaulted claims that White's death sentence should be vacated and the grounds other than actual innocence that White says excuse his procedural default for any claims that the court finds defaulted. Thus, the court must now decide whether White has adequately alleged that he is actually innocent of the death penalty. *See Dretke*, 541 U.S. at 393–94. "[T]he actual innocence exception applies to constitutional errors in capital sentencing only when the constitutional error resulted in the petitioner becoming statutorily eligible for a death sentence that could not otherwise have been imposed." *Magwood v. Warden, Ala. Dep't of Corr.*, 664 F.3d 1340, 1346–47 (11th Cir. 2011).

White makes three arguments for why the court should find him actually innocent of a death sentence. First, White points out that under *Ford* an individual with mental impairments equivalent to insanity cannot be subjected to the death penalty. Second, White asserts his cognitive impairments are equivalent to an intellectual disability and thus he is ineligible for the death penalty. Finally, White argues that because his mental age at the time of his offense was less than 18, he is death penalty ineligible.

The court rejects each of these arguments. The court has carefully reviewed the record and sees no evidence that White's mental impairments prevent him from having "a rational understanding of the reason for [his] execution," *Panetti*, 551 U.S. at 958, which is what's required to satisfy *Ford*. Plus, "a *Ford* claim does not become ripe until a date is set for the prisoner's execution." *Bowles v. Sec'y, Fla. Dep't of Corr.*, 935 F.3d 1176, 1181 (11th Cir. 2019); *see also Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1260 (11th Cir. 2009) ("Mental competency to be executed is measured at the time of execution, not years before then. A claim that a death row inmate is not mentally competent means nothing unless the time for execution is drawing nigh."). And White's execution date has not yet been set. As White's evidentiary submissions show, he is also not intellectually disabled. (*See, e.g.*, Doc. 56-1, pp. 128, 133, 160, 246–47). And the Eleventh Circuit has rejected White's

argument that those with impairments functionally equivalent to an intellectual disability are ineligible for the death penalty under *Atkins*. *See Carroll*, 574 F.3d at 1368–69. Finally, after recognizing that the "qualities that distinguish juveniles from adults do not disappear when an individual turns 18," the Supreme Court stated in *Roper* that the age of 18 "is . . . the age at which the line for death eligibility ought to rest." *See Roper*, 543 U.S. at 574. And White was 19 at the time of Parker's murder. Thus, though White contends that his mental age was less than 18, that does not make him ineligible for the death penalty. *See Melton*, 778 F.3d at 1237 (noting that the Supreme Court of Florida was likely correct to reject claim that the petitioner was death penalty ineligible because he asserted his mental and emotional age at the time of his offense was younger than 18).

In short, White has not shown that he is actually innocent of the death penalty. So failure to consider the penalty phase claims that White has procedurally defaulted will not result in a miscarriage of justice. The court will thus deny White's procedurally defaulted claims without considering their merit.

# VI.

## EVIDENTIARY HEARING + DISCOVERY

White seeks an evidentiary hearing and to conduct discovery on his habeas claims. (*See* Doc. 56, p. 227). Rule 8(a) of the Rules Governing Section 2254 Cases provides that "[i]f the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rule 7 allows a habeas court to "direct the parties to expand the record by submitting additional materials relating to the petition." Under Rule 6(a), a habeas court "may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure." "A party requesting discovery must provide reasons for the request." Rule 6(b), Rules Governing Section 2254 Cases.

If a petitioner was diligent in state court, "a federal court must consider whether [an evidentiary] hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to

federal habeas relief." *Ledford*, 975 F.3d at 1163. But a non-diligent petitioner "must satisfy the conditions of § 2254(e)(2)" to obtain an evidentiary hearing. *See id.* "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Boyd v. Allen*, 592 F.3d 1274, 1304 (11th Cir. 2010); *see also Cullen*, 563 U.S. at 182, 184 ("[l]imiting § 2254(d)(1) review to the state-court record" and precluding "evidence later introduced in federal court [a]s irrelevant" to the habeas analysis).

White specifically requests an evidentiary hearing on these three topics: (1) his penalty phase ineffective assistance of counsel claims; (2) his assertion that he is actually innocent of the death penalty; and (3) his claim that the State's use of peremptory strikes violated *J.E.B. v. Alabama.* (Doc. 61, pp. 64–70, 95). He also generally contends that the state courts' dismissal of his Rule 32 petitions at the pleading stage was contrary to and an unreasonable application of Supreme Court precedent and thus an evidentiary hearing is warranted for each of his claims. (*See id.*, p. 23; Doc. 56, p. 227).

White is not entitled to an evidentiary hearing on the penalty phase ineffective assistance of counsel claims that he has procedurally defaulted because his allegations fail to suggest that "an evidentiary hearing could allow [White] to overcome procedural default." *Ledford*, 975 F.3d at 1164. And he is not entitled to an evidentiary hearing on the penalty phase ineffective assistance of counsel claims that were exhausted because the facts alleged in those subclaims "are either refuted by the record or do not demonstrate that [counsel] provided ineffective assistance." *See Martinez v. Sec'y, Fla., Dep't of Corr.*, 684 F. App'x 915, 926 (11th Cir. 2017). Nor has White made "a threshold showing of actual innocence to warrant a hearing." *Sibley v. Culliver*, 377 F.3d 1196, 1206 (11th Cir. 2004). As for White's other claims, including his claim brought under *J.E.B. v. Alabama,* "[a] district court is not required to hold an evidentiary hearing if the claims are merely conclusory allegations unsupported by specifics or if the record refutes the applicant's factual allegations or otherwise precludes habeas relief." *See Allen v. Sec'y, Fla. Dep't of Corr.,* 611 F.3d 740, 745 (11th Cir. 2010) (quotations and citations omitted). The court thus finds that having discovery and holding an evidentiary hearing is unwarranted here.

## VII.

## CONCLUSION

For these reasons, the court **DENIES** White's § 2254 petition for a writ of habeas corpus (doc. 56) and will not hold an evidentiary hearing.

Rule 11(a) of the Rules Governing Section 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further," *Miller-El*, 537 U.S. at 336 (internal quotations omitted). The court finds that White's claims satisfy neither standard. So the court will not grant White a certificate of appealability.

The court will enter a separate final order that closes this case.

**Done** and **Ordered** on September 29, 2025.

_____

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE

121